UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

INTERNATIONAL STRATEGIES GROUP, LTD.

Plaintiff

MAGISTRATE JUDGE

v.

CIVIL ACTION NO. 5870

GREENBERG TRAURIG, LLP., A. JOHN
PAPPALARDO, AND ECKERT, SEAMANS,
CHERIN AND MELLOTT, LLC.,

Defendants.

AMOUNT $
SUMMONS ISSUED
LOCAL RULE 4.1
WAIVER FORM
MCF ISSUED
BY DPTY. CLK.
DATE

**COMPLAINT AND DEMAND FOR TRIAL BY JURY**

**Nature of the Action**

1.      This is an action for professional malpractice, breach of fiduciary duty,

breach of express and implied contract, conversion/restitution and unfair or deceptive

business practices within the meaning of M.G.L. 93A, §§ 2, 11.

**Jurisdiction and Venue**

2.      This Court has jurisdiction over this action under 18 U.S.C. § 1332

because it is an action between citizens of different nations and the amount in controversy

exceeds $75,000, exclusive of interest and costs.

3.      Venue in this district is proper under 28 U.S.C. §1391 (a)(2).

**The Parties**

4.      Plaintiff International Strategies Group, Ltd. ("ISG") is a corporation

incorporated and existing under the laws of Tortola, British Virgin Islands, with a

principal place of business in Hong Kong.

5.    Defendant A. John Pappalardo ("Pappalardo") is an attorney licensed to practice law in the Commonwealth of Massachusetts. Upon information and belief, Pappalardo currently is a co-managing shareholder at the law firm Greenberg Traurig, LLP, One International Place, Boston, MA. Upon information and belief, between at least August 1, 1999, and March 11, 2001, Pappalardo was a shareholder at the law firm, Eckert Seamans Cherin & Mellott, LLC.

6.    Greenberg Traurig, LLP ("Greenberg Traurig"), a law firm with a place of business at One International Place, Boston, MA, is a limited liability partnership organized under the laws of the State of New York.

7.    Eckert Seamans Cherin & Mellott, LLC ("Eckert Seamans"), a law firm with a place of business at One International Place, Boston, MA, is a limited liability company organized to do business under the laws of the Commonwealth of Pennsylvania.

### General Allegations Applicable to All Counts

#### *Unlawful Transfers of ISG Funds Made by Clients of Eckert Seamans and Greenberg Traurig*

8.    Upon information and belief, since at least 1992 and continuing thereafter, attorneys at Eckert Seamans, through its offices in Massachusetts, performed legal work for the Corporation of the Bankhouse, a/k/a Societe Bankhouse (collectively these two entities are referred to hereinafter as "COB"), the principals of COB, including James Pomeroy II ("Pomeroy") and Stephen C. Heffernan, and successor COB entities including, but not limited to, S B Global Incorporated. ("SBG"). COB's principal place of business was, at all relevant times, at 50 Rowes Wharf, in Boston, MA; SBG's principal place of business was, at all relevant times, 30 Rowes Wharf, in Boston, MA.

2

9.    On or about April 22, 1998, COB entered into a Funds Management Agreement and Syndicate Agreement with ISG in which ISG agreed to invest with COB, and COB agreed to manage, the sum of four million dollars ($4,000,000) transferred by ISG to COB. (Hereinafter, ISG's investment of $4 million is sometimes referred to as "ISG's Investment"). The Funds Management Agreement required COB to arrange for the transfer of ISG's Investment to its trading bank against that bank's undertaking of non-depletion of ISG's Investment.

10.    Investment monies procured by COB, including ISG's Investment, were deposited into three "sub-accounts," all at Abn Amro in Brussels, Belgium ("Abn Amro"). On May 15, 1998, ISG's Investment initially was deposited into a separate account under the name COB Syndicate 165. COB approached ISG about transferring ISG's Investment into a so-called master account, and promised that none of the prior undertakings would be affected by the transfer. On May 29, 1998, ISG's Investment was transferred into COB's primary account at Abn Amro.

11.    Upon information and belief, later in the day on May 29, 1998, without ISG's knowledge or consent, and in flagrant violation of Funds Management Agreement and the Syndicate Agreement and COB's express promises to ISG, $821,500 of ISG's Investment was transferred to Eckert Seamans' account at Mellon Bank in Pittsburgh, and $328,500 of ISG's Investment was transferred to a COB account at Fleet Bank in Boston. Both transfers were, upon information and belief, directed by COB. ISG did not know of, or authorize in any way, these transfers made in violation of its agreements with COB. In fact, after the transfers took place, ISG was assured repeatedly by COB that its

3

$4 million was safe, had not been depleted, and in fact had increased by as much as fifty percent (50%) to $6 million.

12.    On or before November 4, 1998, after a series of additional Ponzi scheme like transfers of funds, all without ISG's knowledge or consent, including a transfer of $ 4 million from an unnamed account to COB's account at Fleet Bank in Boston, which COB then represented to ISG to be ISG's Investment to ISG, COB had amassed $19 million. The $19 million included $5 million from an investor known as PRCS Ltd ("PRCS"), a nominee of a Dutch company, Royal Phillips Electronics; $10 million from an investor known as Danstrupland Holdings A/S, a subsidiary of St. Frederikslund Holdings, A/S in Denmark ("St. Frederikslund"), and the $4 million consistently represented to ISG by COB as ISG's Investment. COB then transferred the $19 million, without the knowledge or consent of ISG or, upon information and belief, of either of the other investors, to an entity called Swan Trust, of which a Henry Pearlberg ("Pearlberg") was a trustee. ISG was not aware of the transfer to either Swan Trust or Pearlberg at the time of the transfer.

13.    Just prior to, and in anticipation of the transfer, on October 31, 1998, without informing ISG of the arrangements with Pearlberg and Swan Trust, COB induced ISG to accept, in place of the original Funds Management Agreement and Syndicate Agreement, a "Cash Flow Promissory Note" in which COB promised to pay ISG $9 million upon certain conditions. COB induced ISG to accept this arrangement by means of misrepresentations, including misrepresentations that ISG's Investment was secure and had accrued $2 million in profit, which had been reinvested by COB. Eckert Seamans may have prepared or reviewed a draft of the Cash Flow Promissory Note.

4

14.    On or about February 5, 1999, and again without ISG's knowledge or consent, Pearlberg caused syndicate funds of $16.7 million to be deposited into an account of First Merchant Bank ("FMB"), an entity operating out of the Turkish Republic of Northern Cyprus, diverting the funds into three separate accounts for the benefit of a C. Joan Patrick, an independent broker working with the May Davis Group.

15.    Upon information and belief, commencing in February, 1999, after they transferred funds to Pearlberg, and after they repeatedly assured ISG that ISG's Investment was in tact, and even earning profits, COB and Pomeroy sought information from Pearlberg about the status of the "investment" they had made with Swan Trust. As a result of those inquiries, on April 29, 1999 Pearlberg executed a "Deed of Assignment" assigning to Pomeroy all right, title and interest in various contracts and in FMB's bank accounts and credit facility at Abn Amro. Later, on July 6, 1999 Pearlberg, by letter to FMB, assigned to Pomeroy all right, title and interest in a bank account in the name of Pearlberg and/or Swan Trust at FMB. None of these transactions was disclosed to ISG at the time of its making.

16.    On July 26, 1999, with Eckert Seamans knowledge, Pomeroy received $1,215,000 from FMB's account at Abn Amro in New York pursuant to the Deed of Assignment. Although any funds received by Pomeroy should have been distributed to the three investors whose funds were transferred to Pearlberg by COB, Pomeroy kept all the funds, which, upon information and belief, he later dissipated. Upon information and belief, Pomeroy received a total of approximately $1.8 million from Pearlberg, which he has dissipated.

5

17.    ISG was not aware of the transfer of funds to Pomeroy at the time of the transfer or of his application of such funds for his personal use.

### *Pappalardo's Representation of ISG*

18.    Upon information and belief, on or before August 11, 1999, Stephen Burr ("Burr"), COB's corporate counsel who had represented COB and Pomeroy while at Eckert Seamans and then continued to do so upon switching affiliation to Greenberg Traurig as of August 11, 1999, and Pappalardo, then at Eckert Seamans, met with Pomeroy for the purpose of representing him (i) in connection with investigations by government agencies of funds depleted at Abn Amro and (ii) in connection with potential legal action to recover the $19 million held by COB for investors, including ISG, which had been transferred to Swan Trust and then depleted. Burr and/or Pappalardo had been involved with Pomeroy and COB in regard to the depleted $19 million as early as July 20, 1999, when a subpoena issued to COB in connection with a federal grand jury investigation relating to the transfer of funds to Pearlberg and even earlier.

19.    On August 12, 1999, Burr sent a demand letter, on Greenberg Traurig stationery, on behalf of COB to Swan Trust and May Davis, stating that the firm had been retained by COB and related entities to recover $19 million and instructed "to take all necessary actions to protect our client's rights in connection therewith." A copy of the letter later was sent to ISG for the purpose of demonstrating to ISG that Greenberg Traurig was taking action to represent ISG's interests and for the further purpose of inducing ISG to forbear from independent action against, among others, COB, Pomeroy, or May Davis, Swan Trust, Pearlberg or the banking institutions involved..

20.     Pomeroy introduced Pappalardo to Philip Clark ("Clark"), a director of ISG and asked that Clark meet with Pappalardo directly. In the course of a meeting in early August, 1999, Pappalardo represented to Clark that COB and Pomeroy were victims of fraud and urged ISG's forbearance and cooperation in a joint recovery effort.

21.     On August 20, 1999, Pappalardo wrote directly to Clark, thanking him for taking the time to meet with him and representing to Clark that unspecified "federal authorities" investigating the theft of the funds believed COB to be a victim of misrepresentations and fraud related to the depletion of assets by Swan Trust.

22.     On August 23, 1999, Burr wrote a letter to Pomeroy, a copy of which was also sent to Pappalardo, reiterating that, "our advice to you has always been and continues to be that it is absolutely essential that Bankhouse [COB] take immediate legal action against those persons and organizations involved." In the letter, Burr advised his client that "pleadings and any appropriate motions for immediate freezing of assets will need to be prepared." Burr acknowledged that a negotiated business resolution would not be inconsistent with litigation but stated, emphatically, "taking the necessary legal steps should happen concurrently." Burr advised that "[m]any times taking legal steps will help force a business resolution." Burr concluded, "in these circumstances it is absolutely essential that Bank House [sic] take the necessary legal steps immediately."

23.     Upon information and belief, Pappalardo agreed with the advice of Burr and Greenberg Traurig that legal action, including but not limited to the freezing of assets, was absolutely essential and had to be taken immediately to ensure that the $19 million could be recovered. Upon information and belief, Burr was referring to

Pappalardo and the meeting he and Pappalardo had with Pomeroy when he described "our advice" with Pomeroy.

24.     The advice of Burr, Greenberg Traurig and Pappalardo that legal steps, including the freezing of assets, had to be taken simultaneously with any negotiation, never was shared with ISG. ISG in fact did not learn of the August 23, 1999, letter and counsel's opinion that immediately legal action was required until 2003, when a federal district court judge, over the objection of Pappalardo, compelled its production in an action filed in March 2002 by ISG against COB, Pomeroy and SBG, ordered Pappalardo to produce the contents of his file.

25.     Between August 23, 1999, and October 22, 1999, representatives of COB, whom Pappalardo and Burr were then representing COB at their respective law firms, contacted Clark and Chris Barber ("Barber"), another director of ISG, to prevail upon them to take no action against COB, Pomeroy or their affiliates, and again characterizing COB, Pomeroy and their related entities as victims Upon information and belief, the representations made by COB and Pomeroy to ISG at this time were known, approved, and directed by Pappalardo.

26.     On October 22, 1999, Pappalardo wrote to Barber of ISG assuring him that he was taking steps "to protect your [i.e., ISG's] interest, including preparing a civil fraud case on behalf of COB against US based parties involved in the alleged fraud." Pappalardo also assured Barber that he had retained "recovery specialists" to help recover the funds. In the letter, while assuring Barber that all necessary actions were being taken, Pappalardo stated that he could not share the specifics of the recovery process because of

confidentiality agreements "integral to the matters involved." ISG reasonably relied on Pappalardo that he would be representing their interests.

27.    Direct communications between Pappalardo and ISG continued thereafter, with Pappalardo assuring ISG that he was representing its interests, and giving ISG minimal details of the specific recovery efforts while at the same time emphasizing the need for forbearance, cooperation and secrecy. ISG believed Pappalardo was representing its interest and reasonably relied on his representation. ISG's reliance was based upon Pappalardo's written and oral representations as to the progress of the recovery and, most importantly, upon Pappalardo's representations that such matters were within his specialized knowledge and vast expertise as private counsel, a former Assistant District Attorney, former Assistant United States Attorney and Deputy Attorney General.

28.    On May 9, 2000, Pappalardo wrote to ISG again, inviting ISG to meet with a consultant, "Vladimir," whom he represented to be a recovery specialist retained by COB.

29.    On June 1, 2000, Pappalardo sent ISG a draft "action plan," prepared by Vladimir. Pappalardo sought ISG's comments on the plan in order that "we can begin implementation." The action plan, which Pappalardo ratified, contemplated that ISG and other investors and COB would act as one "team" and that "John [Pappalardo] represents this team." Based upon Pappalardo's recommendation, ISG agreed to the action plan and to Pappalardo representing the team.

30.    On June 22, 2000, Pappalardo again wrote to ISG, suggesting a meeting on June 26, between ISG and a Mr. Moshe Dayani ("Dayani"), Vladimir's associate, who

had been hired to implement the action plan previously sent to ISG by Pappalardo. However, unbeknown to ISG but known to and approved by Pappalardo, Pomeroy and Dayani agreed that Dayani's task was to meet with Clark and give him minimal information to "keep him quiet" and "more confident." It was agreed that Dayani would "make only well-filtered statements to Clark and up to some degree."

31.    On July 10, 2000, in furtherance of the action plan, Pappalardo sought from ISG and other investors, and ultimately obtained, a Power of Attorney. Upon information and belief, the Power of Attorney was drafted by Eckert Seamans. ISG signed the Power of Attorney on July 11, 2000 appointing Pappalardo as its "true, sufficient and lawful attorney" and authorizing him to act for ISG. In transmitting the Power of Attorney to Pappalardo, in a letter dated July 11, 2000 ("the Side Letter"), ISG expressed its understanding that it was signing the instrument on the condition that Pappalardo and Eckert Seamans would act with "utmost good faith and due care having regard to the interests of ISG" and further that "all communications concerning any matter affecting or affected by the Power of Attorney, directly and indirectly, which may concern or relate to the interests of ISG will be communicated by the attorney fully, and on a timely basis." Neither Eckert Seamans nor Pappalardo disavowed the obligations as set forth in the Side Letter and the Power of Attorney signed by ISG.

32.    Upon information and belief, another investor, St.Frederikslund signed an identical Power of Attorney appointing Pappalardo as its attorney and authorizing him to take such action necessary to recover its funds.

33.    At no time, either before, during or after the procurement of the Powers of Attorney, did Pappalardo explain the implications of his common representation of the

10

investors, COB and Pomeroy, and the risks involved with such joint representation. Indeed, all actions taken by Pappalardo and by COB and Pomeroy were designed to induce forbearance, continue to portray COB and Pomeroy as victims and describe only the advantages, but not the risks, of joint representation. No conflict of interest waivers ever were secured by Pappalardo, Eckert Seamans or Greenberg Traurig.

34.    In or about August, 2000, Burr incorporated SBG, in which Pomeroy and St. Frederikslund were partners. Burr was listed as clerk of the corporation. Upon information and belief, SBG was, in effect, the successor corporation to COB and used primarily as a vehicle to protect funds against attachments by creditors of COB, including, potentially, ISG. The directors of SBG were Pomeroy and Jens Kristiansen, a managing director of St. Frederikslund. Greenberg Traurig represented SBG, including the interests of its managing directors, and its partners and, accordingly, the firm's interests, and those of its clients, SBG, COB, Pomeroy, and St. Frederikslund, became increasingly adverse to ISG's.

35.    Upon information and belief, COB was effectively insolvent at the time SBG was formed. As a result, upon information and belief, Greenberg Traurig and Pappalardo, concerned about outstanding fees, shifted their loyalties toward SBG, now a viable successor to COB, and toward the interests of St. Frederikslund, the venture partner who supplied the capital to SBG and was responsible, directly and indirectly, for paying COB's outstanding counsel fees to Pappalardo and Greenberg Traurig.

36.    Upon information and belief, beginning in and about October 2000, shortly after the incorporation of SBG, St. Frederikslund transferred at least $1.8 million to SBG, most of which was then transferred to COB as an "intra-company" payment.

Further, upon information and belief, on December 15, and December 22, respectively, COB, by this time insolvent, used the transferred funds to pay $250,000 to Greenberg Traurig, $100,000 to Eckert Seamans and $1 million to COB as a "management fee." Upon information and belief, St. Frederikslund may have paid other legal bills of Greenberg Traurig and Pappalardo directly.

37.     In and around the time of the intra-company transfers between SBG and COB, Pappalardo informed ISG that SBG was capable of paying the ISG claim and would likely do so, if that became the only option.  He also represented that COB held a 15% share in SBG partly for the reason that SBG should not be seen to be a vehicle set up to avoid COB creditors.  However, in an internal memorandum later prepared by an associate of Pappalardo' s in 2001 based primarily on the facts as relayed by Pappalardo, it became clear that SBG was the successor corporation to COB upon COB's insolvency.

38.     In December 2000 Pappalardo had meetings in London with the chairman of FMB, its representative Hakki Yaman Namli, who since has been indicted, and FMB's lawyers.  Upon information and belief, Pappalardo apparently accepted the representations made by FMB at the meeting to the effect that the syndicate's funds had been misappropriated by Henry Pearlberg, and made no further inquiry as to potential liability of FMB or Abn Amro, both of which could have been sued in the United States and both of whom, upon information and belief, violated banking regulations in connection with the transfer of ISG's funds.

39.     On February 22, 2001, Pappalardo again wrote to ISG purporting to give ISG an update on current recovery efforts and describing "positive developments" that "could result in the return of monies."  Pappalardo acknowledged his advice to COB

that, "ISG should be paid forthwith consistent with its [COB's] fiduciary duty it has to

ISG as an investor in Swan Trust." He added that COB was "reviewing its legal options

through outside counsel by way of civil suit against both individuals and institutions."

40.    Effective March 12, 2001, Pappalardo joined Greenberg Traurig.

41.    Upon information and belief, St. Frederikslund, for its own business

reasons, instructed Pappalardo not to commence litigation. Upon information and belief,

St. Frederikslund's instructions were motivated by its desire to realize profits projected

for SBG without the cloud of litigation with which that company could become

potentially embroiled, along with concerns for its profile, internal transactions one of

more of its directors wished to shield from shareholders and the potential for adverse

publicity in Denmark. Whether the decision to forgo litigation was advised by

Pappalardo in the first place in light of St. Frederikslund's stated business concerns or

mutually agreed upon, such a decision should have been communicated to ISG pursuant

to the Power of Attorney, the Side Letter, and otherwise, but was not. To the contrary,

COB and Pappalardo led ISG to believe that appropriate steps were being taken to initiate

litigation in the United States.

42.    Pappalardo and ISG, and COB and ISG, continued to correspond directly,

regarding recovery efforts. For instance, on May 29, 2001, Pappalardo wrote, "I met for

three days last week with Henry Pearlberg, who insisted that he would make full

restitution within 7 – 10 days. Perhaps as important, he provided his entire file on the

Swan Trust's dealings with Joan Patrick including original documents such as monetary

transfers and contracts with May Davis and Joan Patrick which are valuable for

litigation." On August 15, 2001, Peter Ness, COB's in-house counsel wrote "we are

proceeding with first steps of litigation." On August 27, 2001, Pappalardo wrote to ISG, "I have had an extensive conversation with Pearlberg who has agreed to meet with you in September, I must coordinate with Chris Jones [of COB] today and I will call when that is completed." On October 2, 2001, Pappalardo wrote to ISG "Pearlberg left a voice mail for me last evening asking me to call him today because the "the deal is all set." The parties also communicated through mobile phone during this period of time.

### *Efforts of Independent Counsel to Obtain Documents From Pappalardo*

43.    In late October 2001, ISG lost confidence in Pappalardo and retained independent counsel in the United States to recover its Investment.

44.    ISG's U.S. counsel and ISG representatives tried, without success, to obtain critical documents from Pappalardo, which he had told ISG, in the course of his representation of the "team," that he had either collected, prepared or reviewed (but failed to provide) and were valuable. ISG and its counsel sought documentation from Pappalardo by telephone, e-mail and by letters dated January 4, January 25, and March 8, 2002, respectively.

45.    As of March 8, 2002, however, Pappalardo failed and refused to give to ISG the documents it needed to fully prepare its case and identify parties, known to Pappalardo, but not to ISG, responsible for the dissipation of ISG's Investment. On or about that date, Pomeroy also advised ISG that, in fact, contrary to COB's representations and to Pappalardo's previous representations that a civil fraud case was being investigated and prepared, he had not prepared any draft pleadings and that no litigation had commenced. In response to the concern raised by ISG earlier in March, 2002, as to statutes of limitations that may have lapsed during the period of Pappalardo's

14

representation, Pappalardo responded, "the statute of limitations will be an issue but creative thinking should be applied."

46.    On March 13, 2002, Pappalardo informed ISG for the first time that neither he nor his firm currently represented Pomeroy or COB.

47.    On March 22, 2002, ISG, although unable to obtain all of the documents required to identify other parties, filed, in the federal district court for the District of Massachusetts, *International Strategies Group, Ltd. v. Corporation of the Bankhouse, et al*, Civil Action No. 02-10532-RWZ ("the COB Litigation") so as to avoid any statute of limitations problems with respect to COB and Pomeroy. ISG's complaint later was amended to add SBG as a defendant.

48.    In the course of discovery in the COB Litigation, ISG subpoenaed documents from Pappalardo, who objected on the grounds of attorney client privilege. ISG moved to compel documents. In ruling on ISG's motion to compel on August 11, 2003, the court (Zobel, J) commented that "any claims of attorney/client privilege are clouded by plaintiff's power of attorney to Mr. Pappalardo."

49.    Only after receiving and reviewing thereafter the documents formerly withheld by Pappalardo on the purported ground of privilege, was ISG able to appreciate the numerous conflicts of interest of Pappalardo, Eckert Seamans and Greenberg Traurig that precluded appropriate representation of ISG's interests; the substantial missed opportunities to initiate action against responsible parties and freeze assets; the prejudice to ISG of delay, including statute of limitations problems admitted by Pappalardo; and the fact that Pappalardo and the law firms with which he was associated failed to take the

very actions they told COB and Pomeroy, on August 23, 1999, were "absolutely essential" to recovering the depleted funds.

48.    On April 26, 2004, ISG obtained judgment in the COB Litigation in the amount of $10,468,106. The court also entered findings of fact regarding defendants' willful and knowing conduct, and an order assigning to ISG all rights to the bank accounts which Swan Trust had transferred to Pomeroy in April 1999. However, that judgment appears essentially worthless as, upon information and belief, all of the defendants in that case – COB, Pomeroy, Societe Bankhouse and SBG -- have dissipated all their assets or otherwise put them out of reach of ISG.

## Count One

### Negligence -- Against All Defendants

49.    ISG repeats and realleges paragraphs 1 through 48 as though fully set forth herein.

50.    Pappalardo, Eckert Seamans and Greenberg Traurig, by virtue of their undertaking of joint representation of the "team," including ISG, owed ISG at least the duty of reasonable care to exercise the degree of care and skill of average qualified practitioners. However, inasmuch as Pappalardo, a shareholder at Eckert Seamans and then at Greenberg Traurig, represented himself to ISG and to the public as specially qualified in the investigation and prosecution of fraud, white collar crime, federal litigation and grand jury investigations, the defendants owed ISG a heightened duty of care in their actions to recover ISG's Investment.

51.    Defendants violated their duty of care to ISG.

52.    As a result of defendants' breach of their duty of care, ISG has been damaged in amount to be determined at trial, and which amount includes, without limitation, counsel fees incurred in defending motions to dismiss on statute of limitations grounds in actions filed against third parties upon ISG's retention of independent counsel, counsel fees incurred in obtaining necessary documentation from Pappalardo in the COB Litigation, counsel fees incurred in initiating third party actions, which, if pursued by Pappalardo on behalf of COB pursuant their fiduciary duties to ISG, would not have been incurred by ISG, and the loss by ISG of its ability to freeze assets and collect upon its judgment of $10,468,106 in the COB Litigation or to recover the full amount of its Investment.

### Count Two

### Breach of Fiduciary Duty – Against Pappalardo

53.    ISG repeats and realleges paragraphs 1 through 52 as though fully set forth herein.

54.    Pappalardo, under the Power of Attorney, and by undertaking to represent ISG as part of the "team" to recover ISG's investment, owed ISG a fiduciary duty whereby ISG placed trust and confidence in him to represent its interests in recovering the Investment.

55.    Pappalardo violated his fiduciary duty to ISG by, *inter alia*, (i) undertaking to represent ISG when his representation was so riddled with conflicts of interest (including the simultaneous representation ISG and individuals and entities who defrauded ISG, the fact that his law firm had received stolen funds of ISG's, and continued simultaneous representation ISG and Pomeroy and St. Frederikslund after

17

Pomeroy and St. Frederikslund formed SBG to divert funds from COB); (ii) failing to disclose the conflicts of interest and to recognize the potential need to withdraw as ISG's representative; (iii) failing to take the very actions he and his respective law firms deemed essential to successful recovery, because, upon information and belief, one of his clients did not desire such action; (iv) taking actions and refraining from taking actions when it was in the best of interest of COB, Pomeroy and SBG, but not ISG; (iv) knowingly participating in a plan of action that included intentional withholding of critical information from ISG; and (v) failing to use his best judgment in prosecuting claims on behalf of ISG that would lead to the recovery of its Investment.

56.     As a result of Pappalardo's breach of his fiduciary duty, ISG has been damaged in amount to be determined at trial, and which amount includes, without limitation, counsel fees incurred in defending motions to dismiss on statute of limitations grounds in actions filed against third parties upon ISG's retention of independent counsel, counsel fees incurred in obtaining necessary documentation from Pappalardo in the COB Litigation, counsel fees incurred in initiating third party actions, which, if pursued by Pappalardo on behalf of COB pursuant their fiduciary duties to ISG, would not have been incurred by ISG and the loss by ISG of its inability to freeze assets and collect upon its judgment of $10,468,106 in the COB Litigation and the loss its ability to recovery its Investment.

## Count Three

## Breach of Express and Implied Contract -- Against Pappalardo

57.     ISG repeats and realleges paragraphs 1 through 56 as though fully set forth herein.

18

58.    Pappalardo, under the Power of Attorney, the Side Letter and his representations to ISG on which ISG reasonably relied, entered into a express or implied contractual relationship with ISG whereby Pappalardo agreed to take all necessary steps to recover ISG's investments, to use utmost good faith and due care in protecting ISG's interest and to forward promptly "all communications concerning any matter affecting or affected by the Power of Attorney, directly and indirectly, which may concern or relate to the interests of ISG."

59.    Pappalardo violated his contract with ISG by, *inter alia*, failing to take all necessary steps to recover ISG's Investment, failing to forward communications to ISG affecting its interest and in fact withholding key information, and failing to use utmost good faith and care in protecting ISG's Investment.

60.    As a result of Pappalardo's breach of contractual obligations to ISG, ISG has been damaged in amount to be determined at trial, but which amount includes, without limitation, counsel fees incurred in defending motions to dismiss on statute of limitations grounds in actions filed against third parties upon ISG's retention of independent counsel, counsel fees incurred in obtaining necessary documentation from Pappalardo in the COB Litigation, counsel fees incurred in initiating third party actions, which, if pursued by Pappalardo on behalf of COB pursuant their fiduciary duties to ISG, would not have been incurred by ISG and the loss by ISG of its inability to freeze assets and collect upon its judgment of $10,468,106 in the COB Litigation and the loss its ability to recovery its Investment.

### Count Four

### Conversion – Against Eckert Seamans

61.    ISG repeats and realleges paragraphs 1 through 60 as though fully set forth herein.

62.    Eckert Seamans received funds stolen from ISG, which ISG did not discover until during the period that Pappalardo, while at Eckert Seamans, convinced ISG to give him a Power of Attorney and had presented ISG with the action plan.

63.    Eckert Seamans exercised dominion over such funds without right to do so and, upon information and belief, has converted such funds.

64.    ISG has a right to immediate possession of funds in the amount of $821,500, together with interest thereon, as of the date of this complaint.

### Count Six

### Violation of M.G.L. 93A – Against All Defendants

65.    ISG repeats and realleges paragraphs 1 through 64 as though fully set forth herein.

66.    The above-described actions of all defendants, including but not limited to undertaking joint representation riddled with conflicts of interest; failing to disclose the risks of joint representation; representing ISG when, in fact, a substantial amount of its misappropriated funds were, in fact, paid to defendants; participating in a plan of action that included intentional withholding of critical information from ISG; characterizing COB and Pomeroy as victims when, in fact, ISG had claims against them for fraud; incorporating an entity the very purpose of which was to hide assets of COB and then receiving payments from that new entity; making numerous promises to ISG that

recovery was imminent; allowing claims to lapse, without informing ISG, so that it later

would have to rely on "creative" arguments to avoid the statute of limitations; and failing

to take the very steps to recover ISG funds that defendants admitted, the day after

learning of the depletion of $19 million transferred from COB to Swan Trust, were

"essential" to recovery.

67.     The above-described actions occurred primarily and substantially in

Massachusetts.

68.     Defendants' conduct was willful and knowing.

69.     As a result of the foregoing, ISG is entitled to treble the amount of its

actual damages, together with attorneys' fees, interest and costs.

WHEREFORE, ISG seeks:

1.     Judgment in its favor on Count One, together with interest and costs as

allowable by law;

2.     Judgment in its favor on Count Two, together with interest and costs as

allowable by law;

3.     Judgment in its favor on Count Three, together with interest and costs as

allowable by law;

4.     Judgment in its favor on Count Four, together with interest and costs as

allowable by law;

5.     Judgment in its favor on Count Five, together with interest and costs as

allowable by law and disgorgement and restitution by Eckert Seamans Cherin and Mellott

of the stolen funds improperly transferred to Eckert Seamans Cherin and Mellott;

6.    Judgment in its favor on Count Six in treble the amount of its actual

damages, together with its attorneys fees, interest and costs as allowable by law; and

7.    Such other and further relief as is just and proper.

ISG DEMANDS A TRIAL BY JURY ON ISSUES SO TRIABLE

INVESTMENT STRATEGIES
GROUP, LTD

By its attorneys,

Jessica Block
BBO#046110
Block & Roos, LLP
60 State Street, Suite 3800
Boston, Massachusetts 02109
September 15, 2004                                (617) 223-1900

22