UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

INTERNATIONAL STRATEGIES GROUP, LTD.,

      Plaintiff

      v.

GREENBERG TRAURIG, LLP., A. JOHN
PAPPALARDO, AND ECKERT, SEAMANS,
CHERIN AND MELLOTT, LLC.,

      Defendants.

CIVIL ACTION NO.
04-CV-12000-RWZ

## AMENDED COMPLAINT AND DEMAND FOR TRIAL BY JURY

### Nature of the Action

1.      This is an action for professional malpractice/negligence, misrepresentation, breach of fiduciary duty, aiding and abetting breach of fiduciary duty and fraud, breach of express and implied contract, conversion/restitution and unfair or deceptive business practices within the meaning of M.G.L. 93A, §§ 2, 11.

### Jurisdiction and Venue

2.      This Court has jurisdiction over this action under 18 U.S.C. § 1332 because it is an action between citizens of different nations and the amount in controversy exceeds $75,000, exclusive of interest and costs.

3.      Venue in this district is proper under 28 U.S.C. §1391 (a)(2).

**The Parties**

4.     Plaintiff International Strategies Group, Ltd. ("ISG") is a corporation
incorporated and existing under the laws of Tortola, British Virgin Islands, with a
principal place of business in Hong Kong.

5.     Defendant A. John Pappalardo ("Pappalardo") is an attorney licensed to
practice law in the Commonwealth of Massachusetts.  Upon information and belief,
Pappalardo currently is a co-managing shareholder at the law firm Greenberg Traurig,
LLP, One International Place, Boston, MA.   Upon information and belief, between at
least August 1, 1999, and March 11, 2001, Pappalardo was a shareholder at the law firm,
Eckert Seamans Cherin & Mellott, LLC.

6.     Greenberg Traurig, LLP ("Greenberg Traurig"), a law firm with a place of
business at One International Place, Boston, MA, is a limited liability partnership
organized under the laws of the State of New York.

7.     Eckert Seamans Cherin & Mellott, LLC ("Eckert Seamans"), a law firm
with a place of business at One International Place, Boston, MA, is a limited liability
company organized to do business under the laws of the Commonwealth of Pennsylvania.

**General Allegations Applicable to All Counts**

*Unlawful Transfers of ISG Funds Made by Clients of Eckert Seamans
and Greenberg Traurig*

8.     Upon information and belief, since at least 1992 and continuing thereafter,
attorneys at Eckert Seamans, through its offices in Massachusetts, performed legal work
for the Corporation of the Bankhouse, a/k/a Societe Bankhouse (collectively these two
entities are referred to hereinafter as "COB"), the principals of COB, including James

2

Pomeroy II ("Pomeroy") and Stephen C. Heffernan, and successor COB entities

including, but not limited to, S B Global Incorporated. ("SBG"). COB's principal place

of business was, at all relevant times, at 50 Rowes Wharf, in Boston, MA; SBG's

principal place of business was, at all relevant times, 30 Rowes Wharf, in Boston, MA.

      9.      On or about April 22, 1998, COB entered into a Funds Management

Agreement and Syndicate Agreement with ISG in which ISG agreed to invest with COB,

and COB agreed to manage, the sum of four million dollars ($4,000,000) transferred by

ISG to COB. (Hereinafter, ISG's investment of $4 million is sometimes referred to as

"ISG's Investment"). The Funds Management Agreement required COB to arrange for

the transfer of ISG's Investment to its trading bank against that bank's undertaking of

non-depletion of ISG's Investment.

      10.      Investment monies procured by COB, including ISG's Investment, were

deposited into three "sub-accounts," all at a bank known as Abn Amro ("Abn Amro") in

its Brussels, Belgium location. On May 15, 1998, ISG's Investment initially was

deposited into a separate account under the name COB Syndicate 165. COB approached

ISG about transferring ISG's Investment into a so-called master account, and promised

that none of the prior undertakings would be affected by the transfer. On May 29, 1998,

ISG's Investment was transferred into COB's primary account at Abn Amro.

      11.      Upon information and belief, later in the day on May 29, 1998, without

ISG's knowledge or consent, and in flagrant violation of Funds Management Agreement

and the Syndicate Agreement and COB's express promises to ISG, $821,500 of ISG's

Investment was transferred to Eckert Seamans' account at Mellon Bank in Pittsburgh,

and $328,500 of ISG's Investment was transferred to a COB account at Fleet Bank in

Boston. Both transfers were, upon information and belief, directed by COB. ISG did not

know of, or authorize in any way, these transfers made in violation of its agreements with

COB. In fact, after the transfers took place, ISG was assured repeatedly by COB that its

$4 million was safe, had not been depleted, and in fact had increased by as much as fifty

percent (50%) to $6 million.

12.     On or before November 4, 1998, after a series of additional Ponzi scheme

like transfers of funds, all without ISG's knowledge or consent, including a transfer of

$ 4 million from an unnamed account to COB's account at Fleet Bank in Boston, which

COB then represented to ISG to be ISG's Investment to ISG, COB had amassed $19

million. The $19 million included $5 million from an investor known as PRCS Ltd

("PRCS"), a nominee of a Dutch company, Royal Phillips Electronics; $10 million from

an investor known as Danstrupland Holdings A/S, a subsidiary of St. Frederikslund

Holdings, A/S in Denmark ("St. Frederikslund"), and the $4 million consistently

represented to ISG by COB as ISG's Investment. COB then transferred the $19 million,

without the knowledge or consent of ISG or, upon information and belief, of either of the

other investors, to an entity called Swan Trust, of which a Henry Pearlberg ("Pearlberg")

was a trustee. ISG was not aware of the transfer to either Swan Trust or Pearlberg at the

time of the transfer.

13.     Just prior to, and in anticipation of the transfer, on October 31, 1998,

without informing ISG of the arrangements with Pearlberg and Swan Trust, COB induced

ISG to accept, in place of the original Funds Management Agreement and Syndicate

Agreement, a "Cash Flow Promissory Note" in which COB promised to pay ISG $9

million upon certain conditions. COB induced ISG to accept this arrangement by means

4

of misrepresentations, including misrepresentations that ISG's Investment was secure and had accrued $2 million in profit, which had been reinvested by COB. Eckert Seamans may have prepared or reviewed a draft of the Cash Flow Promissory Note.

14.     On or about February 5, 1999, and again without ISG's knowledge or consent, Pearlberg caused syndicate funds of $16.7 million to be deposited into an account of First Merchant Bank ("FMB"), an entity operating out of the Turkish Republic of Northern Cyprus, diverting the funds into three separate accounts for the benefit of a C. Joan Patrick, an independent broker working with the May Davis Group.

15.     Upon information and belief, commencing in February, 1999, after they transferred funds to Pearlberg, and after they repeatedly assured ISG that ISG's Investment was intact, and even earning profits, COB and Pomeroy sought information from Pearlberg about the status of the "investment" they had made with Swan Trust. As a result of those inquiries, on April 29, 1999 Pearlberg executed a "Deed of Assignment" assigning to Pomeroy all right, title and interest in various contracts and in FMB's bank accounts and credit facility at Abn Amro. Later, on July 6, 1999, Pearlberg, by letter to FMB, assigned to Pomeroy all right, title and interest in a bank account in the name of Pearlberg and/or Swan Trust at FMB. None of these transactions was disclosed to ISG at the time of its making.

16.     On July 26, 1999, with Eckert Seamans' knowledge, Pomeroy received $1,215,000 from FMB's account at Abn Amro in New York pursuant to the Deed of Assignment. Although any funds received by Pomeroy should have been distributed to the three investors whose funds were transferred to Pearlberg by COB, Pomeroy kept all the funds, which, upon information and belief, he later dissipated. Upon information and

belief, Pomeroy received a total of approximately $1.8 million from Pearlberg, which he has dissipated.

17.    ISG was not aware of the transfer of funds to Pomeroy at the time of the transfer or of his application of such funds for his personal use.

### *Pappalardo's Representation of ISG*

18.    Upon information and belief, on or before August 11, 1999, Stephen Burr ("Burr"), COB's corporate counsel who had represented COB and Pomeroy while at Eckert Seamans and then continued to do so upon switching affiliation to Greenberg Traurig as of August 11, 1999, and Pappalardo, then at Eckert Seamans, met with Pomeroy for the purpose of representing him (i) in connection with investigations by government agencies of funds depleted at Abn Amro and (ii) in connection with potential legal action to recover the $19 million held by COB for investors, including ISG, which had been transferred to Swan Trust and then depleted.  Burr and/or Pappalardo had been involved with Pomeroy and COB in regard to the depleted $19 million as early as July 20, 1999, when a subpoena issued to COB in connection with a federal grand jury investigation relating to the transfer of funds to Pearlberg and even earlier.

19.    On August 12, 1999, Burr sent a demand letter, on Greenberg Traurig stationery, on behalf of COB to Swan Trust and May Davis, stating that the firm had been retained by COB and related entities to recover $19 million and instructed "to take all necessary actions to protect our client's rights in connection therewith."  A copy of the letter later was sent to ISG for the purpose of demonstrating to ISG that Greenberg Traurig was taking action to represent ISG's interests and for the further purpose of

inducing ISG to forbear from independent action against, among others, COB, Pomeroy, or May Davis, Swan Trust, Pearlberg or the banking institutions involved..

20.     Pomeroy introduced Pappalardo to Philip Clark ("Clark"), a director of ISG and asked that Clark meet with Pappalardo directly.  In the course of a meeting in early August, 1999, Pappalardo represented to Clark that COB and Pomeroy were victims of fraud and urged ISG's forbearance and cooperation in a joint recovery effort.

21.     On August 20, 1999, Pappalardo wrote directly to Clark, thanking him for taking the time to meet with him and representing to Clark that unspecified "federal authorities" investigating the theft of the funds believed COB to be a victim of misrepresentations and fraud related to the depletion of assets by Swan Trust.

22.     On August 23, 1999, Burr wrote a letter to Pomeroy, a copy of which was also sent to Pappalardo, reiterating that, "our advice to you has always been and continues to be that it is absolutely essential that Bankhouse [COB] take immediate legal action against those persons and organizations involved."  In the letter, Burr advised his client that "pleadings and any appropriate motions for immediate freezing of assets will need to be prepared."  Burr acknowledged that a negotiated business resolution would not be inconsistent with litigation but stated, emphatically, "taking the necessary legal steps should happen concurrently."  Burr advised that "[m]any times taking legal steps will help force a business resolution."  Burr concluded, "in these circumstances it is absolutely essential that Bank House [sic] take the necessary legal steps immediately."

23.     Upon information and belief, Pappalardo agreed with the advice of Burr and Greenberg Traurig that legal action, including but not limited to the freezing of assets, was absolutely essential and had to be taken immediately to ensure that the $19

million could be recovered. Upon information and belief, Burr was referring to Pappalardo and the meeting he and Pappalardo had with Pomeroy when he described "our advice" with Pomeroy.

24.    The advice of Burr, Greenberg Traurig and Pappalardo that legal steps, including the freezing of assets, had to be taken simultaneously with any negotiation, never was shared with ISG. ISG in fact did not learn of the August 23, 1999, letter and counsel's opinion that immediately legal action was required until 2003, when a federal district court judge, over the objection of Pappalardo, compelled its production in an action filed in March 2002 by ISG against COB, Pomeroy and SBG, ordered Pappalardo to produce the contents of his file.

25.    Between August 23, 1999, and October 22, 1999, representatives of COB, whom Pappalardo and Burr were then representing COB at their respective law firms, contacted Clark and Chris Barber ("Barber"), another director of ISG, to prevail upon them to take no action against COB, Pomeroy or their affiliates, and again characterizing COB, Pomeroy and their related entities as victims  Upon information and belief, the representations made by COB and Pomeroy to ISG at this time were known, approved, and directed by Pappalardo.

26.    On October 22, 1999, Pappalardo wrote to Barber of ISG assuring him that he was taking steps "to protect your [i.e., ISG's] interest, including preparing a civil fraud case on behalf of COB against US based parties involved in the alleged fraud." Pappalardo also assured Barber that he had retained "recovery specialists" to help recover the funds. In the letter, while assuring Barber that all necessary actions were being taken, Pappalardo stated that he could not share the specifics of the recovery process because of

confidentiality agreements "integral to the matters involved." ISG reasonably relied on Pappalardo that he would be representing their interests.

27.     Direct communications between Pappalardo and ISG continued thereafter, with Pappalardo assuring ISG that he was representing its interests, and giving ISG minimal details of the specific recovery efforts while at the same time emphasizing the need for forbearance, cooperation and secrecy. ISG believed Pappalardo was representing its interest and reasonably relied on his representation. ISG's reliance was based upon Pappalardo's written and oral representations as to the progress of the recovery and, most importantly, upon Pappalardo's representations that such matters were within his specialized knowledge and vast expertise as private counsel, a former Assistant District Attorney, former Assistant United States Attorney and Deputy Attorney General.

28.     On May 9, 2000, Pappalardo wrote to ISG again, inviting ISG to meet with a consultant, "Vladimir," whom he represented to be a recovery specialist retained by COB.

29.     On June 1, 2000, Pappalardo sent ISG a draft "action plan," prepared by Vladimir. Pappalardo sought ISG's comments on the plan in order that "we can begin implementation." The action plan, which Pappalardo ratified, contemplated that ISG and other investors and COB would act as one "team" and that "John [Pappalardo] represents this team." Based upon Pappalardo's recommendation, ISG agreed to the action plan and to Pappalardo representing the team.

30.     On June 22, 2000, Pappalardo again wrote to ISG, suggesting a meeting on June 26, between ISG and a Mr. Moshe Dayani ("Dayani"), Vladimir's associate, who

had been hired to implement the action plan previously sent to ISG by Pappalardo. However, unbeknown to ISG but known to and approved by Pappalardo, Pomeroy and Dayani agreed that Dayani's task was to meet with Clark and give him minimal information to "keep him quiet" and "more confident." It was agreed that Dayani would "make only well-filtered statements to Clark and up to some degree."

31.    On July 10, 2000, in furtherance of the action plan, Pappalardo sought from ISG and other investors, and ultimately obtained, a Power of Attorney. Eckert Seamans drafted the Power of Attorney in consultation with ISG. ISG signed the Power of Attorney on July 11, 2000 appointing Pappalardo as its "true, sufficient and lawful attorney" and authorizing him to act for ISG. In transmitting the Power of Attorney to Pappalardo, in a letter dated July 11, 2000 ("the Side Letter"), ISG expressed its understanding that it was signing the instrument on the condition that Pappalardo and Eckert Seamans would act with "utmost good faith and due care having regard to the interests of ISG" and further that "all communications concerning any matter affecting or affected by the Power of Attorney, directly and indirectly, which may concern or relate to the interests of ISG will be communicated by the attorney fully, and on a timely basis." Neither Eckert Seamans nor Pappalardo disavowed the obligations as set forth in the Side Letter and the Power of Attorney signed by ISG.

32.    Upon information and belief, another investor, St. Frederikslund, signed an identical Power of Attorney appointing Pappalardo as its attorney and authorizing him to take such action necessary to recover its funds.

33.    At no time, either before, during or after the procurement of the Powers of Attorney, did Pappalardo explain the implications of his common representation of the

investors, COB and Pomeroy, and the risks involved with such joint representation. Indeed, all actions taken by Pappalardo and by COB and Pomeroy were designed to keep ISG quiet and induce its forbearance, continue to portray COB and Pomeroy as victims and describe only the advantages, but not the risks, of joint representation. No conflict of interest waivers ever were secured by Pappalardo, Eckert Seamans or Greenberg Traurig.

34.    In or about August, 2000, Burr incorporated SBG, in which Pomeroy and St. Frederikslund were partners. Burr was listed as clerk of the corporation. Upon information and belief, SBG was, in effect, the successor corporation to COB and used primarily as a vehicle to protect funds against attachments by creditors of COB, including, potentially, ISG. The directors of SBG were Pomeroy and Jens Kristiansen, a managing director of St. Frederikslund. Greenberg Traurig represented SBG, including the interests of its managing directors, and its partners and, accordingly, the firm's interests, and those of its other clients, SBG, COB, Pomeroy, and St. Frederikslund, became increasingly adverse to ISG's.

35.    Upon information and belief, COB was effectively insolvent at the time SBG was formed. As a result, upon information and belief, Greenberg Traurig and Pappalardo, concerned about outstanding fees, shifted their loyalties toward SBG, now a viable successor to COB, and toward the interests of St. Frederikslund, the venture partner who supplied the capital to SBG and was responsible, directly and indirectly, for paying COB's outstanding counsel fees to Pappalardo and Greenberg Traurig.

36.    Upon information and belief, beginning in and about October 2000, shortly after the incorporation of SBG, St. Frederikslund transferred at least $1.8 million

to SBG, most of which was then transferred to COB as an "intra-company" payment. Further, upon information and belief, on December 15, and December 22, respectively, COB, by this time insolvent, used the transferred funds to pay $250,000 to Greenberg Traurig, $100,000 to Eckert Seamans and $1 million to COB as a "management fee." Upon information and belief, St. Frederikslund may have paid other legal bills of Greenberg Traurig and Pappalardo directly.

37.    In and around the time of the intra-company transfers between SBG and COB, Pappalardo informed ISG that SBG was capable of paying the ISG claim and would likely do so, if that became the only option.  He also represented that COB held a 15% share in SBG partly for the reason that SBG should not be seen to be a vehicle set up to avoid COB creditors.  However, in an internal memorandum later prepared by an associate of Pappalardo's in 2001 based primarily on the facts as relayed by Pappalardo, it became clear that SBG was designed to be the successor corporation to COB upon COB's insolvency.

38.    In December 2000 Pappalardo had meetings in London with the chairman of FMB, its representative Hakki Yaman Namli, who since has been indicted, and FMB's lawyers.  Upon information and belief, Pappalardo apparently accepted the representations made by FMB at the meeting to the effect that the syndicate's funds had been misappropriated by Henry Pearlberg, and made no further inquiry at that time as to potential liability of FMB or Abn Amro, both of which could have been sued in the United States and both of whom, upon information and belief, violated banking regulations in connection with the transfer of funds, including ISG's investments.

39.     On February 22, 2001, Pappalardo again wrote to ISG purporting to give ISG an update on current recovery efforts and describing "positive developments" that "could result in the return of monies." Pappalardo acknowledged his advice to COB that, "ISG should be paid forthwith consistent with its [COB's] fiduciary duty it has to ISG as an investor in Swan Trust." He added that COB was "reviewing its legal options through outside counsel by way of civil suit against both individuals and institutions."

40.     Effective March 12, 2001, Pappalardo joined Greenberg Traurig.

41.     As of late June 2001, nearly two years after his first contact with ISG, Pappalardo had determined that actions would lie against at least FMB, Abn Amro, Pearlberg, Patrick, Patrick's investment group and May Davis, but that statutes of limitations were running out in some courts. However, Pappalardo did not share his opinion with ISG or his concern over lapse of relevant statute of limitations on claims against individuals and financial institutions.

42.     For reasons that were not communicated to ISG, Pappalardo did not initiate any litigation against any party, notwithstanding his earlier representations to ISG that a "civil fraud" case was being prepared, and that "all necessary actions" were being taken to protect the COB investment, which included ISG's funds. ISG relied on Pappalardo to file timely and appropriate actions to recover its investment and, in fact, was forbearing from litigation against COB, Pomeroy and later, SBG, in reliance on Pappalardo's representations that he would initiate actions belonging to COB-related entities that would lead to the recoupment of ISG's monies. It was not until August 15, 2001, that COB's in-house counsel told ISG that "we are proceeding with the first steps

13

of litigation." ISG was alarmed at this statement because Pappalardo had earlier represented that pleadings were drafted pending Pomeroy's signature and instruction.

43.    Instead of filing the actions he deemed meritorious, Pappalardo led ISG to believe that it would receive restitution of its funds from Pearlberg, a man in his 80's, with serious medical problems, and whom Pappalardo knew or should have known was not capable of making good on his promises to restore the funds he had transferred to Patrick. Upon information and belief, COB shared with Pappalardo its impression of Pearlberg, and Pappalardo, having met with Pearlberg, knew that Pearlberg was "wishful, gullible or just remote from the reality of the world where he may once have operated successfully" and that any restitution from him was unlikely. None of these concerns was shared with ISG. COB and Pappalardo instead were more concerned about establishing a written record that they engaged in settlement negotiations with Pearlberg in case he was indicted or pursued civil action and his offers to make restitution became known to the COB investors.

44.    Pappalardo continued to correspond directly with ISG, leading it to believe that restitution from Pearlberg would be forthcoming. On May 29, 2001, Pappalardo wrote, "I met for three days last week with Henry Pearlberg, who insisted that he would make full restitution within 7 – 10 days. Perhaps as important, he provided his entire file on the Swan Trust's dealings with Joan Patrick including original documents such as monetary transfers and contracts with May Davis and Joan Patrick which are valuable for litigation." On August 27, 2001, Pappalardo wrote to ISG, "I have had an extensive conversation with Pearlberg who has agreed to meet with you in September, I must coordinate with Chris Jones [of COB] today and I will call when that is completed."

On October 2, 2001, Pappalardo wrote to ISG "Pearlberg left a voice mail for me last evening asking me to call him today because the "the deal is all set." The parties also communicated through mobile phone during this period of time.

### Efforts of Independent Counsel to Obtain Documents From Pappalardo

45.    In late October 2001, ISG lost confidence in Pappalardo and retained independent counsel in the United States to recover its Investment.

46.    Toward that end, ISG's U.S. counsel and ISG representatives tried, without success, to obtain critical documents, including draft pleadings, from Pappalardo, which he had told ISG, in the course of his representation of the "team," that he had either collected, prepared or reviewed (but failed to provide) and were valuable. ISG and its counsel sought documentation from Pappalardo by telephone, e-mail and by letters dated January 4, January 25, and March 8, 2002, respectively.

47.    As of March 8, 2002, however, after initially leading ISG to believe for several months that he would be cooperative, Pappalardo failed and refused to give to ISG the documents it needed to fully prepare its case and identify parties and claims, known to Pappalardo, but not to ISG, responsible for the dissipation of ISG's Investment. On or about that date, Pomeroy also advised ISG that, in fact, contrary to COB's representations and to Pappalardo's previous representations that a civil fraud case was being investigated and prepared, he had not prepared any draft pleadings.  In response to the concern raised by ISG earlier in March, 2002, as to statutes of limitations that may have lapsed during the period of Pappalardo's representation, Pappalardo responded, "the statute of limitations will be an issue but creative thinking should be applied."

48.    On March 13, 2002, Pappalardo informed ISG for the first time that he and his firm had not represented Pomeroy or COB since May 2001.

49.    On March 22, 2002, ISG, although unable to obtain all of the documents required to identify other parties, filed, in the federal district court for the District of Massachusetts, *International Strategies Group, Ltd. v. Corporation of the Bankhouse, et al*, Civil Action No. 02-10532-RWZ ("the COB Litigation") so as to avoid any statute of limitations problems with respect to COB and Pomeroy.  ISG's complaint later was amended to add SBG as a defendant.

50.    In the course of discovery in the COB Litigation, ISG subpoenaed documents from Pappalardo, who objected on the grounds of attorney client privilege. ISG moved to compel documents.  In ruling on ISG's motion to compel on August 11, 2003, the court (Zobel, J) commented that "any claims of attorney/client privilege are clouded by plaintiff's power of attorney to Mr. Pappalardo."

51.    Only after receiving and reviewing thereafter the documents formerly withheld by Pappalardo on the purported ground of privilege, was ISG able to appreciate the numerous conflicts of interest of Pappalardo, Eckert Seamans and Greenberg Traurig that precluded appropriate representation of ISG's interests; the substantial missed opportunities to initiate action against responsible parties and freeze assets; the prejudice to ISG of delay, including statute of limitations problems admitted by Pappalardo; and the fact that Pappalardo and the law firms with which he was associated failed to take the very actions they told COB and Pomeroy, on August 23, 1999, were "absolutely essential" to recovering the depleted funds.

52. On April 26, 2004, ISG obtained judgment in the COB Litigation in the amount of $10,468,106. The court also entered findings of fact regarding defendants' willful and knowing conduct, and an order assigning to ISG all rights to the bank accounts which Swan Trust had transferred to Pomeroy in April 1999. However, that judgment appears essentially worthless as, upon information and belief, all of the defendants in that case – COB, Pomeroy, Societe Bankhouse and SBG – during the time that the defendants in this case were purporting to represent ISG's interests, dissipated all their assets or otherwise put them out of reach of ISG.

53. As part of the relief in the COB Litigation, ISG also obtained an assignment of COB's rights in the Deed of Assignment from Pearlberg to Pomeroy so as to enable ISG to sue third parties. However, such assignment was not obtained until January 11, 2004 as part of an order of sanctions against COB. The sanction order was later incorporated into the April 26, 2004 judgment.

54. Upon obtaining rights to the Deed of Assignment, ISG filed actions against Abn Amro and FMB in New York for negligence, fraud and aiding and abetting fraud. ISG has had to expend significant legal fees defending motions to dismiss, including on statute of limitations and standing grounds. Abn Amro argues in the New York actions that the applicable statute of limitations is three years and, further, that "ISG's claimed ignorance of the alleged negligence is of no legal significance because 'the statutory period of limitations begins to run from the time when liability for the wrong has arisen even through the injured party may be ignorant of the existence of the wrong or injury.'" Abn Amro further argues that "the purported knowledge of ISG is irrelevant to any possible claim of tolling" because it is "an assignee of a tort claim" and

"did not obtain [ ] an interest in [the] purported claim until well after the period of limitations ran." Abn Amro asserts, in respect to the aiding and abetting claim, that "Pearlberg (as well as Pomeroy through whom ISG obtained the Deed of Assignment) had knowledge of the alleged wrongdoing at or about the time it is claimed to have occurred." Abn Amro further contends that ISG lacks standing to bring claims against it.

### Count One

### Negligence -- Against All Defendants

55.    ISG repeats and realleges paragraphs 1 through 54 as though fully set forth herein.

56.    Pappalardo, Eckert Seamans and Greenberg Traurig, by virtue of their undertaking of joint representation of the "team," including ISG, owed ISG at least the duty of reasonable care to exercise the degree of care and skill of average qualified practitioners. However, inasmuch as Pappalardo, a shareholder at Eckert Seamans and then at Greenberg Traurig, represented himself to ISG and to the public as specially qualified in the investigation and prosecution of fraud, white collar crime, federal litigation and grand jury investigations, the defendants owed ISG a heightened duty of care in their actions to recover ISG's Investment.

57.    Defendants violated their duty of care to ISG in several ways, including, without limitation, purporting to represent ISG's interests in the first place when their interests, and those of COB and Pomeroy, their primary client, were so at odds with ISG and when, without defendants' disclosing the risks of joint representation of the team, they allowed COB, Pomeroy, and SBG to put assets out of reach of ISG during the two year period of joint representation. Defendants further violated their duty of care, having

taken on the collective representation of the team, by failing to take the very acts they deemed necessary to ensure recovery, including, without limitation, immediately filing of legal actions and, later, by refusing to turn over to ISG the documentation necessary for its new counsel to investigate the full panoply of claims available to ISG.

58.    As a result of defendants' breach of their duty of care, ISG has been damaged in amount to be determined at trial, and which amount includes, without limitation, counsel fees incurred in defending motions to dismiss on statute of limitations grounds in actions filed against third parties upon ISG's retention of independent counsel, the potential loss of claims against such third parties on statute of limitations grounds, counsel fees incurred in obtaining necessary documentation from Pappalardo in the COB Litigation, counsel fees incurred in initiating third party actions, which, if pursued by Pappalardo on behalf of COB-related entities pursuant to their fiduciary duties to ISG, would not have been incurred by ISG, and the loss by ISG of its ability to freeze assets and collect upon its judgment of $10,468,106 in the COB Litigation or otherwise to recover the full amount of its Investment.

### Count Two

### Misrepresentation – Against All Defendants

58.    ISG repeats and realleges paragraphs 1 through 57 as though fully set forth herein.

59.    The actions of defendants, including without limitation, their representation that they were capable of representing ISG's interests, that they were preparing a case of civil fraud against US based parties, and that Pearlberg was able to make restitution constituted misrepresentations upon which ISG relied to its detriment.

The misrepresentations were material, defendants knew or should have known the representations were false when made and the representations were made with the intention to induce reliance by ISG and did induce such reliance.

60. As a result of the misrepresentation, ISG forbore from initiating action against COB and has been damaged in an amount to be determined at trial.

### Count Three

### Breach of Fiduciary Duty – Against Pappalardo

61. ISG repeats and realleges paragraphs 1 through 60 as though fully set forth herein.

62. Pappalardo, under the Power of Attorney, and by undertaking to represent ISG as part of the "team" to recover ISG's investment, owed ISG a fiduciary duty whereby ISG placed trust and confidence in him to represent its interests in recovering the Investment.

63 Pappalardo violated his fiduciary duty to ISG by, *inter alia*, (i) undertaking to represent ISG when his representation was riddled with conflicts of interest (including (a) the simultaneous representation of ISG and individuals and entities who defrauded ISG, at a time when he was also retained to fend off criminal investigation of Pomeroy, (b) the fact that his law firm had received funds COB misappropriated from ISG, and (c) continued simultaneous representation ISG and Pomeroy and St. Frederikslund after Pomeroy and St. Frederikslund formed SBG to divert funds from COB); (ii) failing to disclose the conflicts of interest and to recognize the potential need to withdraw as ISG's representative; (iii) failing to take the very actions he and his respective law firms deemed essential to successful recovery because of competing

20

interests, including possible criminal exposure of COB and Pomeroy; (iv) taking actions and refraining from taking actions when it was in the best interest of COB, Pomeroy and SBG, but not ISG; (v) knowingly participating in a plan of action that included intentional withholding of critical information from ISG; and (vi) failing to use his best judgment in prosecuting claims on behalf of ISG that would lead to the recovery of its Investment.

64.    As a result of Pappalardo's breach of his fiduciary duty, ISG has been damaged in amount to be determined at trial.

## Count Four

## Breach of Express and Implied Contract -- Against Pappalardo

65.    ISG repeats and realleges paragraphs 1 through 64 as though fully set forth herein.

66.    Pappalardo, under the Power of Attorney, the Side Letter and his representations to ISG on which ISG reasonably relied, entered into a express or implied contractual relationship with ISG whereby Pappalardo agreed to take all necessary steps to recover ISG's investments,  to use utmost good faith and due care in protecting ISG's interest and to forward promptly  "all communications concerning any matter affecting or affected by the Power of Attorney, directly and indirectly, which may concern or relate to the interests of ISG."

67.    Pappalardo violated his contract with ISG by, *inter alia*, failing to take all necessary steps to recover ISG's Investment, failing to forward communications to ISG affecting its interest and in fact withholding key information, and failing to use utmost good faith and care in protecting ISG's Investment.

21

68.    As a result of Pappalardo's breach of his contractual obligations to ISG,

ISG has been damaged in amount to be determined at trial.

### Count Five

### Conversion – Against Eckert Seamans

69.    ISG repeats and realleges paragraphs 1 through 68 as though fully set forth

herein.

70.    Eckert Seamans received funds misappropriated from ISG by COB and

Pomeroy, allowed them to be deposited in the law firm's bank account in Pittsburgh, PA

and, upon information and belief, disbursed those funds to other investors, thus

participating in its client's fraud of ISG.  There was no basis for a law firm in Pittsburgh

to be disbursing investment funds for a client in Massachusetts, which had several of its

own bank accounts, including a number of syndicate accounts and a master account at

Fleet Bank.  The unusual request from COB that Eckert Seamans disburse funds from its

own bank account in Pittsburgh to other of COB's investors should have put Eckert

Seamans (which is not, upon information and belief, involved in the business of the

transfer or exchange of securities) on notice that the transaction was not "clean" and

caused them to investigate the source of the funds, especially as the firm's lawyers were

familiar with the nature of COB's business.  Had Eckert Seamans investigated the source

of the funds, ISG would not have lost its investment.

71.    ISG did not learn of Eckert Seamans' receipt of its funds until after the

transfer appeared on bank records produced through investigatory proceedings in

Belgium involving Abn Amro. At the time of discovery Pappalardo was purporting to represent ISG. When ISG raised the issue with Pappalardo, Pappalardo advised ISG that Eckert Seamans had done nothing wrong and was adamant his view that the firm was not liable. Pappalardo never advised ISG to seek separate counsel with regard to any potential liability of his firm in connection with the disposition of ISG's funds, either at the time ISG and Pappalardo first discussed the matter or after Pappalardo transitioned to Greenberg Traurig.

72.    Eckert Seamans exercised dominion over ISG's funds without right to do so and, upon information and belief, has converted such funds on COB's behalf.

73.    ISG has a right to immediate possession of funds in the amount of $821,500, together with interest thereon, as of the date of this complaint.

**Count Six**

**Aiding and Abetting Fraud and Breach of Fiduciary Duty – Against Eckert Seamans**

74.    ISG repeats and realleges paragraphs 1 through 73 as though fully set forth herein.

75.    COB and Pomeroy breached their fiduciary duty to ISG under the Funds Management Agreement, and actively defrauded ISG in connection with the transfer by ISG of funds from the syndicate account to the master account. Eckert Seamans knew or should have known of COB's breach of its fiduciary duty to ISG and its fraud upon ISG, and, by disbursing funds on its clients' behalf, substantially assisted COB and Pomeroy in effectuating its breach of fiduciary duty and fraud upon ISG.

76.     As a result of the foregoing, ISG is entitled to damages in an amount to be determined at trial.

## Count Seven

### Violation of M.G.L. 93A – Against All Defendants

77.     ISG repeats and realleges paragraphs 1 through 76 as though fully set forth herein.

78.     The above-described actions of all defendants, including but not limited to undertaking joint representation riddled with conflicts of interest; failing to disclose the risks of joint representation; representing ISG when, in fact, defendants participated in the dissipation of a substantial portion of ISG's funds; participating in a plan of action that included intentional withholding of critical information from ISG; characterizing COB and Pomeroy as victims when, in fact, ISG had claims against them for fraud; incorporating an entity the very purpose of which was to hide assets of COB and then receiving payments from that new entity; making numerous promises to ISG that recovery was imminent; allowing claims to lapse, without informing ISG, so that it later would have to rely on "creative" arguments to avoid the statute of limitations; and failing to take the very steps to recover ISG funds that defendants admitted, the day after learning of the depletion of $19 million transferred from COB to Swan Trust, were "essential" to recovery.

79.     The above-described actions occurred primarily and substantially in Massachusetts.

80.     Defendants' conduct was willful and knowing.

81.    As a result of the foregoing, ISG is entitled to treble the amount of its actual damages, together with attorneys' fees, interest and costs.

WHEREFORE, ISG seeks:

1.    Judgment in its favor on Count One, together with interest and costs as allowable by law;

2.    Judgment in its favor on Count Two, together with interest and costs as allowable by law;

3.    Judgment in its favor on Count Three, together with interest and costs as allowable by law;

4.    Judgment in its favor on Count Four, together with interest and costs as allowable by law;

5.    Judgment in its favor on Count Five, together with interest and costs as allowable by law and disgorgement and restitution by Eckert Seamans of the funds improperly transferred to it;

6.    Judgment in its favor on Count Six, together with interest and costs as allowable by law and disgorgement and restitution by Eckert Seamans of the funds improperly transferred to it; and.

7.    Judgment in its favor on Count Seven in treble the amount of its actual damages, together with its attorneys fees, interest and costs as allowable by law; and

8.    Such other and further relief as is just and proper.

ISG DEMANDS A TRIAL BY JURY ON ISSUES SO TRIABLE.

INVESTMENT STRATEGIES
GROUP, LTD

By its attorneys,


Jessica Block
BBO#046110
Block & Roos, LLP
60 State Street, Suite 3800
Boston, Massachusetts  02109
January 11, 2005                              (617) 223-1900