UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| INTERNATIONAL STRATEGIES GROUP, LTD., <br><br> Plaintiff, <br><br> v. <br><br> GREENBERG TRAURIG, LLP., A. JOHN PAPPALARDO, AND ECKERT, SEAMANS, CHERIN AND MELLOTT, LLC, <br><br> Defendants | CIVIL ACTION No.: 04-12000 RWZ |

## MEMORANDUM OF LAW OF DEFENDANTS GREENBERG TRAURIG, LLP AND A. JOHN PAPPALARDO IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

Defendants Greenberg Traurig, LLP ("GT") and A. John Pappalardo ("AJP") submit this memorandum of law in support of their motion for summary judgment pursuant to Fed. R. Civ. P. 56. GT and AJP are entitled to summary judgment because there is no genuine issue of material fact and they are entitled to judgment as a matter of law. Quite simply, neither GT nor AJP ever represented plaintiff International Strategies Group, Ltd ("ISG") or owed ISG the duties of care alleged. In any event, neither AJP nor GT was a legal cause of any loss allegedly suffered by ISG, whose claims are also barred by the Statute of Limitations. Accordingly, GT and AJP are entitled to summary judgment on all counts of the amended complaint.[1]

---

[1] Additionally, GT and AJP agree with and rely upon the analysis articulated by Eckert Seamans Cherin and Mellott LLC ("ESCM") in its Motion for Summary Judgment and accompanying Memorandum of Law ("ESCM SJ Br.").

## PRELIMINARY STATEMENT

ISG, a corporation incorporated under the laws of Tortola, British Virgin Islands, with a principal place of business in Hong Kong, has brought five claims against AJP, a Co-Managing Shareholder at GT who, before joining GT, was a member of co-defendant Eckert, Seamans, Cherin & Mellot, LLC ("ESCM"). ISG's claims against AJP are for Negligence (Count One), Misrepresentation (Count Two), Breach of Fiduciary Duty (Count Three), Breach of Implied and Express Contract (Count Four), and Violation of M.G.L. 93A (Count Seven). ISG also asserts Counts One, Two, and Seven against GT.[2]

Submitted in support of this motion is the Declaration of AJP. That Declaration and the attached exhibits demonstrate beyond peradventure that at no time did AJP act as counsel for ISG. Rather, AJP only represented COB and its affiliate Société Bank House (collectively, "COB"). AJP's role in the matter was analogous to that of counsel for a bankrupt estate, seeking recovery of estate assets for the benefit of creditors. Although creditors like ISG may derive benefits from the efforts made on behalf of the estate by its lawyer, that lawyer does not thereby represent the creditors, either directly or impliedly. Indeed, counsel for a debtor would encounter a conflict were he to undertake the concurrent representation of the creditors, as ISG recognized here. In addition, AJP owed no duty of care to ISG. That corporation was managed by sophisticated persons (including a lawyer), and its shareholders were also actively involved in the affairs of ISG, sophisticated, and represented by their own counsel. ISG retained counsel in Boston during 2001 when it still had ample time to take whatever legal action it deemed appropriate. Finally, as will be demonstrated, no act or omission of AJP or GT caused any of the losses alleged by ISG.

---

[2] ISG also asserts Counts One, Two, and Seven against ESCM, as well as Counts Five and Six. It is axiomatic that, under no circumstances, could GT be held accountable for any actions of ESCM.

## STATEMENT OF FACTS

In 1998, ISG invested $4 million with COB. (*See* Transmittal Affidavit of Matthew P. Garvey ("Garvey Aff.") Ex. 1 ¶13.)[3] COB in turn invested ISG's $4 million, along with $10 million from Danstrupland Holding A/S, a Danish company that later changed its name to Store Frederikslund Holding A/S ("St. Frederikslund"), and $5 million from a British company, P.R.C.S., with an entity called Swan Trust. (*See* Garvey Aff. Ex. 1 ¶¶ 16,27). ISG ratified this investment. (*See id.* ¶ 25). Henry Pearlberg ("Pearlberg"), a trustee of the Swan Trust, thereupon made various unauthorized transactions with the $19 million in the Swan Trust, including directing on February 5, 1999, that $16.7 million be deposited in accounts belonging to First Merchant Bank OSH Ltd. ("FMB"), a banking entity operating out of the Turkish Republic of Northern Cyprus, at ABN AMRO Bank N.V. ("ABN AMRO"). (*See* Garvey Aff. Ex. 2 ¶¶ 113,144.) The FMB investment was recommended and directed by C. Joan Patrick ("Joan Patrick"), an independent broker working with the May Davis Group ("May Davis"), an investment bank in New York. (*See id.* ¶¶ 126,127.) The entire $19 million was depleted by February 16, 1999. (*See id.* ¶ 156.) Pearlberg had apparently returned approximately $1,115,000 to either COB or to COB's Chief Executive Officer James F. Pomeroy II ("Pomeroy") in early 1999. (*See* Garvey Aff. Ex. 3.)

By no later than July 16, 1999, ISG had learned that the Swan Trust funds were held in the accounts of FMB, and by July 28, 1999, ISG also knew that the funds had been depleted and that a "workout" was necessary to somehow collect the funds that had been invested in Swan Trust. (*See id.*) On July 28, 1999, Phillip G. Clark ("Clark"), a Hong Kong attorney and a Director of ISG, wrote to Mr. Pomeroy and took issue with, among other things, Pomeroy's

---

[3] All citations are to materials contained in the materials appended to the Garvey Aff. or to the Declaration of A. John Pappalardo ("AJP Decl."). These materials are indicated by the conventions "(Garvey Aff. Ex. __)" and "(AJP Decl. Ex. __)", respectively.

apparent interpretation that the $1,115,000 COB received back from the Swan Trust did not belong to ISG. (*See id.*) By August 17, 1999, Pearlberg was apparently penniless; he was accused of defrauding an innkeeper in California when he could not pay his bill, and he claimed that all of his money was being held by FMB. (*See* Garvey Aff. Ex. 4.) COB was insolvent, or nearly insolvent, beginning in 1998. (*See* Garvey Aff. Ex. 1 ¶ 30.)

AJP first became involved in the matter in July, 1999. (*See* AJP Decl. ¶ 6.) AJP and his firms were retained by COB regarding the matters now in litigation. (*See id.* ¶ 5.) By this point, all of the invested funds in question had long since been transferred away from COB to Swan Trust, where they had been diverted, primarily to FMB. (*See id.* ¶ 10, Ex. A.) It was AJP's reasonable understanding that all of the money was completely gone by the time he came to represent COB, and he knew of no money in the United States that could be traced back to the Swan Trust diversion. (*See id.* ¶ 10.) Prior to AJP's involvement, COB directly had engaged the services of T.T.& T. Omnia that purportedly specialized in collection of debt. (*See id.*) Shortly after AJP began his representation, an Assistant United States Attorney in Chicago who, along with the FBI, was investigating the Swan Trust debacle had told him that federal investigators had concluded that COB was a victim of fraud and misrepresentation in connection with the Swan Trust transactions. (*See id.* Ex. A.)

At no time did AJP act as attorney for ISG. (*See id.* ¶ 5.) No engagement letter was ever entered into by AJP, ESCM or GT with ISG, no file was opened in ISG's name, and no invoice was ever sent to or requested by ISG for services. (*See id.*) In fact, because of the potential and, ultimate, conflict between ISG and AJP's client COB, he could not have represented ISG in any respect without first obtaining sufficient waivers, and never could have represented ISG adversely to COB. (*See id.*) In his very first letter to ISG on August 20, 1999, AJP wrote to

Clark, "As you know, I am counsel along with others, for Société Bank House ("C.O.B.")...." (*See id.* Ex. A.) For approximately two years thereafter, at the direction of COB, AJP had communications from time to time with Mr. Clark and his Co-Director Christopher Barber ("Barber") concerning ISG's ill-fated investment with COB. He repeatedly reminded Clark that he represented COB, not ISG, and he told Clark on numerous occasions that Clark should take whatever actions he deemed appropriate on behalf of ISG. (*See id.* ¶ 7.) With COB's consent, ISG and St. Frederikslund executed powers of attorney in July 2000 that authorized AJP to take action necessary to transfer and deliver their lost investments upon recovery and further authorizing ESCM to hold any recovered funds in escrow for the investors. (*See id.* ¶ 9.) These powers constituted AJP attorney-in-fact, not attorney-at-law, for ISG. (*See id.*)

Clark, as noted, is a Hong Kong-based attorney and Director of ISG. At times in his correspondence with AJP, such as in a letter dated December 2, 1999, Clark wrote under the letterhead of "Philip G. Clark & Co, International Legal Council [sic], Hong Kong." (*See* Garvey Aff. Ex. 5.) Barber is also a Director of ISG, and he, too, is based in Hong Kong. (*See* Am. Compl. ¶ 25.) ISG contemplated taking legal action on its own in connection with its investment, both prior to and throughout the period that AJP was representing COB, and Clark and Barber often expressed this sentiment to AJP. In fact, ISG was considering its legal options against COB in connection with its investment at least as early as April 15, 1999, when Clark wrote to Pomeroy regarding ISG's investment: "You seem to be under the mistaken impression that I am posturing with respect to the need for ISG to consider it's [sic] legal options." (*See* AJP Decl. Ex. T.) Also in 1999 ISG, while represented by two Belgian lawyers, initiated criminal proceedings against Albert Pans of COB in Belgium in connection with an ABM AMRO account, leading to Pans's incarceration. (*See* AJP Decl. Exs. D,E,F,G.)

ISG was even contemplating taking action on its own in connection with the Swan Trust matter at least as early as March 30, 2000, when Clark told AJP that ISG was considering taking "action against May Davis" and "also considering direct dealings with Amro Bank immediately." (*See* AJP Decl. Ex. N.) By no later than June 10, 2000, ISG was considering taking action against FMB and ABN AMRO. (*See* AJP Decl. Ex. M.) Thereafter, on January 22, 2001, Barber e-mailed AJP a letter from Clark addressed to AJP in which Clark stated that he was motivated "to communicate with the FBI in an effort to ascertain the position with Joan Patrick." (*See* AJP Decl. Ex. O.) Clark proceeded to "conduct[] a series of communications with Robert Klimas," an FBI agent in Chicago investigating the transaction, and, on September 27, 2001, Clark reported to AJP that AJP "should be in no doubt that the documents in our possession will procure [Pomeroy's] indictment." (*See* AJP Decl. Ex. C.)

ISG retained counsel in the United States at least as early as July 18, 2001. (*See* AJP Decl. Ex. H.) ISG also knew by December 2001 that St. Frederickslund had sued COB and related persons/entities in this Court on November 14, 2001. (*See* AJP Decl. Ex. Q.) Attached to that Complaint as Exhibit 9 was a memorandum authored by AJP that laid out the events as he understood them. (*See id.*) In a letter to AJP of December 11, 2001, Clark referred to that litigation and to his lawyer in Boston, Kathleen Stone of the Boston firm Looney, Cohen, Reagan & Aisenberg LLP. (*See* AJP Decl. Ex. R.) Clark's letter explained that ISG was preparing to file proceedings against COB and referred to possible action against Joan Patrick. (*See id.*) On March 22, 2002, Ms. Stone brought suit in this Court on behalf of ISG against COB and Pomeroy.

More facts and details may be found below and in the Defendants' Joint Statement of Undisputed Facts filed pursuant to Local Rule 56.1.

# ARGUMENT

A court shall grant summary judgment if there are no genuine issues of material fact, and the moving party is entitled to judgment as a matter of law. *See Hershey v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 317 F.3d 16, 19 (1st Cir. 2003). "A genuine issue is one supported by such evidence that a reasonable jury, drawing favorable inferences, could resolve it in favor of the nonmoving party." *Id.* (internal quotations omitted). The non-moving party "may not rely upon conclusory allegations, improbable inferences, or unsupported speculation to defeat summary judgment." *Id.* "Summary judgment is mandated against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Flanders & Medeiros, Inc. v. Bogosian*, 65 F.3d 198 (1st Cir. 1995)(granting summary judgment on legal malpractice claims)(internal citations and ellipses omitted)(citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). The moving party discharges its "initial burden of 'showing' the absence of a genuine issue concerning any material fact" by demonstrating "that there is an absence of evidence to support the nonmoving party's case." *Id.* Here, the burden of proof rests squarely with ISG.

I. **All Claims Against GT And AJP Fail Because Neither GT Nor AJP Ever Represented ISG Or Owed ISG A Duty Of Care**

To sustain a claim of legal malpractice (Counts One, Three, and Four (to the extent that it is construed as an alleged breach of contract to serve as counsel)), a plaintiff must show that the defendant attorney owed plaintiff a duty of care. *One Nat'l Bank v. Antonellis*, 80 F.3d 606, 609 (1st Cir. 1996)(applying Massachusetts law). Whether or not such a duty exists is a question of law. *Id.* "The duty of care owed by an attorney arises from an attorney-client relationship." *Miller v. Mooney*, 725 N.E.2d 545, 549 (Mass. 2000). The existence of such a relationship "is an element of a malpractice plaintiff's proof, and may be shown by an express contract, or it may be

implied when (1) a person seeks advice or assistance from an attorney, (2) the advice or assistance sought pertains to matters within the attorney's professional competence, and (3) the attorney expressly or impliedly agrees to give or actually gives the advice or assistance." *Id.* (Internal quotations omitted.)

In certain limited cases, the third element "may be established by proof of detrimental reliance," and only thus may a duty of care be extended to non-clients. *Id.* This "foreseeable reliance" exception has two requirements. *One Nat'l Bank*, 80 F.2d at 609. First, "a duty is only owed to nonclients who the attorney knows will rely on the services rendered," and for this the plaintiff must show "that the attorney should reasonably foresee that the nonclient will rely upon him for legal services." *Id.* (Internal quotations and citations omitted.) Second, a court "will not impose a duty of reasonable care on an attorney if such an independent duty would potentially conflict with the duty the attorney owes to his or her client." *Id.*

ISG's claims for misrepresentation (Count Two), breach of contract (Count Four), and violation of M.G.L. ch. 93A (Count Seven) also fail if neither GT nor AJP owed ISG a duty of care as an attorney. Claims against attorneys for misrepresentation require plaintiffs to show reasonable detrimental reliance, and plaintiffs must satisfy the same two requirements of the "foreseeable reliance" exception in legal malpractice. *Miller*, 725 N.E.2d at 550. ISG's claim for breach of express or implied contract is intertwined with its malpractice claims, and is based upon AJP's owing ISG a duty of "utmost good faith and care." (Am. Compl. ¶¶ 66-67.) So, too, claims against attorneys under M.G.L. ch. 93A depend on the existence of an attorney-client relationship. *See Robertson v. Gaston Snow & Ely Bartlett*, 536 N.E. 2d 344, 349 n.4 (Mass. 1989)(no M.G.L. ch. 93A violation occurred because plaintiff had not established that an attorney-client relationship existed).

A. Neither AJP Nor GT Ever Entered Into An Attorney-Client Relationship With ISG

It is undisputed that AJP represented COB in connection with matters related to the Swan Trust investment, and that ISG knew all along that AJP represented COB. (*See* AJP Decl. Ex. A, a letter to Clark in which AJP states, "as you know, I am counsel along with others, for Société Bank House ("C.O.B.")....") AJP never acted as attorney for ISG. (*See* AJP Decl. ¶ 5.) No engagement letter was ever executed, no conflict waivers were sought or obtained (as Clark knew or should have known would be necessary, given the potential and actual conflict he recognized between ISG and COB), no file was opened, and no invoice was ever rendered to or requested by ISG. (*See* AJP Decl. ¶¶ 5, 7, 16, and Exs. B,S.) In fact Clark, himself an attorney, initiated legal action on ISG's behalf completely independent of AJP or GT, including contacting the FBI in Chicago at least as early as September 2001 (*see* AJP Decl. Ex. B), hiring two attorneys in Belgium and commencing legal proceedings there in 1999 against Albert Pans, an officer of COB (*see* AJP Decl. Exs. D, E, F, G), and retaining counsel for ISG in the United States prior to July 18, 2001 (*see* AJP Decl. Ex. H).

All of these facts lead inevitably to the determination that no attorney-client relationship existed between AJP and ISG. *See Symmons v. O'Keefe*, 644 N.E.2d 631, 639 (Mass. 1995)(no attorney-client relationship between firm and plaintiffs in connection with trusts that were subject of plaintiffs' legal malpractice claim against firm where, among other factors, no fee arrangement was discussed, no retainer was paid, and no bill was sent to plaintiffs for such services). AJP's explicit written statement that he represented COB (*see* AJP Decl. Ex. A), and his repeated reminders of this point (*see* AJP Decl. ¶ 7), put ISG on notice that his role was to protect COB's interest, not ISG's, and provides further evidence that no attorney-client relationship existed. *See Horvarth v. Adelson, Golden & Loria, P.C.*, 55 Mass.App.Ct. 1113,

773 N.E.2d 478, 2002 WL 1931997, at *2 (2002)(unpublished table decision). Indeed, Mr. Clark acknowledged this lack of an attorney-client relationship, for example on March 30, 2000, when he wrote to AJP: "*While I appreciate that you act for Corporation of the Bankhouse (COB)*, I find that your failure to respond to any of our correspondence [is] insulting and unprofessional. It is not beyond the parameters of your ethical requirements for you to correspond with International Strategies Group (ISG) *on COB's instructions*." (AJP Decl. Ex. B.) (Emphasis added.) Clark and Barber also acknowledged that they understood the "conflict or potential conflict" between ISG and COB. (AJP Decl. Ex. S.)

ISG relies upon the power of attorney it executed in July 2000 as the predicate for its assertion that AJP was its counsel. (Am. Compl. ¶¶ 31-33.) While that instrument enabled AJP and ESCM to recover and hold in escrow funds belong to ISG, it did not create an attorney-client relationship. A power of attorney is merely a "formal authority" that appoints the designee as "attorney in fact" for a specific purpose. *See Massachusetts Bonding & Ins. Co. v. Baker's Sur. Co.*, 179 N.E. 329, 334 (Ind. App. 1932)(internal quotations and citations omitted). This purpose may be "to do a particular act" or "for the transaction of business in general," but it cannot be "of a legal character." *Id.* A power of attorney, which can be granted to anyone, and not merely a lawyer, creates a special and narrowly defined principal-agent relationship that is distinct from the attorney-client relationship. Indeed, the relationship is even more limited than a typical principal-agent relationship: "A power of attorney is subject to a special rule of construction that requires that it be strictly construed to limit authority." *See Grabowski v. Bank of Boston*, 997 F. Supp. 111, 125 (D. Mass. 1997)(applying Massachusetts law).

On June 9, 2000, ISG suggested that AJP prepare a power of attorney for ISG and COB's other investors, St. Frederikslund and P.R.C.S., that would grant AJP or ESCM the limited

authority "to receive principle [sic], and profit appurtenant thereto, on [the investor's] behalves and that disbursement of such amounts be subject to the prior unanimous approval of all three investors." (*See* Garvey Aff. Ex. 6.) And, indeed, the power of attorney that Clark, on behalf of ISG, executed in favor of AJP on July 11, 2000, merely authorized AJP to "transfer and deliver personal property or that which [Clark] hold[s] in a representative capacity relating to an investment made with Swan Trust on or about April 1998 through [COB] and to sign and execute and deliver any and all papers or instruments necessary to obtain, collect and transfer all principle [sic] profits or any income whatsoever belong to [ISG]." (*See* AJP Decl. Ex. G.) Putting into express terms the rule that a power of attorney confers authority sufficient to take actions necessary to complete the specific authorized task, *see Grabowski*, 997 F. Supp. at 125, the power of attorney also granted AJP the authority "to do all acts and take whatever steps which in his judgment are necessary, convenient or expedient in the effort to collect and transfer the above described funds." (*See* AJP Decl. Ex. G.) Such limited language, couched in terms of a power of attorney that by law must be strictly construed and cannot authorize work of a legal character, cannot be read to have ordained inferentially AJP as ISG's attorney at law.[4]

Nor did the unexecuted, draft action plan prepared by T.T. & T. Omnia, and forwarded by AJP to ISG at COB's direction (*see* AJP Decl. ¶ 10 and Ex. L), create an attorney-client relationship between AJP and ISG. That draft, which was never finalized or executed, contemplated that all investors and COB would work as a team to seek recovery of capital. (*Id.*) Steps were contemplated in various venues to try to apply pressure as appropriate to recover the lost funds. It suggested that AJP would coordinate team efforts and provide investors with

---

[4] ISG references in its Amended Complaint at ¶ 31a letter it sent to AJP concurrently with the power of attorney. AJP never assented to the statements in that self-serving letter (*see* AJP Decl. ¶ 9) which, as a result, is of no consequence. An attorney-client relationship cannot be formed unilaterally. *Cf. Broomfield v. Kosow*, 212 N.E.2d 556, 560 (Mass. 1965)(fiduciary relationships cannot be formed unilaterally).

regular updates. In that sense, it recited that AJP would "represent" the team. The unexecuted draft action plan did not create an attorney client relationship between AJP and any of the investors, and no other investor has ever maintained to the contrary. (*Id.* ¶ 11.) AJP was to be a spokesperson only, not an attorney at law, for the various "team" members. (*Id.*) He continued to act as attorney for COB only, as ISG and its Directors Clark and Barber well knew. (*Id.*)

Indeed, ISG has admitted that it did not regard itself as being represented by AJP. Rather, ISG considered itself to have been a third party to the AJP-COB attorney-client relationship, even well after it had executed the power of attorney and received the draft action plan. (*See* AJP Decl. Ex. P, a letter from Barber to AJP of 8/15/01 in which Barber writes, "We can prepare a comprehensive complaint to the Massachusetts State Bar with respect to your treatment of us *as third parties*, particularly in the circumstances of the Power of Attorney." Emphasis added.) Based on the evidence not in dispute, therefore, it cannot be said that an attorney-client relationship existed between ISG and either AJP or GT.[5]

B.   AJP Did Not Owe A Duty To ISG Under The Foreseeable Reliance Exception Because Of The Conflict Inherent In The Relationship Between COB And ISG

ISG's claims cling to the thin reed that courts have grown whereby attorneys may, in certain limited circumstances, owe a duty to non-clients—a reed that is simply unavailable to ISG given the undisputed facts. While Massachusetts courts occasionally have recognized a duty of reasonable care to a non-client where an attorney knows or has reason to know that the non-client is relying on the services rendered *to the attorney's client*, the courts will not recognize such an extended duty where the mere potential for conflict between the attorney's duty to his client and to a third party exists. *See Lamare v. Basbanes*, 636 N.E.2d 218, 219 (Mass. 1994).

---

[5] This point alone is the death knell of ISG's M.G.L. ch. 93A claim (Count Seven), for which the "foreseeable reliance" exception (*see infra.* at 7) is not available. *See Robertson v. Gaston Snow & Ely Bartlett*, 536 N.E. 2d 344, 349 n.4 (Mass. 1989).

The rationale for this prophylactic limitation is that an attorney cannot ever owe a duty to his or her client's adversary. *See id.* (Attorney for father in divorce and care and protection proceedings owed no fiduciary duty to children; children's and father's interests generally may conflict, and here, in particular, the two were in an adversarial position regarding charges of sexual abuse and court-recommended guardian ad litem); *Spinner v. Nutt*, 631 N.E.2d 542 (Mass. 1994)(attorneys for trustees do not owe fiduciary duty to trust beneficiaries, because of the potential for conflict between trustees and beneficiaries generally); *DaRoza v. Arter*, 622 N.E.2d 604 (Mass. 1993)(attorney for worker's compensation carrier owed no duty to employee/claimant, despite letter from attorney to employee saying attorney had been assigned to represent employee in action against manufacturer, because employee's interests with regard to settlement against manufacturer could have differed from those of attorney's client).

A potential conflict existed between ISG and COB certainly no later than when ISG became aware that its assets in COB had been depleted. That knowledge existed even before AJP ever communicated with ISG, which first occurred in August 1999, shortly after AJP began representing COB. (*See* AJP Decl. ¶ 6.) Indeed, in *ISG v. Heffernan*, this Court held that the statute of limitations with regard to ISG's claims against Heffernan, a COB principal, began to run once ISG knew or should have known that it had a cause of action against COB with regard to the funds in dispute, which was when ISG knew the funds were no longer with COB. *ISG v. Heffernan*, July 30, 2004 Memorandum of Decision and Order in 04CV-10863-RWZ. While this Court fixed that date as "sometime in 1999," it is clear that ISG knew its funds were depleted by at least July 16, 1999 (*see* Garvey Aff. Ex. 3), which is before AJP first had contact with ISG. (*See* AJP Decl. ¶6.) In fact, ISG was even considering taking legal action against COB in connection with its investment at least as early as April 15, 1999. (*See* AJP Decl. Ex. T.)

While both ISG and COB clearly at times had a mutual interest in recovering the assets diverted from COB, which included the investment made by ISG, the overall potential for conflict with regard to those assets requires a finding that AJP and his firms never owed a duty to ISG. *See Spinner*, 631 N.E.2d at 545 ("an isolated instance identity of interests" does not support imposition of a fiduciary duty to non-client where potential for conflict exists); *DaRoza*, 622 N.E.2d at 608 (no fiduciary duty owed by worker's compensation counsel to claimant, although both at one point had joint interest in recovering payment from manufacturer that caused claimant's injury). Indeed, as determined by this Court in *ISG v. Heffernan*, for the entire time that it had any communications with AJP, ISG knew or should have known that it had a potential cause of action against COB, AJP's and eventually GT's client, and an entity that ISG did in fact sue on March 22, 2002. That suit was filed by counsel ISG had retained, according to its Amended Complaint, in October 2001, but most assuredly had actually retained more than two months before then, when ISG had "sent further documents across to the US for legal advice." (*See* AJP Decl. Ex. H.)

AJP's duty to keep COB's confidences also compels a finding that he did not owe a duty to ISG, as this limitation would have impeded his ability to represent ISG concurrently with regard to recovering the depleted funds without first obtaining sufficient waivers. *See One Nat'l Bank*, 80 F.3d at 610 ("The Massachusetts and federal courts ... have repeatedly drawn on the importance of the duty of confidentiality in finding the potential for conflict, so that an attorney's duty to third parties is circumscribed and limited by the law and the disciplinary rules governing attorney conduct.")(Internal quotations and citations omitted.) ISG acknowledged that it was aware that ethical constraints, related to AJP's representation of COB, prevented him from communicating in full to ISG. (*See* AJP Decl. Ex. B, in which Clark wrote to AJP, "It is not

beyond the parameters of your ethical requirements for you to correspond with International Strategies Group (ISG) on COB's instructions.")

Courts are especially loathe to find that a lawyer owes a duty to a non-client where the party claiming reliance on the attorney is a sophisticated party that should have been aware of the potential for conflict between the client and the non-client. *Cf. Robertson,* 536 N.E. 2d at 350 (plaintiff's years of business experience are relevant to court's rejection of his argument that attorneys representing company also owed a fiduciary duty to plaintiff, an officer of the company, with regard to plaintiff's position in the company). Clark, himself an attorney and director of a firm making multi-million dollar investments, certainly qualifies as a sophisticated party. Indeed, ISG and its investors, as noted, also engaged counsel in Europe at least as early as 1999, before retaining counsel here in 2001. (*See* AJP Decl. Exs. D, E, F, G.)

ISG often acknowledged the potential and actual conflicts it had with COB. Thus, on January 22, 2001, Barber e-mailed AJP a letter from Clark addressed to AJP in which Clark stated that a lack of communication from AJP "puts us back to an adversarial position." (AJP Decl. Ex. O.) In a letter to AJP and Pomeroy, Chris Jones and Peter Ness dated March 28, 2001, Clark and Barber wrote that they understood the "conflict or potential conflict" between ISG and COB. (AJP Decl. Ex. S.)

Based upon the undisputed facts, neither AJP nor GT can be said as a matter of law to have owed a duty of care to ISG. Because ISG's claims are premised on such an alleged duty, all of its claims must fail.

## II.   Neither GT Nor AJP Was The Proximate Cause Of Any Injury To ISG

Even if one were to assume arguendo that AJP and his firms either represented or owed a fiduciary duty to ISG, ISG's claims nonetheless fail because of a complete absence of causal connection to any loss sustained by ISG. Where a client alleges that a lawyer's delay in

prosecution has caused injury, "the burden is on the client to establish that delay proximately caused the injury." 4 Mallen & Smith, Legal Malpractice, The Plaitiff's Attorney—Delay in Prosecution—Errors Regarding Collectibility and Bankruptcy, § 30.20, 506 (5th Ed. 2000). As addressed by ESCM in its brief, which is incorporated herein by reference by GT and AJP, an attorney cannot be held liable for failing to file an action prior to the statute of limitations if he ceased to represent the client and was replaced by other counsel before the statute ran on the client's action. While ISG acknowledges that it retained independent counsel in October 2001, it is actually clear that it had already retained counsel in the United States at least as early as July 18, 2001. (*See* AJP Decl. Ex. H, a letter from Clark to AJP of 7/18/01 in which Clark states, "Obviously we continue to prepare a comprehensive case against Jim [Pomeroy] and CoB and have sent further documents across to the US for legal advice.") And, of course, Clark was a lawyer in Hong Kong, and ISG had used outside counsel pursuing Pans in Belgium, not to mention the engagement of lawyers by ISG's investors. (*See* AJP Decl. ¶¶ 7, 11 and Ex. I.) It is thus undisputed that ISG had its own counsel, independent of AJP and GT, well before the statute of limitations ran on any claims ISG alleges to have possessed against prospective defendants.

ISG clearly knew as of July 18, 2001 that AJP had not filed any litigation on its behalf and that ISG had not obtained restitution from Pearlberg, COB, or anyone else. ISG cannot claim that the statute of limitations on any of its alleged claims in connection with its COB investment had run or was about to run by that time. The earliest any statute of limitations in tort could have started to run in connection with the COB investment is likely February 5, 1999, when funds ISG had invested with COB were deposited in an account of FMB. (*See* Garvey Aff. Ex. 2 ¶¶ 113,144.) Even assuming that the statute of limitations did begin to run at that time, it

would not have expired until February 2002, and ISG still had over six months within which to pursue litigation after it had hired new counsel.[6]

ISG's argument that it needed information from AJP before initiating suit during this period defies credulity. ISG knew that its investment with COB was depleted in 1999 (*see* Garvey Aff. Ex. 3), ISG had taken action against Pans in Belgium (*see* AJP Decl. Exs. D,E,F,G), and ISG's investors had been urging suit against Pomeroy and others since at least March 2000 (*see* AJP Decl. Ex. I.) Moreover, St. Frederikslund sued COB and its principals in this Court on November 14, 2001, and ISG and its counsel in Boston were aware of this suit by at least December 11, 2001. (*See* AJP Decl. Exs. Q,R). Attached to the St. Frederikslund Complaint as Exhibit 9 was a memorandum generated by AJP on November 9, 2001 that recapitulated the important players and events as AJP understood them. (*See id.* Ex. Q.) In fact, when Mr. Clark and AJP were in London together in June 2000, AJP gave him an even more comprehensive analysis, complete with exhibits, of what had occurred that had been prepared by Peter Ness of COB, and which formed the basis for AJP's November 9, 2001 memorandum. (*See* AJP Decl. ¶ 15.) In addition to writing that he was aware of the St. Frederikslund suit, on December 11, 2001 Mr. Clark also stated that ISG was "now preparing to file proceedings against COB." (*See id.* Ex. R.) ISG did not require more information from AJP to file suit against COB or anyone else.

In fact, ISG was contemplating taking action on its own in connection with the Swan Trust matter at least as early as March 30, 2000, when Clark told AJP that ISG was considering taking "action against May Davis" and "also considering direct dealings with Amro Bank

---

[6] ISG did not learn of the transfer to FMB until after February 5, 1999 (*see* Am. Compl. ¶ 18), so it is likely the statute would not have started to run until even later. Moreover, ISG does not say why it did not have contract claims against various entities, which have a six year statute of limitations. It is likely, on the facts alleged by ISG, that it did in fact have such claims.

immediately." (*See* AJP Decl. Ex. N.) By no later than June 10, 2000, ISG was considering taking action against FMB and ABN AMRO. (*See* AJP Decl. Ex. M.) On January 22, 2001, Barber e-mailed AJP a letter from Clark addressed to AJP in which Clark stated that he was motivated "to communicate with the FBI in an effort to ascertain the position with Joan Patrick." (*See* AJP Decl. Ex. O.)

ISG has never pointed to any documents it allegedly needed from AJP before it could file suit against anyone. Additionally, ISG's assertion that it could not have sued others until first obtaining a judgment against COB is totally without merit and is unsupported by legal analysis. ISG has not—and cannot—point to any action that AJP could have taken on its behalf that was not still available to ISG in October 2001.

Based on the undisputed facts, as a matter of law, AJP and GT were not the proximate cause of ISG's alleged harm. Accordingly, all of ISG's counts[7] against GT and AJP must fail, and both are entitled to summary judgment.

GT and AJP also incorporate herein by reference ESCM's argument that all of ISG's claims against ESCM are barred by the Statute of Limitations. For the same reasons argued by ESCM in its brief, all of ISG's claims against AJP and GT are also barred by the Statute of Limitations.

---

[7] This includes ISG's claim of misrepresentation. To prove a claim for misrepresentation, a plaintiff has the burden of establishing that the defendant's misrepresentations were the proximate cause of harm to the plaintiff. *See Ploy v. Mylan*, 667 N.E.2d 250, 256 (Mass. 1996). All damages alleged by ISG in its claim for misrepresentation stem from the allegation that "ISG forbore from initiating action against COB" as a result of misrepresentations by the defendants. (*See* Am. Compl. ¶60-61.) Because, as a matter of law, ISG cannot show that GT or AJP was the proximate cause of any alleged harm caused by delayed prosecution, ISG's claim for misrepresentation also must fail.

## Conclusion

For these reasons, and for those given in ESCM's brief in support of its motion for summary judgment, GT and AJP respectfully request that the Court enter judgment in their favor and order the case dismissed in all respects.

                                          Respectfully submitted,

                                          GREENBERG TRAURIG, LLP AND
                                          A. JOHN PAPPALARDO,

                                          By their attorneys,

                                          /s/ Paul B. Galvani
                                          Paul B. Galvani (BBO # 183800)
                                          Matthew P. Garvey (BBO # 655419)
                                          Ropes & Gray LLP
                                          One International Place
                                          Boston, MA 02110
                                          Tel.: (617) 951-7000

Dated: May 31, 2005

**Certification of Consultation**

Pursuant to Local Rule 7.1, I, the undersigned counsel for defendants Greenberg Traurig, LLP. and A. John Pappalardo, certify that I have conferred with plaintiff's counsel regarding this motion in good faith to resolve or narrow the issues presented by this motion.

Matthew P. Garvey

**CERTIFICATE OF SERVICE**

I, Matthew P. Garvey, a member of the Bar of this Court, hereby certify that on this day, May 31, 2005, the within motion for summary judgment, memorandum of law in support of summary judgment, the affidavit of Matthew P. Garvey and accompanying exhibits, and the declarations of A. John Pappalardo and accompanying exhibits were served on the plaintiff by causing a copy of the same to be hand delivered to its counsel, Jessica Block, Esq., Block & Roos, LLP, 60 State Street, Suite 3800, Boston, MA 02109, and were served on defendant Eckert, Seamans, Cherin and Mellott, LLC by causing a copy of the same to be hand delivered to its counsel, Devorah Levine, Esq., Eckert, Seamans, Cherin and Mellott, LLC, One International Place, 18th Fl., Boston, MA 02110.

Matthew P. Garvey