UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MASSACHUSETTS

)
INTERNATIONAL STRATEGIES GROUP, LTD. )
)
        Plaintiff, )
)
v. ) CIVIL ACTION NO.: 04-12000 RWZ
)
GREENBERG TRAURIG, LLP., A JOHN )
PAPPALARDO, AND ECKERT, SEAMANS, )
CHERIN AND MELLOTT, LLC, )
)
        Defendants )
)

**JOINT STATEMENT OF MATERIAL FACTS
AS TO WHICH THERE IS NO GENUINE ISSUE TO BE TRIED
OF DEFENDANTS ECKERT, SEAMANS, CHERIN AND MELLOTT, LLC,
GREENBERG TRAURIG, LLP AND A. JOHN PAPPALARDO**

In accordance with Local Rule 56.1, Defendants Eckert, Seamans, Cherin and Mellott, LLC ("ESCM"), Greenberg Traurig, LLP ("GT") and A. John Pappalardo ("AJP") respectfully submit this statement of the material facts of record, as to which there is no genuine issue to be tried, in support of their motions for summary judgment.

**I.    ISG's Investment In COB**

1.    In 1998, ISG invested $4 million with COB. (*See* Transmittal Affidavit of Matthew P. Garvey ("Garvey Aff.") Ex. 1 ¶ 13.)[1] COB in turn invested ISG's $4 million, along with $10 million from Danstrupland Holding A/S, a Danish company that later changed its name to Store Frederikslund Holding A/S ("St. Frederikslund"), and $5 million from a British

---

[1] All citations are to materials attached to the Garvey Aff. or to the Declaration of A. John Pappalardo ("AJP Decl."). These materials are indicated by the conventions "(Garvey Aff. Ex. ___)" and "(AJP Decl. Ex. ___)", respectively.

company, P.R.C.S., with an entity called Swan Trust. (*See* Garvey Aff. Ex. 1 ¶¶ 16,27). ISG ratified this investment. (*See id.* ¶ 25).

2.  Henry Pearlberg ("Pearlberg"), a trustee of Swan Trust, made various unauthorized transactions with the $19 million, including directing on February 5, 1999 that $16.7 million be deposited in accounts belonging to First Merchant Bank OSH Ltd. ("FMB") at ABN AMRO Bank N.V. ("ABN AMRO"). (*See* Garvey Aff. Ex. 2 ¶¶ 113,144.) FMB was a banking entity operating out of the Turkish Republic of Northern Cyprus. (*See id.* at ¶ 3.) The FMB investment was recommended and directed by C. Joan Patrick ("Joan Patrick"), an independent broker working with the May Davis Group ("May Davis"), an investment bank in New York. (*See id.* ¶¶ 126,127.) The entire $19 million was depleted by February 16, 1999. (*See id.* ¶ 156.) Pearlberg had apparently returned approximately $1,115,000 to either COB or to COB's Chief Executive Officer James F. Pomeroy II ("Pomeroy") in early 1999. (*See* Garvey Aff. Ex. 3.)

3.  By no later than July 16, 1999, ISG had learned that the Swan Trust funds were held in the accounts of FMB, and by July 28, 1999, ISG also knew that the funds had been depleted and that a "workout" was necessary to somehow collect the funds that had been invested in Swan Trust. (*See id.*) On July 28, 1999, Phillip G. Clark ("Clark"), a Hong Kong attorney and a Director of ISG, wrote to Pomeroy and took issue with, among other things, Pomeroy's apparent interpretation that the $1,115,000 COB received back from the Swan Trust did not belong to ISG. (*See id.*)

4.  By August 17, 1999, Pearlberg was apparently penniless; he was accused of defrauding an innkeeper in California when he could not pay his bill, and he claimed that all of

his money was being held by FMB. (*See* Garvey Aff. Ex. 4.) COB was insolvent, or nearly insolvent, beginning in 1998. (*See* Garvey Aff. Ex. 1 ¶ 30.)

## II. ESCM, GT and AJP Represent COB, But Not ISG

### A. AJP Becomes Counsel To COB

5. AJP first became involved in the matter in July, 1999. (*See* AJP Decl. ¶6.)

6. AJP is Co-managing Shareholder in GT's Boston office. He joined that firm on March 8, 2001. Prior thereto, he had been a member of ESCM since 1997, practicing in its Boston office. (*See* AJP Decl. at ¶¶2-3.)

7. AJP and his firms were retained by COB regarding the matters now in litigation. (*See* AJP Decl. ¶5.)

8. By the time of AJP's involvement in the matters now in litigation, all of the invested funds in question had long since been transferred away from COB to Swan Trust, where they had been diverted, primarily to FMB. (*See id.* ¶ 10, Ex. A.) AJP knew of no money in the United States that could be traced back to the Swan Trust diversion. (*See id.* ¶ 10.)

9. Prior to AJP's involvement, COB had directly engaged the services of T.T.& T. Omnia that purportedly specialized in collection of debt. (*See id.*)

### B. AJP Never Represented ISG

10. At no time did AJP act as attorney for ISG. (See AJP Decl. at ¶5.) No engagement letter was ever entered into by AJP, ESCM or GT with ISG, no file was opened in ISG's name, and no invoice was ever sent to or requested by ISG for services. (*See id.*) In fact, because of the potential and, ultimate, conflict between ISG and AJP's client COB, he could not

have represented ISG in any respect without first obtaining sufficient waivers, and never could have represented ISG adversely to COB. (*See id.*)

11. In his very first letter to ISG on August 20, 1999, AJP wrote to Clark, "As you know, I am counsel along with others, for Société Bank House ("C.O.B.")...." (*See id.* Ex. A.)

12. In the August 20, 1999 letter, AJP also reported that the Assistant United States Attorney in Chicago had told him that federal investigators had concluded that COB was a victim of fraud and misrepresentation in connection with the Swan Trust investment. (*See id.*)

13. For approximately two years thereafter, at the direction of COB, AJP had communications from time to time with Clark and ISG Co-Director Christopher Barber ("Barber") concerning ISG's ill-fated investment with COB. AJP repeatedly reminded Clark that he represented COB, not ISG, and he told Clark on numerous occasions that Clark should take whatever actions he deemed appropriate on behalf of ISG. (*See id.* ¶ 7.)

    **C.**    **ISG Contemplates And Takes Legal Action To Recover Its Investment, Including Action Against COB And Its Principals, Prior To And During The Period That AJP Represented COB**

14. Clark is a Hong Kong-based attorney and Director of ISG. At times in his correspondence with AJP, such as in a letter dated December 2, 1999, Clark used letterhead reading "Philip G. Clark & Co, International Legal Council, Hong Kong." (*See* Garvey Aff. Ex. 5.)

15. ISG contemplated taking legal action on its own in connection with its investment both prior to and throughout the period that AJP was representing COB, and Clark and Barber often expressed this sentiment to AJP. ISG was considering its legal options against COB in

connection with its investment at least as early as April 15, 1999, when Clark wrote to COB's Mr. Pomeroy regarding ISG's investment with COB: "You seem to be under the mistaken impression that I am posturing with respect to the need for ISG to consider it's [sic] legal options." (*See* AJP Decl. Ex. T.)

16. In 1999 ISG, while represented by two Belgian lawyers, initiated criminal proceedings against Albert Pans of COB in Belgium in connection with an ABM AMRO account, leading to Pans's incarceration. (*See* AJP Decl. Exs. D,E,F,G.)

17. ISG retained counsel in the United States at least as early as July 18, 2001. (*See* AJP Decl. Ex. H.)

18. At least some of ISG's participating investors had separate counsel. (*See* AJP Decl. Exs. I.)

19. ISG was contemplating taking action on its own in connection with the Swan Trust matter at least as early as March 30, 2000, when Clark told AJP that ISG was considering taking "action against May Davis" and "also considering direct dealings with Amro Bank immediately." (*See* AJP Decl. Ex. N.) By no later than June 10, 2000, ISG was considering taking action against FMB and ABN AMRO. (*See* AJP Decl. Ex. M.)

20. On January 22, 2001, Barber e-mailed AJP a letter from Clark addressed to AJP in which Clark stated that he was motivated "to communicate with the FBI in an effort to ascertain the position with Joan Patrick." (*See* AJP Decl. Ex. O.)

21. On January 30, 2001, Clark and Barber wrote to AJP, Pomeroy, Peter Ness and Chris Jones expressing concern that the matter of the squandered investment was going to be

made public in Hong Kong, in which case, they stated: "… we will be forced to proceed with haste in the United States, to the detriment of all parties. Obviously fraud and inducement [sic] will be straightforward allegations to substantiate, without even developing into a discussion with respect to money secretly transferred from Belgium amid representations that it remained intact, and the already defined criminal activity in Belgium." (*See* AJP Decl. Ex. J.) In the letter of January 30, 2001, Clark and Barber also stated that they had "formed preliminary views as to how we would wish to pursue Joan Patrick and May Davis in conjunction with you…." (*See id.*)

22.     Clark proceeded to "conduct[] a series of communications with Robert Klimas," an FBI agent in Chicago investigating the transaction, and on September 27, 2001, Clark reported to AJP that AJP "should be in no doubt that the documents in our possession will procure [Pomeroy's] indictment." (*See* AJP Decl. Ex. C.)

## II.    ISG Executes A Power Of Attorney Authorizing AJP To Act On Its Behalf As Attorney-in-Fact In A Manner That Is Specifically Described

23.     On June 9, 2000, ISG suggested that AJP prepare a power of attorney for ISG and COB's other investors, St. Frederikslund and P.R.C.S., that would grant AJP or ESCM the limited authority "to receive principle [sic], and profit appurtenant thereto, on [the investor's] behalves and that disbursement of such amounts be subject to the prior unanimous approval of all three investors." (*See* Garvey Aff. Ex. 6.)

24.     The power of attorney that Clark, on behalf of ISG, executed in favor of AJP on July 11, 2000, authorized AJP to "transfer and deliver personal property or that which [Clark] hold[s] in a representative capacity relating to an investment made with Swan Trust on or about April 1998 through [COB] and to sign and execute and deliver any and all papers or instruments necessary to obtain, collect and transfer all principle [sic] profits or any income whatsoever

belong to [ISG]." (*See* AJP Decl. Ex. G.) The power of attorney also granted AJP the authority "to do all acts and take whatever steps which in his judgment are necessary, convenient or expedient in the effort to collect and transfer the above described funds." (*See id.*)

25.     There were no subsequent agreements between AJP and ISG regarding the Power of Attorney executed by ISG. (*See* AJP Decl. at ¶9.)

26.     At the direction of COB, AJP forwarded a draft "Action Plan" prepared by T.T. & T. Omnia to Mr. Clark on June 1, 2000. (*See* AJP Decl. ¶ 10.) That draft, which was never finalized or executed, contemplated that all investors and COB would work as a team to seek recovery of capital. (*See id.* Ex. L.) Steps were contemplated in various venues to try to apply pressure as appropriate to recover the lost funds. (*See id.*) It suggested that AJP would coordinate team efforts and provide investors with regular updates. In that sense, it recited that AJP would "represent" the team. (*See id.* ¶ 10.)

27.     AJP continued to act as attorney for COB only, as ISG and its Directors Philip Clark and Chris Barber well knew. (*See* AJP Decl. ¶ 11) Indeed, ISG and several of its several investors had their own attorneys, some of whom took independent legal action on behalf of their clients during the time that AJP was representing COB. (*See* AJP Decl. Exs. D,E,F,G,I.)

28.     Even considering "the circumstances of the Power of Attorney", and well after circulation of the unexecuted, draft "Action Plan", ISG considered itself to be a "third part[y]" to the AJP-COB attorney-client relationship, and Barber stated such to AJP by letter dated August 15, 2001. (*See* AJP Decl. Ex. P.)

### III. ISG Was Aware Of The Constraints And Conflicts Present In The Relationship Between ISG and COB's Counsel

29. ISG acknowledged that it was aware that ethical constraints, related to AJP's representation of COB, prevented AJP from communicating in full to ISG. For example, on March 30, 2000, Clark wrote to AJP: *"While I appreciate that you act for Corporation of the Bankhouse (COB),* I find that your failure to respond to any of our correspondence [is] insulting and unprofessional. It is not beyond the parameters of your ethical requirements for you to correspond with International Strategies Group (ISG) *on COB's instructions."* (AJP Decl. Ex. B.) (Emphasis added.)

30. Clark and Barber also acknowledged that they understood the "conflict or potential conflict" between ISG and COB. (AJP Decl. Ex. S.)

31. Indeed, ISG admitted that it would have been "inadequate" for ISG merely to rely upon the efforts of COB's attorneys, or COB's purported collection specialists, to recover ISG's investment as an incident of their work for COD. On June 10, 2000, Clark wrote to Vladimir of T.T.&T. Omnia and Moshe [Dayani] that, when ISG's investors inquire into why ISG had not lodged any criminal complaints in connection with its lost investment, "It will be inadequate as you might imagine for us to justify our failing to have done so by saying that we have been relying upon your goodselves and upon Jim Pomeroy's attorneys." (*See* AJP Decl. Ex. M.)

### IV. ISG Retains Its Own Counsel In The United States

32. ISG retained counsel in the United States prior to July 18, 2001, by which time it was preparing a suit against Mr. Pomeroy and AJP's client, COB. In an e-mail message to AJP dated July 18, 2001, Clark and Barber of ISG stated the following: "Obviously, we continue to

prepare a comprehensive case against Jim [Pomeroy] and COB *and have sent further documents across to the US for legal advice.*" (*See* AJP Decl. Ex.H.)(Emphasis added.)

33.     Then, in a letter dated August 15, 2001, Barber wrote to AJP posing questions and suggestions related to a possible civil action and raising, inter alia, "the Statute of Limitation issue." (*See id*. Ex. P.) In numerous conversations with AJP, Clark represented that he had retained lawyers both in the United States and abroad and that they would take the necessary legal steps to secure ISG's investment. Clark further repeatedly stated that his interests were adverse to those of COB. (*See id*. ¶ 13.)

34.     St. Frederickslund sued COB and related persons/entities in this Court on November 14, 2001. (*See* AJP Decl. Ex. Q.) ISG knew about this litigation at least as early as December 2001. In a letter to AJP of December 11, 2001, Clark referred to that litigation and to his lawyer in Boston, Kathleen Stone of the Boston firm Looney, Cohen, Reagan & Aisenberg LLP. (*See* AJP Decl. Ex. R.) The letter also recounted communications with the FBI, about which ISG stated: "We are conjecturing that this will cause FMB and ABN Amro to be required to provide details as to the present location of the funds.... It will also increase the focus we expect upon Jim Pomeroy's activities." The letter further stated as follows: "In anticipation of these developments we are planning to meet with the Chairman of ABN Amro in Amsterdam early in the New Year. The meeting will primarily concern events in Belgium commensurate with Jim Pomeroy's fraudulent transfer of funds. However, it would be helpful and appropriate during the meeting to raise concerns with respect to what by all accounts, was an unauthorised transfer of the funds subsequently out of the US jurisdiction. You have in the past indicated that you have in your possession documentary evidence to this effect. Clearly anything of this nature should be passed to Kathleen."

## V. AJP Never Impaired The Rights Or Abilities Of ISG To Take Action In Seeking To Recover Its Funds

35.    The earliest any statute of limitations in tort could have started to run in connection with the COB investment is likely February 5, 1999, when funds ISG had invested with COB were deposited in an account of FMB. (*See* Garvey Aff. Ex. 2 ¶¶ 113,144.) Even assuming that the statute of limitations had begun to run in February 1999, it would not have expired until February 2002. Prior to that date, ISG had ample opportunity and ability to sue the parties that it ultimately did sue. (*See* AJP Decl. at ¶ 15.) Nothing AJP did impaired any rights of ISG. (*See id.*)

36.    On the contrary, AJP's actions and communications facilitated the ability of ISG to take action against third parties who misappropriated its funds. For example, when Kathleen Stone, counsel to ISG, contacted AJP in November 2001, AJP told her that ISG likely had a case against persons and entities such as May Davis, C. Joan Patrick, Pearlberg, and FMB. (*See id.*)

37.    Moreover, attached as Exhibit 9 to the St. Frederickslund Complaint of November 14, 2001 was a memorandum generated by AJP on November 9, 2001 that recapitulated the important players and events as he then understood them. (*See* AJP Decl. Ex. Q.) When Mr. Clark and AJP were in London together in June 2000, AJP gave him an even more comprehensive analysis, complete with exhibits, of what had occurred that had been prepared by Peter Ness of COB, and which formed the basis for AJP's November 9, 2001 memorandum. (*See id.* ¶ 15.)

38.    ISG long knew that it could pursue an action against COB if it so chose, and as it had threatened since before AJP began to represent COB (*see id.* Ex. T), and as its investors had

been urging since at least 2000 (*see id*. Ex. I). Its actions against Pans in Belgium were an example of action ISG in fact did take at an earlier date. (*See id.*. Exs. D, E, F, G.)

39.   AJP does not know of any legal action that could have been taken on behalf of ISG between August 1999 and October 2001 that was not still available to ISG at that time. (*See* AJP Decl. at ¶17.)

## VI.   The May 29, 1998 Wire Transfer From COB

40.   On May 29, 1998, COB sent $821,490 by wire transfer to an escrow account of ESCM at Mellon Bank in Pittsburgh Pennsylvania. Pursuant to the express instructions of COB, ESCM distributed the transferred funds to various persons and entities as follows: Monaco Holdings Ltd., $197,473.33; Group C. Marketing Inc., $103,933.33; DSC Holdings, Inc., $207,866.67; Tracy Edmonds, $103,933.33; Sarif & Associates, $103,933.33; and The Lara Family Trust, $103,933.33. After distributing the aforesaid amounts pursuant to the instructions of COB, the sum of $416.68 was left over from the original transfer amount and was returned to COB. ESCM did not retain any portion of the May 29, 1998 wire transfer. (*See* Affidavit of Timothy S. Coon.)

-12-

Respectfully submitted,

GREENBERG TRAURIG, LLP AND
A. JOHN PAPPALARDO,

By their attorneys,

/s/ Paul B. Galvani

Paul B. Galvani (BBO # 183800)
Matthew P. Garvey (BBO # 655419)
Ropes & Gray LLP
One International Place
Boston, MA 02110
Tel.: (617) 951-7000

ECKERT, SEAMANS,
CHERIN AND MELLOTT, LLC,

By its attorneys,

/s/ Devorah Levine

William B. Mallin (admitted pro hac vice)
Timothy S. Coon (admitted pro hac vice)
Devorah A. Levine, Esquire (BBO #650813)
Eckert Seamans Cherin & Mellott, LLC
One International Place
Boston, MA 02110
(617) 617) 342-6800

Dated: May 31, 2005

-13-

## CERTIFICATE OF SERVICE

    I, Matthew P. Garvey, a member of the Bar of this Court, hereby certify that on this day, May 31, 2005, the above joint statement of material facts as to which there is no genuine issue to be tried was served on the plaintiff by causing a copy of the same to be hand delivered to its counsel, Jessica Block, Esq., Block & Roos, LLP, 60 State Street, Suite 3800, Boston, MA 02109.

_____
Matthew P. Garvey