UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| INTERNATIONAL STRATEGIES GROUP, LTD. ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> GREENBERG TRAURIG, LLP., A JOHN ) <br> PAPPALARDO, AND ECKERT, SEAMANS, ) <br> CHERIN AND MELLOTT, LLC, ) <br> ) <br> Defendants ) <br> ) | CIVIL ACTION NO.: 04-12000 RWZ |

DECLARATION OF A. JOHN PAPPALARDO

A. John Pappalardo declares as follows:

1.  I am an attorney licensed to practice law in the Commonwealth of Massachusetts, and am admitted to practice in this Court, among others.

2.  I am Co-managing Shareholder in the Boston office of the law firm Greenberg Traurig, LLP. I joined that firm on March 8, 2001. Prior thereto, I was a member of the law firm Eckert Seamans Cherin & Mellott, LLC, practicing in its Boston office.

3.  Before joining Eckert Seamans Cherin & Mellott, LLC in 1997, I served from 1975 – 1993 in various capacities as a prosecutor in Norfolk County, the Commonwealth of Massachusetts, and the United States Attorney's Office, culminating with the position of United States Attorney for the District of Massachusetts. From 1994 – 1997, I was a partner at Dwyer & Collora, LLP.

4.  I have reviewed the pleadings in this Action and submit this Declaration in Support of the Defendants' Motions for Summary Judgment.

5.  At no time did I act as attorney for International Strategies Group, Inc. ("ISG"). My clients, and those of my law firms, regarding the matters in litigation were Corporation of the Bank House and its affiliate Société Bank House (collectively, "COB"). Contrary to the assertions of the plaintiff, I never represented ISG. No engagement letter was ever entered into by me or my firms with ISG, no file was opened in its name, and no invoice was ever sent to or requested by ISG for my services. In fact, because of the potential and, ultimate, conflict between ISG and my client COB, I could not have represented ISG in any respect without first obtaining sufficient waivers, and never could have represented ISG adversely to COB.

6.  I first became involved in the matter in July, 1999, and I first had contact with ISG in August, 1999, when I first communicated with anyone connected with ISG. On August 20, 1999, I wrote to Philip G. Clark, Director of ISG. Mr. Clark is an attorney who, at the time, was licensed to practice law in Hong Kong. In my letter, a copy of which is attached hereto as Ex. A, I specifically stated, "As you know, I am counsel along with others, for Société Bank House ("C.O.B.")...." In that letter, I reported that the Assistant United States Attorney in Chicago had told me that the federal investigators had concluded that COB was a victim of fraud and misrepresentation in connection with the transactions that are at issue in this litigation.

7.  For approximately two years thereafter, at the direction of COB, I had communications from time to time with Mr. Clark and his co-director Chris Barber concerning ISG's ill-fated investment with COB. ISG acknowledged that I represented COB and as such could only correspond with ISG on COB's instructions. In a letter from Mr. Clark to me dated

March 30, 2000, Mr. Clark wrote: *"While I appreciate that you act for Corporation of the Bankhouse (COB), I find that your failure to respond to any of our correspondence insulting and unprofessional. It is not beyond the parameters of your ethical requirements for you to correspond with International Strategies Group (ISG) on COB's instructions."* (A copy of that letter is attached hereto as Ex. B. Emphasis added.) I repeatedly reminded Mr. Clark that I represented COB, not ISG, and I told him on numerous occasions that he should take whatever action he deemed appropriate on behalf of ISG. In fact, he did initiate such action, including: contacting the FBI in Chicago (*see* e-mail from Mr. Clark to me of 9/27/01, a copy of which is attached hereto as Ex. C), hiring two Belgian lawyers and commencing legal proceedings in Belgium against Albert Pans, an officer of my client COB, which resulted in Pans's going to jail (*see* Telefax by Guy Janssens to Mr. Pomeroy of 9/2/99, a copy of which is attached as Ex. D, memo from Christopher Jones to me and Mr. Pomeroy of 10/1/99, a copy of which is attached as Ex. E, Letter from Mr. Clark to me of 4/7/00, a copy of which is attached as Ex. F, and Letter from Mr. Clark to Terkild J. Terkildsen and Jorgen G. Mortensen of 2/1/01, a copy of which is attached hereto as Ex. G); and ultimately retaining counsel for ISG in the United States at least as early as July 18, 2001 (*see* e-mail from Mr. Clark and Chris Barber of 7/18/01, a copy of which is attached as Ex. H).

       8.      While I undertook action on behalf of COB that I believed might facilitate the recovery of the investments not only of ISG and its participating investors (some of whom, at least, also had separate counsel – *see, e.g.,* e-mail from Peter van Loosbroek to Mr. Barber of 3/9/00, a copy of which is attached hereto as Ex. I, and Letter from Mr. Clark to me, James Pomeroy, Peter Ness, and Chris Jones of 1/30/01, a copy of which is attached hereto as Ex. J), but also of St. Frederickslund Group and P.R.C.S. Limited, I never acted as attorney for these

-3-

customers of COB. My role was analogous to that of counsel for a bankrupt estate, seeking recovery of estate assets for the benefit of creditors. Such counsel does not represent the creditors of the estate, although they may derive benefit from his efforts.

9. While, with COB's assent, ISG and St. Frederickslund Group executed Powers of Attorney in July 2000 authorizing me to take action necessary to transfer and deliver their lost investments upon recovery and further authorizing Eckert Seamans Cherin & Mellot, LLC to hold any recovered funds in escrow for the investors, those Powers of Attorney made me an "Attorney-in-Fact", not an attorney at law, for ISG. (A copy of ISG's Power of Attorney is attached hereto as Ex. K.) There were no subsequent agreements between me and ISG regarding the Power of Attorney executed by ISG.

10. When I first became involved in representing COB in connection with this matter, the invested funds in question had long since been transferred away from COB to Swan Trust, where they had been diverted. (*See* Ex. A.) Indeed, I learned that most of the funds had been transferred to First Merchant Bank ("FMB") in Turkish Cyprus. Moreover, it was my understanding that all of the money was completely gone by the time I came to represent COB, and I knew of no money in the United States that could be traced back to the Swan Trust diversion. Prior to my involvement, COB had directly engaged the services of a business named T.T.& T. Omnia that purportedly specialized in collection of debt. At the direction of COB, I forwarded a draft "Action Plan" prepared by T.T. & T. Omnia to Mr. Clark on June 1, 2000. A copy of my fax to Mr. Clark, along with the attached draft action plan, is attached hereto as Ex. L. That draft, which was never finalized or executed, contemplated that all investors and COB would work as a team to seek recovery of capital. Steps were contemplated in various venues to try to apply pressure as appropriate to recover the lost funds. It suggested that I would

coordinate team efforts and provide investors with regular updates. In that sense, it recited that I would "represent" the team.

11.    The unexecuted draft "Action Plan" did not create an attorney client relationship between me and any of the investors. No other investor has ever maintained to the contrary. I was to be a spokesperson only, not attorney at law, for the various "team" members. I continued to act as attorney for COB only, as ISG and its Directors Philip Clark and Chris Barber well knew. Indeed, several investors, including ISG, had their own attorneys, some of whom took independent legal action on behalf of their clients during the time that I was representing COB. (*See, e.g.,* Exs. D, E, F, G.)

12.    In paragraph 38 of its Amended Complaint, ISG alleges that FMB and ABN AMRO Bank N.V. ("ABN AMRO") could have been sued in the United States and that those two banks had violated banking regulations in connection with the transfer of ISG's funds, which had occurred in February 1999. I do not know if that was the case, but I do know that ISG was contemplating taking action against ABN AMRO and FMB on its own at least as early as June 10, 2000. (*See* e-mail of Mr. Clark to Vladimir and Moshe of 6/10/00, a copy of which is attached at Ex. M.) By letter dated March 30, 2000, Mr. Clark had told me ISG was considering taking "action against May Davis" and "also considering direct dealings with Amro Bank immediately." (A copy of that letter is attached hereto as Ex. N.) On January 22, 2001 Mr. Barber e-mailed me a letter from Mr. Clark addressed to me in which Mr. Clark stated that he was motivated "to communicate with the FBI in an effort to ascertain the position with Joan Patrick." (A copy of that e-mail and the attached letter is attached hereto as Ex. O.) ISG also instigated criminal proceedings against Albert Pans of COB in Belgium in connection with an ABM AMRO account, leading to Pans's incarceration. (*See* Exs. D, E, F, G.)

13. In their e-mail message to me dated July 18, 2001, Messrs. Clark and Barber of ISG state the following: "Obviously, we continue to prepare a comprehensive case against Jim [Pomeroy] and COB *and have sent further documents across to the US for legal advice.*" (Ex. H. Emphasis added.) Then, in a letter dated August 15, 2001, a copy of which is attached hereto as Ex. P, Mr. Barber wrote to me posing questions and suggestions related to a possible civil action and raising, inter alia, "the Statute of Limitation issue." In numerous conversations, Clark represented that he had retained lawyers both in the United States and abroad and that they would take the necessary legal steps to secure ISG's investment. Clark further repeatedly stated that his interests were adverse to those of COB. (*See, e.g.*, Ex. O.)

14. In paragraph 45 of its Amended Complaint, ISG alleges that, in late October 2001, it had hired independent counsel in the United States to recover its investment. In fact, it is apparent from the 7/18/01 e-mail that ISG had been conferring for several months already with such counsel. (*See* Ex. H.) Moreover, ISG knew in December 2001 that St. Frederickslund had sued COB and related persons/entities in this Court on November 14, 2001. (A copy of the Complaint in *St. Frederickslund Holding A/S v. SB Global, Inc.*, Civ. A. No. 0111968, is attached hereto as Ex. Q.) In a letter to me of December 11, 2001, Mr. Clark referred to that litigation and to his lawyer here in Boston, Kathleen Stone. (A copy of that letter is attached hereto at Ex. R.) Mr. Clark's letter explained that ISG was preparing to file proceedings against COB and referred to possible action against Joan Patrick. It also recounted communications with the FBI, about which ISG stated: "We are conjecturing that this will cause FMB and ABN Amro to be required to provide details as to the present location of the funds.... It will also increase the focus we expect upon Jim Pomeroy's activities." The letter further stated as follows: "In anticipation of these developments we are planning to meet with the Chairman of ABN Amro in

Amsterdam early in the New Year. The meeting will primarily concern events in Belgium commensurate with Jim Pomeroy's fraudulent transfer of funds. However, it would be helpful and appropriate during the meeting to raise concerns with respect to what by all accounts, was an unauthorised transfer of the funds subsequently out of the US jurisdiction. You have in the past indicated that you have in your possession documentary evidence to this effect. Clearly anything of this nature should be passed to Kathleen."

15.  The statute of limitations on ISG's claims against FMB, COB, Pomeroy, Pearlberg and others did not expire until at least February 2002, three years after funds ISG had invested with COB were deposited in an account at FMB. *See* Am. Compl. at ¶15. Prior to that date, ISG had ample opportunity and ability to sue the parties it ultimately did sue. Nothing I did impaired any rights of ISG. On the contrary, my actions and communications facilitated the ability of ISG to take action against third parties who misappropriated its funds. For example, when Kathleen Stone, counsel to ISG, contacted me in November 2001, I communicated that ISG likely had a case against persons and entities such as May Davis, Henry Pearlberg, C. Joan Patrick, and FMB. Moreover, attached as Exhibit 9 to the St. Frederickslund Complaint of November 14, 2001 (Ex. Q) was a memorandum generated by me on November 9, 2001 that recapitulated the important players and events as I then understood them. When Mr. Clark and I were in London together in June 2000, I handed him a more comprehensive analysis of what had occurred that had been prepared by Peter Ness of COB, which formed the basis for this memorandum, complete with exhibits.

16.  At no time prior to October 2001 was I aware of the financial condition of COB. Moreover, as Mr. Clark and ISG well knew, I could not have taken action adverse to my client COB. In fact, in a letter to me and Messrs. Pomeroy and Jones and Peter Ness dated March 28,

2001, a copy of which is attached hereto as Ex. S, Messrs. Clark and Barber wrote that they understood the "conflict or potential conflict" between ISG and COB. ISG long knew that it could pursue an action against COB if it so chose, as it had threatened since before I came to represent COB, *see* Letter from Mr. Clark to Mr. Pomeroy of 4/15/99, a copy of which is attached hereto as Ex. T, and as its investors had been urging since at least 2000, *see* Ex. I. Its actions against Pans in Belgium were an example of action ISG in fact did take.

17.  I do not know of any legal action that could have been taken on behalf of ISG between August 1999 and October 2001 that was not still available to ISG at that time.

Signed under the pains and penalties of perjury on this 26th day of May 2005.

A. John Pappalardo