UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

INTERNATIONAL STRATEGIES GROUP, LTD.,

Plaintiff,

v.

CIVIL ACTION NO. 04-12000 RWZ

GREENBERG TRAURIG, LLP., A. JOHN
PAPPALARDO, AND ECKERT, SEAMANS,
CHERIN AND MELLOTT, LLC.,

Defendants.

## RESPONSE OF INTERNATIONAL STRATEGIES GROUP TO DEFENDANTS' JOINT STATEMENT OF MATERIAL FACTS

International Strategies Group, Ltd. ("ISG") responds as follows to the Joint Statement

of Material Facts submitted by defendants Greenberg Traurig, LLP ("GT"), A. John

Papparlardo ("AJP") and Eckert, Seamans, Cherin and Mellott, LLC ("ESCM"). Further facts

relevant to ISG's opposition to the pending motions for summary judgment ("ISG's

Opposition") are set forth in the affidavits of Christopher M. Barber, Philip G. Clark,

Christopher G.L. Jones, Frank Hansen, and Kathleen C. Stone, and the exhibits attached

thereto. Additionally, Jessica Block, counsel for ISG in this action, has submitted an affidavit

under Fed.R.Civ.P. 56(f) and attached exhibits previously produced in discovery in

*International Strategies Group, Ltd. v. Corporation of the Bankhouse, et al*, Civil Action No.

02-10532-RWZ ("the COB Litigation") or through Automatic Disclosure but which ISG has not

had the opportunity to authenticate or explore further through deposition discovery in this case.

1.     *In 1998, ISG invested $4 million with COB. (See Transmittal Affidavit of Matthew P. Garvey ("Garvey Aff.") Ex. 1 ¶ 13.). COB in turn invested ISG's $4 million, along with $10 million from Danstrupland Holding A/S, a Danish company that later changed its name to Store Frederikslund Holding A/S ("St. Frederikslund"), and $5 million from a British company, P.R.C.S., with an entity called Swan Trust. (See Garvey Aff. Ex. 1 ¶J 16,27). ISG ratified this investment. (See id. ¶ 25).[1]*

       **ISG's Response**: ISG agrees that it placed $4 million with COB for deposit in a Federal Reserve Guarantee Program. ISG further refers to the affidavit of Christopher Barber, ¶¶ 1-12, as to the lies told to ISG by representatives of COB to induce it to make the original $4 million deposit into a Federal Reserve Guaranteed Program in 1998 and, later, to agree to transfer the same amount in anticipation of a new proposed investment of the same amount. ISG states that later COB deposited with Swan Trust for proposed investment $15 million of funds from (i) St. Frederikslund and P.R.C. S., together with (ii) $4 million, which COB's CEO, James F. Pomeroy ("Pomeroy"), represented to be ISG's funds,  but which was, in fact, a transfer from an unnamed account (COB, ESCM and Pomeroy already having depleted all or most of ISG's original funds).


2.     *Henry Pearlberg ("Pearlberg"), a trustee of Swan Trust, made various unauthorized transactions with the $19 million, including directing on February 5, 1999 that $16.7 million be deposited in accounts belonging to First Merchant Bank OSH Ltd. ("FMB") at ABN AMRO Bank N.V. ("ABN AMRO"). (See Garvey Aff Ex. 2, ¶¶ 113,144.) FMB was a banking entity operating out of the Turkish Republic of Northern Cyprus. (See*

---

[1] The "facts" as characterized by defendants are set forth in italics. ISG's response is set forth below each recitation in plain type.

*id. at ¶ 3.) The FMB investment was recommended and directed by C. Joan Patrick ("Joan Patrick"), an independent broker working with the May Davis Group ("May Davis"), an investment bank in New York. (See id. ¶¶ 126,127.) The entire $19 million was depleted by February 16, 1999. (See id. ¶ 156.) Pearlberg had apparently returned approximately $1,115,000 to either COB or to COB's Chief Executive Officer James F. Pomeroy II ("Pomeroy") in early 1999. (See Garvey Aff. Ex. 3.)*

**ISG's Response.** Undisputed, except ISG clarifies that while the entire $19 million may have been transferred by Pearlberg from the Bank of New York to FMB by February 16, 1999, funds were still available in FMB's concentration and sweep accounts through May 2000. (Barber Aff, Exhs. I and J).

*3.     By no later than July 16, 1999, ISG had learned that the Swan Trust funds were held in the accounts of FMB, and by July 28, 1999, ISG also knew that the funds had been depleted and that a "workout" was necessary to somehow collect the funds that had been invested in Swan Trust. (See id) On July 28, 1999, Phillip G. Clark ("Clark"), a Hong Kong attorney and a Director of ISG, wrote to Pomeroy and took issue with, among other things, Pomeroy's apparent interpretation that the $1,115,000 COB received back from the Swan Trust did not belong to ISG. (See id.)*

**ISG's response.** ISG refers to the July 28, 1999 letter referenced herein from Clark to Pomeroy for its entire contents. ISG further notes that the letter does not indicate that ISG was aware the $19 million had been "depleted," but rather indicates ISG's perception, created by Pomeroy, that funds were available from FMB through the proposed workout within 15 days.

4.    *By August 17, 1999, Pearlberg was apparently penniless; he was accused of defrauding an innkeeper in California when he could not pay his bill, and he claimed his money was being held by FMB. (See Garvey Aff. Ex. 4.) COB was insolvent, or nearly insolvent, beginning in 1998. (See Garvey Aff. Ex. 1 30.)*

**ISG's Response:** Without further discovery, ISG is unable to determine whether Pearlberg's financial condition as of August 17, 1999 and further states that the exhibit referenced by defendants, a one-page letter from an investigator in the Monterey County Sheriff's office, does not prove the point asserted by defendants. ISG further states that COB may or may not have been insolvent "beginning in 1998," but it and its CEO James F. Pomeroy ("Pomeroy") helped themselves to ISG's money on and after May 29, 1998 and perhaps funds of other syndicate participants, helped themselves to the first "tranche" of funds received from FMB at the end of July, 1999, received at least $19 Million from September 1998 through October 26, 2001, received internal transfers from SB Global ("SBG") and were launching new investments through SBG, which was also a defendant in the COB Litigation. (Block Aff., Exhs. 34-35; Hansen Aff.,¶9).

5.    *AJP first became involved in the matter in July, 1999. (See AJP Decl. ¶6.)*

**ISG's Response.** Without further discovery, including the narratives of the legal bills, ISG has no way to verify whether this statement is true or not. (Block Aff.,¶¶ 1, 3-4).

6.    *AJP is Co-managing Shareholder in GT's Boston office. He joined that firm on March 8, 2001. Prior thereto, he had been a member of ESCM since 1997, practicing in its Boston office. (See AJP Decl. at ¶¶2-3.)*

**ISG's Response:** ISG has no reason to doubt the veracity of this statement.

7.     *AJP and his firms were retained by COB regarding the matters now in litigation. (See AJP Decl. ¶5.)*

**ISG's Response**: ISG does not understand the reference to "the matters now in litigation." For instance, AJP and his firms did not represent COB in the COB Litigation, as they had a conflict of interest and referred the matter to Gary Crossen of Rubin & Rudman. ISG does not dispute that AJP and his firms represented COB for a number of years on a variety of matters, including during the time COB and Pomeroy and Albert Pans were defrauding ISG and including representing COB, PRCS, St. Frederikslund and ISG in connection with the Swan Trust recovery. (Barber Aff., ¶¶14-20 (and referenced exhibits); Clark Aff, ¶¶5-21 (and referenced exhibits), Block Aff., Exhs 1, 11,14,15.)

**8.**    *By the time of AJP's involvement in the matters now in litigation, all of the invested funds in question had long since been transferred away from COB to Swan Trust, where they had been diverted, primarily to FMB. (See id. ¶10, Ex. A.) AJP knew of no money in the United States that could be traced back to the Swan Trust diversion. (See id. ¶ 10.)*

**ISG's Response:** Without further discovery, ISG is unable to determine what AJP knew in July, 1999 or what due diligence he took upon being retained as to the location of funds available for attachment or injunction. (Block Aff.,¶¶1, 3-4). ISG has learned that monies were available to be enjoined in the FMB concentration and "sweep" accounts at ABN Amro bank through May 12, 2000. (Barber Aff., Exhs I,J)  Moreover, assuming AJP was retained in July 1999 and consulted with his then partner, Stephen Burr, he would have known that COB and Pomeroy received back from FMB $1,215,000 from Swan Trust as a "first tranche," as Pomeroy wrote a memorandum to Burr describing same, which memorandum was produced by

5

AJP in the COB Litigation as coming from his files on the matter. (Block Aff., Exh. 4). AJP
also noted at the time of his retention, "all banks have assets on US soil." (Block Aff., Exh. 16).

     9.     *Prior to AJP's involvement, COB had directly engaged the services of T.T.& T.*
*Omnia that purportedly specialized in collection of debt. (See id.)*

     **ISG's Response:** Disputed. The contract between COB and TTTO is dated
September 7, 1999, *after* the date AJP states he was retained. (Block Aff, Exh. 39.).

     10.     *At no time did AJP act as attorney for ISG. (See AJP Decl. at ¶5.) No*
*engagement letter was ever entered into by AJP, ESCM or GT with ISG, no file was opened in*
*ISG's name, and no invoice was ever sent to or requested by ISG for services. (See id.) In fact,*
*because of the potential and, ultimate, conflict between ISG and AJP's client COB, he could*
*not have represented ISG in any respect without first obtaining sufficient waivers, and never*
*could have represented ISG adversely to COB. (See id)*

     **ISG's Response**: ISG disputes that AJP did not act as attorney for ISG (and
the two other syndicate participants) in connection with the Swan Trust recovery (Barber Aff.,
Clark Aff., Opposition to the Motion for Summary Judgment, pp. 21-26; Barber Aff.,¶¶14-20
(and referenced exhibits); Clark Aff, .,¶¶5-21 (and referenced exhibits); Hansen Aff.¶ 7 and
Exhs. 7,8, Jones Aff., ¶3 ). Without discovery ISG is unable to determine what files were
opened at either GT or ESCM. (Block Aff.,¶¶ 1, 3-4). ISG does not dispute that AJP should
have obtained sufficient waivers.

     11.     *In his very first letter to ISG on August 20, 1999, AJP wrote to Clark, "As you*
*know, I am counsel along with others, for Societe Bank House ("C.O.B.")...." (See id. Ex. A.)*

6

**ISG's Response**: ISG refers to the letter described for its contents and further states that the correspondence sent to ISG on August 20, 1999, the letter sent to May Davis Group and Swan Trust on August 12, 1999, other correspondence sent or copied to ISG was intended to induce and did induce reliance on AJP and the other defendants to protect ISG's interests. (Barber Aff.,¶¶14-20 (and referenced exhibits); Clark Aff, .,¶¶5-21 (and referenced exhibits).

*12.    In the August 20, 1999 letter, AJP also reported that the Assistant United States Attorney in Chicago had told him that federal investigators had concluded that COB was a victim of fraud and misrepresentation in connection with the Swan Trust investment. (See id.)*

**ISG's Response**: ISG agrees that is what AJP reported but further states that it has not had the opportunity to take discovery on communications between AJP and the Assistant U.S. Attorney investigating this matter. (Block Aff.¶¶1, 3-4).

*13.    For approximately two years thereafter, at the direction of COB, AJP had communications from time to time with Clark and ISG Co-Director Christopher Barber ("Barber") concerning ISG's ill-fated investment with COB.   AJP repeatedly reminded Clark that he represented COB, not ISG, and he told Clark on numerous occasions that Clark should take whatever actions he deemed appropriate on behalf of ISG. (See id. ¶ 7.)*

**ISG's Response**. ISG agrees that AJP had direct communications with both Clark and Barber, separately and together, but denies that he told Clark on numerous occasions to take whatever actions he deemed appropriate on behalf of ISG.  To the contrary, AJP warned Clark repeatedly not to complicate matters through independent

7

actions so as not to jeopardize recovery efforts and made numerous representations to ISG to keep it in a "hold pattern" and to induce ISG to think that he and his law firms were representing ISG's interests as well as COB's (Clark Aff, .,¶¶5-21 (and referenced exhibits), AJP told Clark that ISG's interests and COB's were "one and the same." (Clark Aff., ¶8).

*14.     Clark is a Hong Kong-based attorney and Director of ISG. At times in his correspondence with AJP, such as in a letter dated December 2, 1999, Clark used letterhead reading "Philip G. Clark & Co, International Legal Council, Hong Kong." (See Garvey Aff. Ex. 5.)*

**ISG's Response:**    Not disputed.

*15.     ISG contemplated taking legal action on its own in connection with its investment both prior to and throughout the period that AJP was representing COB, and Clark and Barber often expressed this sentiment to AJP. ISG was considering its legal options against COB in connection with its investment at least as early as April 15, 1999, when Clark wrote to COB's Mr. Pomeroy regarding ISG's investment with COB: "You seem to be under the mistaken impression that I am posturing with respect to the need for ISG to consider it's [sic] legal options." (See AJP Decl. Ex. T.)*

**ISG's Response.** ISG certainly agrees that before its introduction to AJP, it contemplated its "legal options" against COB, but, as AJP knew, once he was introduced as the attorney for Swan Trust recovery, ISG relied upon his advice and expertise exclusively in recovering money from the banks, Pearlberg, Patrick and others and forbore from initiating an adverse action against COB and Pomeroy. (Barber Aff.,¶¶14-20 (and referenced exhibits); Clark Aff, .,¶¶5-21 (and referenced exhibits).

8

16.     *In 1999 ISG, while represented by two Belgian lawyers, initiated criminal proceedings against Albert Pans of COB in Belgium in connection with an ABM AMRO account, leading to Pans' incarceration. (See AJP Decl. Exs. D,E,F,G.)*

        **ISG's Response:** ISG admits that it caused to be commenced a criminal investigation against Pans, whom it (falsely) was led to believe, by Pomeroy and by AJP, acted in a rogue capacity without the knowledge of Pomeroy. (Clark Aff., ¶¶7,12-3). It appears that Pans was incarcerated for defrauding an Australian businessman, using COB's name. (AJP Declaration, Q 9, page 3).

17.     *ISG retained counsel in the United States at least as early as July 18, 2001. (See AJP Decl. Ex. H.)*

        **ISG's Response**. Disputed. ISG did not retain counsel in the United States until November 2001. (Clark Aff., ¶ 22 ; Stone Aff., ¶ 2).

18.     *At least some of ISG's participating investors had separate counsel. (See AJP Decl. Exs. I.)*

        **ISG's Response**. Undisputed, but their intention was to sue ISG, not COB. (Clark Aff.,¶17 and Exh. N).

19.     *ISG was contemplating taking action on its own in connection with the Swan Trust matter at least as early as March 30, 2000, when Clark told AJP that ISG was considering taking "action against May Davis" and "also considering direct dealings with Amro Bank immediately." (See AJP Decl. Ex. N.)    By no later than June 10, 2000, ISG was considering taking action against FMB and ABN AMRO. (See AJP Decl. Ex. M.)*

        **ISG's Response**: ISG refers to the March 30, 2000 letter *(See* AJP Decl. Ex. N)*

9

and the June 10, 2000 e-mail *(See* AJP Decl. Ex. M.) for their entire contents. ISG further states that the March 30, 2000, letter does not indicate that ISG was considering taking action against May Davis – indeed ISG expected, based on the August 12, 1999, letter from Burr, that one or both of ESCM and GT was preparing actions against May Davis. *See also* AJP Decl., Ex. M (memorandum from Clark to AJP mail dated 1/17/2001)) ("This follows on the heels of the May Davis Investment Bank position where you were categoric in your assurances to us as to how very strong *our* (emphasis added) position was and how you would be drawing up a letter to commence steps against them.") The June 10, 2000, e-mail similarly does not indicate that ISG was considering taking action against FMB and ABN Amro – that e-mail was, instead, an explanation to TTTO as to ISG's position, including the urgency of keeping its own investors from suing it, because it was relying in good faith on AJP's promises of recovery through his representation. In March, 2000, ISG had considered, in the absence of communication from AJP, dealing directly with the ABN Amro instead of relying on AJP *(See AJP Decl. Ex. N.).* However, AJP responded to ISG with phone calls, e-mails and assurances of his involvement for all parties, and kept ISG in a hold pattern. By June 2000, AJP met with Clark in London, presented him with the action plan, and, after such discussion, ISG appointed AJP as the attorney to work exclusively representing the team. (Clark Aff.,¶¶11-16).

20. *On January 22, 2001, Barber e-mailed AJP a letter from Clark addressed to AJP in which Clark stated that he was motivated "to communicate with the FBI in an effort to ascertain the position with Joan Patrick." (See AJP Decl. Ex. O.)*

        **ISG's Response**: ISG refers to the letter for its entire contents. The letter indicates that Clark only was motivated to communicate with the FBI regarding the position of Joan Patrick in the absence of communication from AJP. However, AJP did respond to ISG

thereafter (Barber Aff., ¶ Clark Aff. ¶17 and Exhs. O, P.) On February 2, 2001, AJP's secretary wrote Barber, by e-mail, "Chris, please let Philip know that John will respond to his recent letter on Monday." (Barber Aff., Exh. P). On March 14, 2001, AJP, having just left ESCM for GT, promised ISG, "My new firm is exploring a suit against Joan Patrick whether or not she chooses to sign over rights to the remaining account at FMB." (Barber Aff., Exh.R).

21.     *On January 30, 2001, Clark and Barber wrote to AJP, Pomeroy, Peter Ness and Chris Jones expressing concern that the matter of the squandered investment was going to be made public in Hong Kong, in which case, they stated: "... we will be forced to proceed with haste in the United States, to the detriment of all parties. Obviously fraud and inducement [sic] will be straightforward allegations to substantiate, without even developing into a discussion with respect to money secretly transferred from Belgium amid representations that it remained intact, and the already defined criminal activity in Belgium." (See AJP Decl. Ex. J.) In the letter of January 30, 2001, Clark and Barber also stated that they had "formed preliminary views as to how we would wish to pursue Joan Patrick and May Davis in conjunction with you...." (See id.)*

     **ISG's Response:** ISG refers to the letter for its entire contents. Further ISG notes the purpose of this letter was to impress upon AJP how ISG's investors in Asia and Europe were threatening legal action against ISG and to ask for his assistance. ISG further notes that the letter contemplates representation against Patrick and May Davis by AJP.

22.     *Clark proceeded to "conduct a series of communications with Robert Klimas," an FBI agent in Chicago investigating the transaction, and on September 27, 2001, Clark reported to AJP that AJP "should be in no doubt that the documents in our possession*

11

*will procure [Pomeroy's] indictment." (See AJP Decl. Ex. C.)*

**ISG's Response**: ISG refers to the referenced e-mail for its entire contents.
By the end of September, 2001, as indicated in the e-mail,. ISG did communicate directly
with Klimas. ISG further notes, however, that Clark adds, "Kindly advise by return how the
civil action is progressing. This is most urgent and important in my considerations prior to
next month. I still consider my relationship with you vital so that a conversation this evening
might be fortuitous."


*23.    On June 9, 2000, ISG suggested that AJP prepare a power of attorney for ISG
and COB's other investors, St. Frederikslund and P.R.C.S., that would grant AJP or ESCM the
limited authority "to receive principle [sic], and profit appurtenant thereto, on [the investor's]
behalves and that disbursement of such amounts be subject to the prior unanimous approval of
all three investors." (See Garvey Aff. Ex. 6.)*

**ISG's Response**: ISG disputes that ISG proposed the power of attorney. AJP
proposed the power of attorney in connection with the discussion of the action plan drafted by
"Vladimir," which included a requirement of a written agreement by ISG, PRCS and St.
Frederikslund to allow AJP to represent the team. The power of attorney signed by ISG was
prepared by ESCM.  (Clark Aff.,¶¶ 15-6 ).

*24.    The power of attorney that Clark, on behalf of ISG, executed in favor of AJP on
July 11, 2000, authorized AJP to "transfer and deliver personal property or that which [Clark]
hold[s] in a representative capacity relating to an investment made with Swan Trust on or
about April 1998 through [COB] and to sign and execute and deliver any and all papers or
instruments necessary to obtain, collect and transfer all principle [sic] profits or any income*

*whatsoever belong to [ISG]," (See AJP Decl. Ex. G.) The power of attorney also granted AJP the authority "to do all acts and take whatever steps which in his judgment are necessary, convenient or expedient in the effort to collect and transfer the above described funds." (See id.)*

**ISG's Response:** ISG refers to the power of attorney drafted by AJP for its entire contents, including ISG's appointment of AJP as its "true, sufficient and lawful attorney for [ISG]." ISG also refers to the side letter (see below) describing the conditions under which it gave a power of attorney to AJP.

*25.     There were no subsequent agreements between AJP and ISG regarding the Power of Attorney executed by ISG. (See AJP Decl. at ¶9.)*

**ISG's Response:** Disputed. On July 11, 2000, as a condition of signing the power of attorney, ISG sent by e-mail and telecopier a side letter stating, "The Directors of ISG seek to, and do hereby clarify and render as a matter of record that the Power of Attorney is given to Messrs. Eckert Seamans Cherin & Mellott, LLC and specifically to Mr. A. John Pappalardo upon the understanding that it will be actioned by the attorney with the utmost good faith and due care having regard to the interests of ISG. In particular, the Directors of ISG require that all communications concerning any matter affecting or affected by the Power of Attorney, directly or indirectly, which may concern or relate to the interests of ISG will be communicated by the attorney fully, and on a timely basis." (Barber Aff.,¶15 and Exh O). If AJP disagreed with the contents of the side letter, he never so informed ISG. (Id; Clark Aff., ¶16).

26.     *At the direction of COB, AJP forwarded a draft "Action Plan" prepared by T.T. & T. Omnia to Mr. Clark on June 1, 2000. (See AJP Decl. ¶ 10.) That draft, which was never*

*finalized or executed, contemplated that all investors and COB would work as a team to seek recovery of capital. (See id. Ex. L.) Steps were contemplated in various venues to try to apply pressure as appropriate to recover the lost funds. (See id.) It suggested that AJP would coordinate team efforts and provide investors with regular updates. In that sense, it recited that AJP would "represent" the team. (See id. ¶ 10.)*

**ISG's Response:** Without further discovery, ISG is unable to determine the circumstances that led to AJP's forwarding the action plan to Clark. (Block Aff.¶¶1,3-4) ISG notes, however, that on June 1, 2000, Pomeroy approved a "general attack plan that makes the investors in line." ((Block Aff., Exh. 25). Perhaps this document is what defendants refer to as "the direction of COB." ISG also disagrees that the action plan was never executed or finalized. ISG executed the action plan by signing the power of attorney. On August 24, 2000, AJP informed Barber that he executed the action plan on his end. (Barber Aff., Exh. Y).

27.    *AJP continued to act as attorney for COB only, as ISG and its Directors Philip Clark and Chris Barber well knew. (See AJP Decl. ¶ 11) Indeed, ISG and several of its several investors had their own attorneys, some of whom took independent legal action on behalf of their clients during the time that AJP was representing COB. (See AJP Decl. Exs. D,E,F,G,I.)*

**ISG's Response**: ISG disputes that AJP acted as attorney for COB only especially in light of, *inter alia*, ISG's forbearance, with AJP's knowledge, from independent actions; ISG's expressed reliance on his efforts; and statements about the importance of its relationship with him; ISG's misapprehension, based upon AJP's representation, that civil proceedings initiated by AJP or other attorneys at ESCM or GT were progressing or would progress on behalf of all the investors; and ISG's request for legal advice regarding Swan Trust recovery actions. Barber Aff., ¶¶14-20 (and referenced exhibits); Clark Aff, ¶¶5-21 (and

14

referenced exhibits), St. Frederikslund similarly considered both AJP at ESCM and Stephen
Burr at GT to be their U.S. attorneys in relationship to the Swan Trust recovery. (Block Aff.,
Exhs.11. 14,15; Hansen Aff., 7 and Exh. 7,8). The investors who retained their own attorneys
in Europe and Asia were looking to sue ISG, not COB. (Clark Aff., ¶17.)  AJP knew that Clark
was not admitted to practice in the United States and could not sue COB or any other parties in
the United States. Moreover ISG's investors who retained counsel were placated by AJP on
March 16, 2001, after AJP assured them in a conference call that he was acting for all of the
Swan Trust participants, including ISG. (Barber Aff., ¶17.)

28.     *Even considering "the circumstances of the Power of Attorney", and well after
circulation of the unexecuted, draft "Action Plan", ISG considered itself to be a "third part[y]"
to the AJP-COB attorney-client relationship, and Barber stated such to AJP by letter dated
August 15, 2001. (See AJP Decl. Ex. P.)*

        **ISG's Response:** ISG refers to the August 15, 2001 for its entire contents.  ISG
further states that the letter re-iterates ISG's forbearance from its own civil action, and from
initiating criminal proceedings in the U.S. based upon AJP's involvement and representation; its
wish not to harm its relationship with AJP; and its expectation of sharing in the civil action it
was led to believe was underway on behalf of all Swan Trust participants, including ISG.
ISG's cited AJP's ethical obligations to it "*particularly* in the circumstances of the Power of
Attorney," indicating its view that a special relationship that was, in essence, an attorney-client
relationship between it and AJP, existed.

29.     *ISG acknowledged that it was aware that ethical constraints, related to AJP's
representation of COB, prevented AJP from communicating in full to ISG. For example, on*

15

*March 30, 2000, Clark wrote to AJP: "While I appreciate that you act for Corporation of the Bankhouse (COB), I find that your failure to respond to any of our correspondence [is] insulting and unprofessional. It is not beyond the parameters of your ethical requirements for you to correspond with International Strategies Group (ISG) on COB's instructions." (AJP Decl. Ex. B.) (Emphasis added.)*

**ISG's Response:** ISG refers to the letter of March 30, 2000, for its entire contents. ISG further notes that the letter prompted a response from AJP, including without limitation, a request for what would keep ISG in a "hold pattern," the forwarding of an action plan, the execution of a power of attorney, direct meetings with ISG in London in June 2000 and assurances that civil proceedings were underway together with negotiation and settlement efforts. (Clark Aff., ¶¶ 11-16 and referenced exhibits). ISG further notes that the March 30, 2000, letter reflects its understanding, that as a condition of its forbearance, that AJP would protect its interests as well as COB's in connection with the promised recovery actions. Moreover, the March 30, 2000, letter was sent prior to the execution of the action plan and power of attorney.

30. *Clark and Barber also acknowledged that they understood the "conflict or potential conflict" between ISG and COB. (AJP Decl. Ex. S.)*

**ISG's Response:** ISG refers to the referenced letter of March 28, 2001, for its contents. ISG further notes that the reference to "areas of conflicts or potential conflicts" refers to contribution for ISG's legal fees. ISG wrote that "we are doing everything possible to prevent the development of any matter [in Asia] that might impact the process underway in Boston. In particular we are reasserting our belief in Jim's lack of knowledge of the activities of Pans and Heron, and with some difficulty,

16

Henry's name has not come up yet. We have characterized COB as a victim like ourselves, and have placed John [Pappalardo] in an extremely favourable light." The letter also refers to the "team approach" and seeks AJP's legal advice regarding actions against Patrick. Moreover, AJP told Clark that ISG's interests and COB's in respect to the Swan Trust recovery were "one and the same." (Clark Aff., ¶8).

*31.      Indeed, ISG admitted that it would have been "inadequate" for ISG merely to rely upon the efforts of COB's attorneys, or COB's purported collection specialists, to recover ISG's investment as an incident of their work for COD. On June 10, 2000, Clark wrote to Vladimir of T.T.&T. Omnia and Moshe [Dayani] that, when ISG's investors inquire into why ISG had not lodged any criminal complaints in connection with its lost investment, "It will be inadequate as you might imagine for us to justify our failing to have done so by saying that we have been relying upon your goodselves and upon Jim Pomeroy's attorneys." (See AJP Decl. Ex. M.)*

**ISG's Response:** ISG refers to the lengthy June 10, 2000, e-mail for its entire contents. Defendants take Clark's statement out of context. For instance, the very next sentence reads, "you have comprehensively explained to me that the filing of any criminal complaint will impede the process of recovery. Mr. John Pappalardo has similarly fully explained to me that the filing of any criminal complaint will retard the process." Further, the e-mail states, "Both John and Jim have on a number of occasions referred to the likely availability of a 'settlement amount' or the sale and purchase of ISG's position. Jim has spoken of his ability to produce a guarantee for the principal amount of USD $4 million. These offers have provided ISG with a level of security and comfort." The June 10, 2000, preceded the execution by ISG of the action plan and power of attorney confirming AJP's role as the attorney for the team.

17

*32.    ISG retained counsel in the United States prior to July 18, 2001, by which time it*
*was preparing a suit against Mr. Pomeroy and AJP's client, COB.  In an e-mail message to*
*AJP dated July 18, 2001, Clark and Barber of ISG stated the following: "Obviously, we*
*continue to prepare a comprehensive case against Jim [Pomeroy] and COB and have sent*
*further documents across to the US for legal advice." (See AJP Decl. Ex.H.)*

      **ISG's Response**.  ISG did not in fact consult U.S. counsel until late October
2001 (Clark Aff., ¶ 22 ; Stone Aff., ¶ 2)., but understands that defendants mistakenly might
believe that it consulted counsel on July 18, 2001, based upon the above-described letter.  ISG
also notes its continued forbearance from filing a case against Pomeroy or COB and its view of
its relationship with AJP, expressed to him as late as September 27, 2001,  as "vital."  (AJP
Decl., Exh. C.)

33.    *Then, in a letter dated August 15, 2001, Barber wrote to AJP posing*
*questions and suggestions related to a possible civil action and raising, inter alia, "the*
*Statute of Limitation issue." (See id. Ex. P.)  In numerous conversations with AJP,*
*Clark represented that he had retained lawyers both in the United States and abroad*
*and that they would take the necessary legal steps to secure ISG's investment. Clark*
*further repeatedly stated that his interests were adverse to those of COB. (See id. ¶ 13.)*

      **ISG's Response:**  ISG disputes that Clark stated that his interest were
adverse to COB's with regard to the Swan Trust recovery efforts.  Clark specifically
recalls AJP telling him repeatedly that ISG's interest and COB's were "one and the
same."  (Clark Aff., ¶8).  Obviously ISG's interest would be adverse if ISG had to file a
direct action against COB but it advised AJP repeatedly that it was forbearing from
such action and was part of the "team effort."  (Clark Aff., ¶14 and Exh. M; Clark Aff.,

¶¶12,13 , Barber Aff., Exh. T). Indeed, as of March 28, 2001, ISG still, consistent with team approach, was representing to the investigatory authorities in Asia, that COB was a victim and promoted the efforts of AJP in the recovery. *(AJP Decl. Ex. S.)*   The referenced August 15, 2001, letter reflects that ISG continued to look to AJP for legal advice, and the legal action contemplated in that letter refers to an action to be initiated by AJP on behalf of all the Swan Trust participants (indeed Clark was not admitted to practice in the US, had not retained separate counsel for ISG and would not be able to file any lawsuit here). ISG denies that Clark told AJP "in numerous conversations" that he had retained counsel in the U.S. and Europe and notes that before it retained Kathleen Stone in November, 2001, no lawyer ever contacted AJP on ISG's behalf. (Clark Aff.,¶ 22 ).

34.     *St. Frederikslund sued COB and related persons/entities in this Court on November 14, 2001. (See AJP Decl. Ex. Q.)   ISG knew about this litigation at least as early as December 2001.   In a letter to AJP of December 11, 2001, Clark referred to that litigation and to his lawyer in Boston, Kathleen Stone of the Boston firm Looney, Cohen, Reagan & Aisenberg LLP. (See AJP Decl. Ex. R.) The letter also recounted communications with the FBI, about which ISG stated: "We are conjecturing that this will cause FMB and ABN Amro to be required to provide details as to the present location of the funds.... It will also increase the focus we expect upon Jim Pomeroy's activities." The letter further stated as follows: "In anticipation of these developments we are planning to meet with the Chairman of ABN Amro in Amsterdam early in the New Year. The meeting will primarily concern events in Belgium commensurate with Jim Pomeroy's fraudulent transfer of funds. However, it would be helpful and appropriate during the meeting to raise concerns with respect to what by all accounts, was an unauthorised*

19

*transfer of the funds subsequently out of the US jurisdiction. You have in the past indicated that you have in your possession documentary evidence to this effect. Clearly anything of this nature should be passed to Kathleen."*

**ISG's Response**: Undisputed, but adds that AJP did not pass the information requested to ISG's new counsel.

*35.     The earliest any statute of limitations in tort could have started to run in connection with the COB investment is likely February 5, 1999, when funds ISG had invested with COB were deposited in an account of FMB. (See Garvey Aff. Ex. 2 ¶¶ 113,144.) Even assuming that the statute of limitations had begun to run in February 1999, it would not have expired until February 2002. Prior to that date, ISG had ample opportunity and ability to sue the parties that it ultimately did sue. (See AJP Decl. at ¶ 15.) Nothing AJP did impaired any rights of ISG. (See id.)*

**ISG Response:** Disputed. ISG refers to the extensive discussion in ISG's Opposition, pages30-32, including the citations to the evidence cited therein, as to why defendants' conflicted representation and their conduct after November, 2001, when ISG terminated the relationship, obstructed ISG's ability to obtain the requisite rights to the Deed of Assignment and sufficient documentation to allege fraud and aiding and abetting fraud against FMB and ABN Amro. Furthermore to the extent that the bank defendants are successful in their argument that no discovery rule applies to their conduct, ISG may lose its right to pursue any negligence claims against ABN Amro arising out of the May 29, 1998 transfers.

On the contrary, AJP's actions and communications facilitated the ability of ISG to take action against third parties who misappropriated its funds. For example, when Kathleen Stone, counsel to ISG, contacted AJP in November 2001, AJP told her that ISG likely had a case against persons and entities such as May Davis, C. Joan Patrick, Pearlberg, and FMB. (See id.)

**ISG's Response:** ISG disputes that defendants did anything to facilitate Ms. Stone's ability to bring an action against third parties. Indeed, they did everything in their power to obstruct it.    Their refusal to furnish ISG with the documentation they promoted to Pomeroy as supporting claims against third parties hindered ISG's efforts (and which they earlier told Barber "were valuable for litigation") and led to further delays and damage. (Stone Aff., ¶¶3-4, Exhs. A, B; (Clark Aff., ¶22 and Exh. Q).

*36.      Moreover, attached as Exhibit 9 to the St. Frederikslund Complaint of November 14, 2001 was a memorandum generated by AJP on November 9, 2001 that recapitulated the important players and events as he then understood them. (See AJP Decl. Ex. Q.) When Mr. Clark and AJP were in London together in June 2000, AJP gave him an even more comprehensive analysis, complete with exhibits, of what had occurred that had been prepared by Peter Ness of COB, and which formed the basis for AJP's November 9, 2001 memorandum. (See id. ¶ 15.)*

**ISG's Response:**    ISG disputes that AJP gave a copy of "an even more comprehensive analysis" replete with exhibits and, states that, in fact, AJP withheld such analysis after promising to provide it. (Barber Aff. ¶ 19 and Exh.X; Clark Aff.,¶ 15). The November 9, 2001, memorandum attached to the St. Frederikslund complaint is woefully short on legal analysis of any potential claims, particularly considering that it was over two

21

years in the making.  Moreover, ISG required rights to the Deed of Assignment to pursue

parties other than COB.  COB was vigorously defending, through Gary Crossen, the St.

Frederikslund complaint and later the complaint filed by ISG in the COB Litigation -- it is

not credible to assume ISG's could have obtained derivative rights even if new counsel filed

a complaint against COB the day after she was retained.  As late as March 7, 2002, AJP

informed ISG that COB itself was considering a lawsuit against third parties either as a

counterclaim (presumably he meant crossclaim) in the St. Frederikslund litigation or as "an

affirmative freestanding action." (Clark Aff., Exh. Q).

37.     *ISG long knew that it could pursue an action against COB if it so chose, and as
it had been urging since at least 2000 (see id. Ex. I). Its actions against Pans in Belgium
were an example of action ISG in fact did take at an earlier date. (See id.. Exs. D, E, F,
G.)*

            **ISG's Response:**  ISG knew it had an action against COB, but was

induced by AJP to forbear from such an action. (Barber Aff., ¶¶14-20 (and referenced

exhibits); Clark Aff, ¶¶5-21 (and referenced exhibits), and many of the letters and e-mails

referenced in this statement of facts).  Indeed as the correspondence between the parties

reveals, whenever ISG would state that it would have to file actions against COB or

Pomeroy, either because its own investors were pressing for action or because it had not

heard from AJP during a period of time, AJP, Ness or Pomeroy would send a promise that

recovery was imminent, represent that COB was proceeding with civil litigation or

contend that independent actions would jeopardize the recovery efforts to which AJP, the

team leader, exclusively held the key. (Clark Aff., *passim*; Barber Aff., *passim*).  The

action against Pans in Belgium was initiated after ISG learned that Pans invested $3

million, which ISG believed to be its misappropriated funds, in an Antwerp football club. Again, ISG was led to believe repeatedly by Pomeroy and AJP that Pans was acting in a rogue capacity. (Clark Aff., ¶7 ).

39. *AJP does not know of any legal action that could have been taken on behalf of ISG between August 1999 and October 2001 that was not still available to ISG at that time. (See AJP Decl. at ¶17.)*

**ISG's Response**: ISG cannot respond to this assertion as it has not had the opportunity to depose AJP or review the narratives of the legal bills. (Block Aff.¶¶ 1,3-4). However AJP certainly should have considered, *inter alia*, the effect of a two-year delay on ISG's ability to bring actions against third parties if, as occurred here, COB elected not to pursue such actions while still holding the rights to the Deed of Assignment. ISG also refers to its Opposition, pages 26-33 and the evidence cited therein for the damages, including its lost remedies and increased legal fees and risks occasioned by defendants' purported representation.

40. *On May 29, 1998, COB sent $821,490 by wire transfer to an escrow account of ESCM at Mellon Bank in Pittsburgh Pennsylvania. Pursuant to the express instructions of COB, ESCM distributed the transferred funds to various persons and entities as follows: Monaco Holdings Ltd., $197,473.33; Group C. Marketing Inc., $103,933.33; DSC Holdings, Inc., $207,866.67; Tracy Edmonds, $103,933.33; Sarif & Associates, $103,933.33; and The Lara Family Trust, $103,933.33. After distributing the aforesaid amounts pursuant to the instructions of COB, the sum of $416.68 was left over from the original transfer amount and was returned to COB. ESCM did not retain any portion of the May 29, 1998 wire transfer. (See Affidavit of Timothy S. Coon.)*

23

**ISG's Response**:   The documents produced in Automatic Disclosure by ESCM appear to evidence transfers to other investors of COB. However, without further discovery, ISG is unable to determine what COB's instructions were, why ESCM was transferring ISG's money to other investors on COB's behalf, where COB had its own bank account in Massachusetts and, apparently, in Brussels, or what ESCM knew about COB's financial condition prior to the transfers. (Block Aff., ¶¶ 1, 3-4). ISG also notes the Automatic Disclosure from ESCM raises more questions than it answers, that no escrow agreements for the 1998 transfers were produced and it appears that investors may have been threatening to sue COB at the time ESCM was transferring almost $821,500 of ISG's funds. (Id). ISG needs to review the billing narratives and communications with the transferees to discover whether escrow agreements exist and generally the entire circumstances of these disbursements.

24

INTERNATIONAL STRATEGIES
GROUP, LTD

By its attorneys,

Jessica Block
BBO#046110
Block & Roos, LLP
60 State Street, Suite 3800
Boston, Massachusetts 02109
June 30, 2005                                     (617) 223-1900

## CERTIFICATE OF SERVICE

I, Jessica Block, Esquire, counsel for the plaintiff, do hereby certify that the within pleading was served by causing copies to be delivered, by messenger, to counsel for the other parties of record, this 30rd day of June 2005.

Jessica Block

25