UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| INTERNATIONAL STRATEGIES GROUP, LTD.<br><br>Plaintiff,<br><br>v.<br><br>GREENBERG TRAURIG, LLP., A. JOHN PAPPALARDO, AND ECKERT, SEAMANS, CHERIN AND MELLOTT, LLC.,<br><br>Defendants. | CIVIL ACTION NO. 04-12000 RWZ |

**OPPOSITION OF INTERNATIONAL STRATEGIES GROUP, LTD. TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

**Introduction**

International Strategies Group, Ltd. ("ISG") submits this opposition to the separate motions for summary judgment filed by Eckert, Seamans, Cherin and Mellott, LLC ("ESCM") and by Greenberg Traurig LLP ("GT") and A. John Pappalardo ("AJP"). Summary judgment against both law firms and AJP must be denied. No discovery has taken place with the exception of the exchange of automatic disclosure materials. The automatic disclosure materials produced thus far and the affidavits submitted evidence genuine issues of material fact as to whether defendants owed a duty of care to ISG or breached contractual obligations. Similarly, these materials demonstrate genuine issues

of material fact as to when the statute of limitations commences on ISG's claims against ESCM and as to whether or not defendants are the proximate cause of harm to ISG.

**BACKGROUND RELEVANT TO ISG'S
OPPOSITION TO THE MOTIONS FOR SUMMARY JUDGMENT[1]**

The Fraud of Corporation of the Bankhouse

ISG's claims originated with a fraud perpetrated by Corporation of the Bankhouse (COB), a former client of ESCM and GT.

In the Spring of 1998, Christopher Barber ("Barber"), an ISG representative, met with an Albert Pans ("Pans"), who represented himself as Vice President of European Affairs of COB. (Barber Aff., ¶2). Pans induced ISG to participate in a so-called "Federal Reserve Guarantee Program," which he described as a highly confidential program sponsored by the U.S. government to control the circulation of U.S. dollars. As Pans explained the program, participants agree to take their money out of circulation for specified periods of time in exchange for substantial profits. (Id). Pans represented that the bank to which the funds were deposited would undertake a guarantee of non-depletion, meaning that the funds would not be at risk. (Id.). Pans also represented that two large and highly reputable international companies, St. Frederikslund Holdings A/S ("St. Frederikslund")[2] and PRCS Ltd. ("PRCS"), already had advanced $10 million apiece and that funds had already been deposited in syndicate "sub-accounts" at ABN Amro in their names. (Id, ¶3.) Based on the representations of Pans and a Christopher Heron ("Heron"), a COB Vice President, and particularly the representations that the funds

---

[1] ISG has responded to defendants' joint statement of material facts, demonstrating the existence of disputed facts as well as conflicting inferences that can be drawn from the facts. Additionally it submits the affidavits of Jessica Block ("Block Aff."), Christopher Barber ("Barber Aff."), Philip Clark ("Clark Aff."), Kathleen

would not be at risk, on April 22, 2998, ISG executed a Funds Management Agreement with COB, signed by Barber on behalf of ISG and Heron and Pans on behalf of COB. (Id., ¶3 and Exh. A). On May 5, 1998, ISG and COB executed a Syndicate Agreement, which purported to implement the Funds Management Agreement. (Id., ¶4 and Exh. B.) The Syndicate Agreement was signed by James F. Pomeroy ("Pomeroy") on behalf of COB and Barber on behalf of ISG. ISG thereafter deposited $4 million to an ISG syndicate sub-account at ABN Amro in Belgium known as COB Syndicate Number 165. (Id.).

On or about May 26, 1998, Pans told ISG that the guarantee of non-depletion could not attach to three sub-accounts and requested ISG to transfer its funds to COB's master account at ABN Amro. Pans represented that the two other participants in the program, St. Frederikslund and PRCS, already had done so. On May 29, 1998, Pans reassured ISG that the transfer would "in no way affect the terms and conditions of the earlier with you executed agreements [sic]." (Id, ¶5 and Exh. C.) ISG authorized the transfer to the master account. On June 8, 1998, Pans assured ISG that the non-depletion guarantee was in place. (Id, ¶5 and Exh. D.)

According to bank records later procured, on May 29, 1998, the very day COB assured ISG the transfer to the master account at ABN Amro would not affect the previous agreements, COB transferred $821,500 of ISG's money to ESCM's account at Mellon Bank in Pittsburgh, PA. Another $328,500 was transferred to COB's account at Fleet Bank in Boston. (Id., ¶6 and Exh. E.) According to the bank statements, the transfers

---

Stone ("Stone Aff."), Christopher Jones ("Jones Aff.") and Frank Hansen ("Hansen Aff.") to present facts relevant to the pending motions.
[2] St. Frederikslund was known at the time as Danstrupland.

(which effectively depleted ISG's funds from $4,000,0000 to $2,849,544.20, contrary to COB's non-depletion assurances), were authorized by "JFP" (James F. Pomeroy) and "SH" (Stephen Heffernan, a senior executive at COB). (Barber Aff., Exh. E) ESCM produced documents on May 17, 2005, showing for the first time of its transfers of ISG's funds to other COB investors. (Id.)

ESCM has asserted that the firm was "acting as a transfer agent in returning investment funds to various investors of COB, pursuant to COB's direction." (Defendant Eckert Seamans Cherin & Mellott, LLC's Memorandum of Law in Support of its Motion to Dismiss, page 5, n.1)  But ESCM clearly was not "returning" funds; instead it was furthering COB's Ponzi scheme, apparently without questioning how its client suddenly came into such a large sum of money transferred from a foreign bank, and all while its client was defrauding investors.  COB's transfer to ESCM and ESCM's subsequent transfers to COB's investors were "truly astonishing," as the procedure enabled a law firm essentially to act as a bank or clearing house for investment funds, thus avoiding regulations the securities laws or banking regulations. (Jones Aff., ¶ 6).  ISG has not had the opportunity to conduct discovery, including, for instance, a review of the billing narratives and communications with the COB investors to whom ESCM was transferring ISG's funds to determine the extent of ESCM's participation in its clients' fraud.

After the ESCM's transfers, and while the firm was still representing COB, including, apparently in defense of claims brought by COB investors (*see, e.g.*, of Jessica Block Aff., Exh. 1),[3] COB made further misrepresentations regarding ISG's $4 million. For instance, notwithstanding the continued depletion of ISG funds, on August 12, 1998,

---

[3] Further discovery is needed as to what communications with ESCM preceded its transfers.

4

Pomeroy represented to ISG that ISG had earned $2 million in profits and that the total assets in the syndicate had increased to $6 million. (Barber Aff., ¶7 and Exh. F). Pomeroy thereafter transferred $1 million of ISG's own money back to ISG, representing it to be profit. Believing the $1 million to be profit, ISG paid out brokerage commissions with the alleged "profit." (Barber Aff.,¶7). On September 17, 1998, COB transferred the balance of ISG's funds at the ABN Amro master account in Brussels to COB's account at Fleet Bank in Boston, without ISG's knowledge or authorization. (Id.., ¶ 8). In October, 1998 (after the master account at ABN Amro in Brussels had already been depleted), Pomeroy persuaded ISG (after the fact and to cover his tracks) to authorize the transfer of its funds from the ABN Amro master account in Brussels to Fleet Bank in Boston, representing to ISG that COB was having difficulty receiving bank statements from ABN Amro and further representing in writing, again, that ISG had a total $6 million in principal and interest. (Barber Aff., ¶8 and Exh. G.)

On or about November 4, 1998, COB transferred a total of $19 million of investors' funds to an account at the Bank of New York (BONY). The BONY account was held in the name of May Davis/S.G. Cowen Securities Corp for the benefit of Swan Trust of which a Henry Pearlberg ("Pearlberg") was Head Trustee. (Barber Aff., ¶ 9).

In late November, 1998, Pomeroy continued to represent that ISG's principal investment was intact and, in fact, had earned $2 million in profit. He proposed a Cash Flow Promissory Note in favor of ISG in the amount of $9 million as collateral for a new investment using the same $4 million of ISG's funds. He gave ISG a New Proposal Letter, which he back-dated to October 31, 1998, purportedly in anticipation of a new, unspecified investment scheduled to occur before January 31, 1999. (Barber Aff., ¶9 and

Exh. H). ISG accepted the new proposal and the note in reliance on the representation that its principal and interest thereon totaled $6 million and remained intact and not knowing that Pomeroy already had transferred funds. (Barber Aff., ¶9). The proposed $19 million investment, memorialized by agreements between COB and Swan Trust, included, ISG was told, $10 million from St. Frederikslund, $5 million from PRCS and $4 million that COB represented to be ISG's principal funds (but was in fact a transfer by COB from an unnamed account). ISG disputes that it "ratified" any transfer to Swan Trust or later purported investment, as defendants contend in their motion papers, because ISG agreed to the New Proposal Letter and promissory notes solely upon further lies by Pomeroy about the security of its funds, the amount of profit already earned and the assurance that ISG's funds would not leave a joint account opened for COB and ISG for any further investment without ISG's approval. (Barber Aff., ¶¶9-10; Clark Aff., ¶2).

ISG later learned that Pearlberg used approximately $2.3 million for his own purposes before transferring, on February 2, 1999, the remaining $16.7 million to an account at ABN Amro in New York in the name of First Merchant OSH Ltd. Bank (FMB) for later investment by C. Joan Patrick, an independent broker affiliated with the May Davis Group ("May Davis") in New York. FMB, a foreign bank operating out of the Turkish Republic of Northern Cyprus, previously had established correspondent banking privileges with ABN Amro in New York. (Id., ¶ 10). ISG also has learned, after subpoenaing bank records in <u>International Strategies Group, Ltd. v. Corporation of the Bankhouse, et al</u>, Civil Action No. 02-10532-RWZ ("the COB Litigation") and further investigation, that FMB never maintained individual sub-accounts accounts for depositors, but instead illegally pooled their money in a single "concentration account." (Clark Aff.,

6

¶ 3). ISG further has learned that within a month after FMB established correspondent banking privileges with ABN Amro and before the Swan Trust transfers, ABN Amro received a warning letter that FMB was suspected of money laundering and other financial improprieties. (Id.)

The records obtained from ABN Amro and FMB reflect a number of transfers, after February 2, 1999, the date of the Pearlberg transfer of $16.7 million, out of the FMB account with ABN Amro in New York to various parties and in and out of a "sweep account" established by ABN Amro on FMB's behalf. Funds were literally "swept" through the FMB accounts until May 12, 2000, when the accounts were closed after the balance of over $1 million was transferred to FMB in Cyprus. (Barber Aff., ¶11 and Exhs. I, J.)

Notwithstanding the transfer to Pearlberg and dissipation of funds, COB continued to represent to ISG that its investment was growing. On March 30, 1999, Pomeroy told ISG that he had confirmed $19 million in principal, including ISG's original funds, and $46 million in profits to be distributed among the investors; in April, 1999, he further "confirmed" the availability of $65 million. (Barber Aff., ¶ 12 and Exhs. K, L). To this day, ISG has no idea where those numbers originated. (Barber Aff., ¶ 12). The FMB bank documents certainly show no such profits (Barber Aff., Exhs. I, J) and Pomeroy's representations appear to be entirely fictitious. (Barber Aff., ¶ 12.)

On April 29, 1999, and July 6, 1999, in connection with the Swan Trust transaction, COB caused Pearlberg to execute and implement a "Deed of Assignment" assigning to Pomeroy, as agent for COB, all right, title and interest in various contracts and in FMB's bank accounts and credit facility at ABN Amro. (Block Aff., Exhs. 2,3).

Before notifying ISG of any problems, COB apparently had consulted counsel. (*See* Block Aff., Exh.4). One of its lawyers, Pasquale Maiorino, advised, "As a fiduciary Bankhouse owes it to its investors to pursue this matter expeditiously and vigorously. If a settlement in this matter is not eminent [sic] then civil litigation and other action must be taken forthwith." (Id.) Pomeroy also consulted Stephen Burr ("Burr"), then a partner at ESCM. Burr appears to have been involved at least as early as April, 1999. (*See* Block Aff., Exhs. 5 and 6). After Pearlberg executed the assignment, Pomeroy demanded from FMB immediate transfer of $1.2 million from the former Pearlberg account (Block Aff., Exh. 7). On July 29, 1999, Pomeroy advised Burr that he received the first "tranche" of funds from FMB in the total amount of $1,215,000. (Block Aff., Exh. 8.) Although this money rightfully belonged to PRCS, ISG and St. Frederikslund, none of it having originated with COB, COB used the money, through October, 1999, to pay employees, rent, consultants, perquisites, a retainer to GT, substantial American Express bills and other operating expenses of COB or personal expenses of its principals. (Block Aff., Exh. 24.)

Engagement of ESCM, GT and AJP

By August, 1999, ISG became increasingly concerned about the security of its funds under management by COB. (Clark Aff., ¶4.) At some point prior to August, 1999, ISG learned that COB transferred funds to Swan Trust (although ISG was not told about the transfer until after it had occurred) and that availability of the funds was in jeopardy. (Barber Aff., ¶ 13). On August 11, 1999, Pomeroy sent Barber an e-mail detailing the options for recovery of the funds. (Barber Aff., ¶ 13 and Exh. M). Listing several "workout" options, Pomeroy informed ISG, "It is our intent to continue to negotiate. However, I have chosen to move to prepare litigation against the parties

utilizing the law firm of Greenberg & Traurig. I have utilized the law firm of Seamin Cherin & Melott [sic] for the criminal assistance against the parties. (Barber Aff., Exh.M.) By August 11, 1999, Philip Clark ("Clark"), a principal of ISG, already had flown to Boston to confront Pomeroy. He was very concerned about the status of ISG's funds. Pomeroy, protesting innocence, immediately took Clark to meet with AJP. (Clark Aff., ¶4 ). The meeting took place on August 11, 1999, at ESCM's offices. Burr and perhaps another attorney from ESCM or GT also were present. (Clark Aff., ¶4.)

During the meeting, AJP touted his experience as a U.S. Attorney, as a state Attorney General and in private practice as well as his extensive expertise in white collar crime, public corruption and securities fraud matters. AJP advised Clark that COB and Pomeroy were victims, that he (AJP) had been retained to recover the funds on behalf of the investors; that he had the expertise, the clout and the special connections to the FBI, U.S. Attorney's office, and other government authorities to recover the funds for the investors; that all necessary steps, including litigation, would be taken; and that any independent action by ISG in the United States against Pomeroy or COB or other parties would jeopardize recovery. (Clark Aff., ¶5.) Pomeroy gave Clark a letter sent by Burr to Swan Trust and May Davis on August 12, 1999, in which Burr threatened these entities, "Our instructions are to pursue immediately all avenues of recovery." (Clark Aff., ¶5 and Exh. A ). Clark's meeting with AJP on August 11, 1999 and the strong letter from Burr the next day gave ISG comfort that ISG's interests were being represented through both ESCM, with which AJP was then affiliated, and GT, with which Burr had just become affiliated. (Clark Aff., ¶5.)

9

On August 23, 1999, Burr, AJP, and other GT lawyers advised Pomeroy that, in conjunction with negotiation, COB should promptly prepare "pleadings and any appropriate motions for immediate freezing of assets." (Block Aff., Exh.10). This advice never was shared with ISG.

AJP's file notes reveal that AJP viewed his "mission" as "multifaceted." (Block Aff., Exh. 16).[4] His roles, among others, were to deal with federal authorities investigating Swan Trust as a criminal matter, "explore litigation, assist in dialogue (if necessary) to recover profit" and "deal with investors who expressed desire to sue COB." (Id). AJP noted that "all banks have assets on US soil." (Id.)

On August 20, 1999, AJP sent Clark a follow-up letter thanking him for meeting with him, giving him an update on communications with the FBI and other enforcement agencies and purporting to relay the conclusions of those agencies that COB was a victim. (Clark Aff.¶ 6, Exh. B). Clark wrote back to AJP on September 30, 1999, informing him that his involvement "provided essential comfort" for ISG and that he had been advised that amounts exceeding $100 million had been frozen. (Clark Aff, ¶7, Exh. C). In the meantime, on September 28, 1999, ISG conveyed to COB through Christopher Jones ("Jones"), whom ISG believed to be a COB Vice President, that it was ISG's belief Pans had misappropriated its funds acting alone. (Clark Aff., ¶ 7 and Exh. D.) Clark drew this conclusion because of a newspaper article linking Pans to a suspicious investment of $3 million in an Antwerp football club around the same time ISG placed funds with COB.

---

[4] There are many pages of notes upon which ISG has not had the opportunity to examine defendants. The notes of interest include, but are not limited to, "accounting on $1.2 M" (Block, Exh. 17); V/M "not going to go well –821K" (Block Exh. 19), "Jim-Jens partners, why not sued, what is take out strategy,"(Block Exh. 20); "Philip Clark getting killed" (Block Exh. 21), "they want to know more about Pans and Jim" (Block Exh. 22); "Klimas looking at improper transfer of ISG money to Boston" (id); "$1.2 M from Swan Trust – This was booked as prom. note from COB to participants in Swan Trust 164, 165, 166.") (Block Exh. 23).

As a result, with COB's knowledge, ISG opened a criminal inquiry in Belgium regarding Pans. (Clark Aff., ¶7.) Clark also was told by AJP that Pans was acting in a rogue capacity and his affiliation with COB had been terminated. (Clark Aff., ¶7 )

Beginning with August 11, 1999 meeting with AJP forward, ISG had every reason to believe that AJP was representing its interests as well as those of PRCS, St. Frederikslund and COB. Despite AJP's disclaimers now that he represented only COB, none of the correspondence with AJP disabused ISG that he also was acting on behalf of the syndicate participants in connection with the Swan Trust recovery. For instance, on October 22, 1999, AJP wrote to Barber about his "significant efforts" in the recovery process, and added "[t]o also protect your interest and as part of pursuing our position for collection COB has been preparing its own civil fraud case against the US based parties." (Barber Aff., ¶14 and Exh. N). AJP also expressed the "need on our side to have mutually supportive positions" (id.) just as he did in the August, 1999 meeting and in virtually every meeting or phone call thereafter. (Id., Clark Aff., ¶ 8). Barber and Clark, in reviewing that letter, understood "our" to refer to COB, ISG, St. Frederikslund and PRCS. (Barber Aff., ¶14.) ISG denies that AJP described any conflicts with him regarding such joint representation. (Clark Aff., ¶ 8.)[5]

ISG was not alone in believing that AJP, ESCM and GT were jointly representing all of the investors in addition to COB. On January 17, 2000, Jens Kristiansen, CEO of St. Frederikslund, wrote AJP and confirmed "that you are authorized to act on our behalf in all matters concerning the improper transfer of monies by Swan Trust." (Block Aff., Exh. 11; Hansen Aff., ¶7 and Exh. 7). Thereafter, Kristiansen referred to AJP as "our US

11

attorney." (Block Aff., Exh. 15).  Kristiansen also referred to Burr at GT as "our US attorney." (Block Aff., Exh. 14; Hansen Aff., ¶7 and Exh. 8).  Jones, who participated in a number of meetings with AJP and Pomeroy while he was affiliated with COB, also understood and was told on a number of occasions that the law firms were representing all investors.  Jones never was told by anyone that AJP acted only for COB or Pomeroy or that any conflicts prevented him from acting for ISG and the others. (Jones Aff., ¶3.)

ISG's Continued Forbearance and Reliance on ESCM, GT and AJP

ISG (as well as St. Frederikslund) not only forbore from initiating their own actions against COB and Pomeroy because of AJP's involvement and promises, but worked with AJP to forestall criminal indictments of Pomeroy and COB in the on-going FBI investigation of their role in the Swan Trust matter.  For instance, Agent Robert Klimas, an FBI agent in Chicago, in January and February, 2000, contacted ISG and St. Frederikslund directly.  Agent Klimas also contacted St. Frederikslund's auditors and investment partners. (Block Aff., Exhs. 12,13.)  When the FBI contacted Arthur Anderson, St. Frederikslund's auditors in Denmark, Peter Ness, acting as legal counsel for COB together with AJP, advised Kristiansen "to tell his auditors that this matter is being handled through COB with the advice of legal counsel and not to interfere with the collection process now in the works." (Block Aff., Exh. 10).  Investment partners and auditors of St. Frederikslund who were contacted by the FBI were referred to AJP and Burr, whom Kristiansen described as St. Frederikslund's "U.S. attorneys." (Block Aff., Exhs. 14,15; Hansen Aff., ¶7, Exh. 8).  When Agent Klimas contacted Clark of ISG directly, he "was scathing in his comments about both John Pappalardo and Jim

---

[5] Clark does recall a discussion as to whether AJP could represent Pomeroy individually in the FBI criminal

Pomeroy," telling Clark that "there was no rectification process." (Clark Aff., ¶9 and Exh. E). Clark, alarmed, immediately placed a call to AJP, who insisted that Klimas was acting outside of the scope of his authority, advised him (Clark) that "delays would be caused by complicating the picture at this point," assured Clark that the process was underway, and appeared to confirm the existence of documents evidencing two amounts of $4 million and $4 million available to COB. (Id.) Clark later spoke with Jones, who, relying on information told to him by AJP, told Clark that "any process or publicity" regarding the funds would delay the release of the funds by the banks, and "nothing must now disturb the indictment" of Pearlberg. (Clark Aff., ¶ 10 and Exh. F).

In March, 2000, when the indictment seemed to be delayed, Clark communicated further with COB indicating its desire to commence civil proceedings but was told, in response, "John Pappalardo wished to speak with [him] directly to ascertain what exactly was required to help ISG keep its holding pattern." (Clark Aff., ¶11 and Exh.H.) Clark was also told that AJP was "coaching" the Assistant U.S. Attorney in Chicago. (Clark Aff., ¶11. *See also* Clark Aff., Exh. F.)

In April, 2000, as a result of the criminal inquiry in Belgium, ISG, having previously been encouraged to believe by AJP and Pomeroy that Pans had acted alone, suspected that Pomeroy may also have been actively involved in the dissipation of ISG's funds. (Clark Aff., ¶ 12 and Exh. I.) Clark nevertheless wrote AJP, "we appreciate and do not wish to involve Jim in this especially since he needs to go to Europe to negotiate the settlement of profit with ABN Amro Bank" (Id..) He reminded AJP "we exercised forbearance late last year because of your introduction." (Id.) ISG sent AJP a letter

---

investigation; AJP told Clark he would reserve opinion on that issue. (Clark Aff., ¶ 8. )

13

detailing the results of the investigation, including the revelation that Pomeroy was making representations to ISG regarding profits when, in fact, amounts in ISG's accounts were depleted and some of ISG's money was transferred to ESCM. (Clark Aff., ¶ 12 and Exhs. J, K). ISG was under increased pressure from its own investors to take action and so informed AJP (Clark Aff., ¶13.) From April through July 2000, and continuing thereafter, AJP had a series of conversations over these issues in which AJP advised Clark repeatedly that ESCM had done nothing wrong and was only paying "creditors," that Pomeroy and COB were victims, that Pans was acting in a rogue capacity and that independent action by ISG against Pomeroy and COB or other parties in the United States, including any lawsuit or bad press or publicity, would interfere with recovery. (Clark Aff., ¶13.) AJP also advised ISG that in addition to his continued actions to obtain funds directly with the banks and in connection with investigation by the FBI and U.S. Attorney's office through means he was not at liberty to disclose because of alleged confidentiality constraints with those entities, Pearlberg was prepared to make restitution directly. (Clark Aff., ¶13). AJP made this representation to ISG although Jones had shared with him his impression that Pearlberg was "wishful, gullible or just remote from the reality of the world where he may once have operated successfully" and that any restitution from him was unlikely. (Block Aff., Exh. 25). AJP acknowledged Clark's "great patience in face of unusual circumstances." (Clark Aff., ¶13 and Exh. L.)

On June 1, 2000, AJP presented Clark with the so-called "action plan" detailing collection efforts on behalf of ISG, PRCS, St. Frederikslund and COB as a "team" represented by AJP, with the assistance of a Russian-based recovery service (Pappalardo Decl., Exh. L.) AJP met directly with Clark in London to present the plan. (Clark Aff.,

14

¶14). ISG approved the action plan and expressed its readiness to become a "team player" subject to certain conditions. (Clark Aff., ¶ 14 and Exh. M.) Meanwhile, unbeknown to ISG, the Russian recovery specialists planned, with AJP's approval, to meet with Clark and only give him "some information to keep Clark more confident in terms of phase I" and make him "quite" [sic] (Block Aff., Exh. 27). The designated member of the Russian recovery team would be instructed "to make only verbal well-filtered statements to Clark." (Id.) On June 1, 2000, the same day the draft action plan was forwarded to Clark, Pomeroy wrote AJP privately approving "a general attack plan that makes the three investors stay in line." (Block Aff., Exh. 25).

Clark disputes that he initiated the idea of a power of attorney. He recalls that AJP proposed the power of attorney in the context of discussing a written agreement requirement in the action plan proposed by the Russian recovery specialist. (Clark Aff.,¶15.) Clark did not receive from AJP, as AJP asserts in his "Declaration," any memorandum from Ness regarding potential claims; no such memorandum is contained in the documents he and Barber furnished to separate counsel in October 2001. (Clark Aff.,¶15). AJP mentioned the existence of a memorandum describing claims against May Davis and promised to provide it to ISG, but never did. (Barber Aff., ¶19 and Exh.X.) In any event, on July 11, 2000, ISG did sign a power of attorney received from AJP and drafted apparently by ESCM. (Clark Aff., ¶ 16.) That same date, Barber sent, by e-mail and regular mail, a letter stating that the power of attorney was given "upon the understanding that it will be actioned by the attorney with the utmost good faith and due care having regard to the interests of ISG. In particular the Directors of ISG require that all communications concerning any matter affecting of affected by the Power of Attorney,

15

directly or indirectly which may concern or relate to the interests of ISG will be communicated by the attorney fully, and on a timely basis." (Barber Aff., ¶15 and Exh. O). AJP did not disavow any of the expectations described in the July 11, 2000, letter. (Barber Aff.,¶15; Clark Aff. ¶16. ) On the same date that AJP obtained the signed power of attorney and received ISG's letter, Pomeroy sent him a facsimile calling Clark "pond water scum" and telling AJP, "Its [sic] time to light [t]his brat on fire." (Block Aff., Exh. 40 ). On August 24, 2000, AJP told ISG he had executed the "action plan" on his end. (Barber Aff, ¶ 20,  Exh.Y.)

Within a month after AJP secured the power of attorney, Pomeroy registered new companies known as SB Global, Inc. and SB Global Management LLC (collectively "SBG"). (Block Aff., Exh. 28 ) SBG's managers included COB employees and affiliates; its directors were Pomeroy and Kristiansen; and its attorneys were ESCM and GT (Block Aff., Exh. 29 ).

In or before January, 2001, without any apparent progress on recovery, two investors in ISG hired their own counsel and threatened to sue ISG or subject Clark and Barber to an investigation by Hong Kong regulatory authorities. (Clark Aff., ¶17.) Clark immediately made AJP and COB aware of this development and reminded them of ISG's "enormous patience and forbearance to date." (Id and Exh. N)  In later correspondence after an "optimistic" phone from AJP, Clark stressed "our prolonged patience and continued attempts to be supportive." (Clark Aff., ¶17 and, Exh.O.)  AJP responded, *inter alia,* by advising ISG that "it is reasonable to conclude that positive developments could result in the return of monies," and further advising ISG that COB had a fiduciary duty to ISG to pay ISG "forthwith." (Clark Aff., ¶ 17 and Exh. P.)  Clark, Barber and AJP

16

had several conversations thereafter, including a conference call on March 16, 2001 with ISG's investors, whom AJP assuaged with assurances that he was representing ISG's interests as well as COB's. (Barber Aff., ¶17.)  AJP's notes of that conversation reflect that he was asked to provide legal advice, including an opinion on the statute of limitations. (Block Aff., Exh. 30.)

On March 13, 2001, AJP advised ISG that he joined the firm of GT. (Barber Aff., Exh. Q.).  Barber sent Clark a handwritten note that "the firm he has joined was the other law firm apart from Eckert Seamans who were appointed I believe on the criminal side of things." (Id.)  It was ISG's impression that ESCM also continued to be involved in the recovery as Pomeroy had previously represented to them that he retained both firms and AJP referred to other actions for fraud to be prepared by one firm or the other. (Barber Aff., 17, and Exhs.M, N, and R; Clark Aff, ¶18.)  Thereafter, AJP continued to communicate directly with ISG, including (but not limited to) advising it by e-mail on March 14, 2001, that GT was exploring a lawsuit against Patrick and advising ISG by e-mail on May 29, 2001 that he met with Pearlberg for three days and Pearlberg would make full restitution within 7-10 days. (Barber Aff, ¶18, Exhs. R,S.)  In the May 29, 2001 e-mail, AJP represented that Pearlberg had given him documents that were "valuable for litigation." (Barber Aff., Exh.S.)  Around this time, AJP informed Clark about SBG.  He assured Clark that (i) SBG was the successor to COB, (ii) COB would retain a 15 percent interest in SBG to cover any liability to ISG, (iii) SBG had assets of over $200 million and (iv) as a last resort, SBG would buy out ISG's position. (Clark Aff.,¶19.)

In mid-July, 2001, not having heard from AJP since May 29, 2001 and no restitution having been received, ISG did consider finding new counsel and began to assemble documents to send to the United States for legal advice. (Clark Aff., ¶20.) ISG, did not, in fact, retain counsel in the United States at that time. (Id.) In fact, in August, 2001, ISG halted its efforts to find counsel, after it was told by Jones that Pomeroy had pleadings on his desk and was ready to file. (Clark Aff. ¶20; *see also* Jones Aff., ¶4. ) AJP also told Clark on numerous occasions that pleadings had been drafted. (Clark Aff.,¶¶20, 22.) On August 15, 2001, in response to a letter by ISG and likely in an effort to head off any independent action by ISG, Ness sent Clark a fax stating that "we are proceeding with the first steps of litigation." (Block Aff., Exh.13.) Ness also promised ISG, in response to ISG's letter from ISG of even date, "will get letter [sic] to you ASAP from me (with John P. OK) or from John." (Id.) On August 16, 2001, Barber sought advice from AJP regarding the civil action, the statute of limitations and a summary of communications with Pearlberg, reminding him that ISG remained in a hold pattern because of his representation. (Barber Aff,, Exh. T). AJP corresponded with Barber thereafter by e-mail and telephone, representing that recovery was imminent, including representing, on October 2, 2001 that the restitution deal "was all set." (Barber, Aff ¶ 19 and Exhs. U,V,W ). However, on October 3, 2001, Lynn Bernazzini at SBG, warned AJP to take steps to ensure "that we do not give Clark any implied right to take action in the US." (Block Aff., Exh. 32.) Also unbeknown to ISG, AJP previously had written to Pomeroy on June 28, 2001, expressing his concern about the expiration of statute of limitations on a number of claims and advising Pomeroy that "the timing for litigation is immediate." (Block Aff., Exh. 37.) As of September 27, 2001, having previously been

told that litigation was underway, ISG inquired about the progress of the civil action, telling AJP that its relationship to him was "vital." (AJP Decl, Exh.C.)

### ISG Retains New Counsel

In late October, 2001, Clark traveled to the United States to interview counsel. (Clark Aff., ¶ 22). He met with Kathleen Stone ("Stone") on October 23, 2001, and formally retained her on November 7, 2001. (Clark Aff., ¶ 22 ; Stone Aff., ¶ 2). Stone attempted to contact AJP and finally had a conversation with him on December 10, 2001 (Stone Aff., ¶3.) Stone sought from AJP the documents he had amassed in connection with this investigation of the trail of the funds. (Stone Aff.,¶4 and Exh. A.) AJP mentioned in an off-hand manner during the phone conversation that ISG might have claims against certain other parties, including "the banks," but did not describe the basis of those claims, and promised to cooperate. (Stone Aff., ¶3). He promised cooperation but did not send the documents. Stone thereafter repeatedly tried to get documents that might substantiate claims available to ISG, including documents given to AJP by Pearlberg, Patrick and FMB that clearly were not privileged (Stone Aff., ¶3 and Exh. A). Her consistent attempts, without success, to obtain these documents from AJP, and the stonewalling of AJP, together with Gary Crossen (who assumed representation of COB and Pomeroy when St. Frederikslund sued them in November 2001), are a matter of record in the COB Litigation, in which ISG ultimately was forced to bring a motion to compel. (*See also* Stone Aff., Exhs, A, B). Clark tried independently to obtain documents from AJP, including the pleadings he was told were drafted, and, given AJP's superior knowledge of the facts, further sought advice from him regarding the statute of

19

limitations. (Clark Aff., ¶22 and Exh. Q). AJP responded in March 2002 that no pleadings ever existed. He further advised Clark, "the statute of limitations will be an issue but creative thinking should be applied." (Clark Aff., Exh.Q).

Financial Condition of COB, Pomeroy and related Entities

*In addition to the original $10,000,000 St. Frederikslund transferred to COB in 1998 for the Swan Trust investment,* St. Frederikslund paid $5,500,000 to COB and COB related entities for investment management fees, out of pocket expenses and other costs on March 2, 1999; $450,000 for investment management fees, out of pocket expenses and other costs on June 27, 2000; $300,000 for investment management fees, out of pocket expenses and other costs on August 2, 2000; $500,000 for investment management fees, out of pocket expenses and other costs on April 27, 2000; $95,000 for investment management fees, out of pocket expenses and other costs on September 14, 2000; and $1,800,000 on December 22, 2000 to purchase an interest in SBG. (Hansen Aff., ¶ 9). In addition, Kristiansen, St. Frederikslund's, CEO made payments of another $200,000. (Block Aff., Exh. 35). COB apparently received a $1 million management fee as an intra-company transaction between SBG and COB; $350,000 in legal fees were paid to GT and ESCM in December 2000; and other substantial sums were paid to COB principals, including to Pomeroy and his associates. (Block Aff., Exh. 34).

Pomeroy and Ness continued to assure St. Frederikslund that its assets were growing, including providing a medallion guarantee letter that the assets in its syndicate totaled in excess of $200 million. St. Frederikslund, accordingly, was motivated to continue a business relationship with Pomeroy and COB entities, with the comfort that GT, ESCM and AJP were protecting its interests in the Swan Trust recovery, (Hansen