Aff., ¶10 and Exhs. 1 through 6.  St. Frederikslund would have purchased ISG's position in the Swan Trust recovery had ISG been separately represented and sought a buyout. ( Id., ¶12).

Liens in excess of $230,000 on Pomeroy's home were recorded prior ISG's retention of independent counsel.  (Block Aff., Exh. 33).  Several million dollars were transferred in and out of the FMB concentration and sweep accounts in New York during the period of AJP's representation of all the investors, which were not available after May 2000 when the balance was transferred to Cyprus. (Barber Aff., Exhs.I,J.)

Actions Taken by ISG After Retaining Independent Counsel

In addition to initiating the COB Litigation, ISG sued ABN Amro and FMB in New York ("the New York action") after finally receiving AJP's files and after receiving, by subpoena, other documents from ABN Amro.  As a predicate to filing the New York action, ISG also had to obtain, as part of its judgment in the COB Litigation, an assignment of COB's rights in the Deed of Assignment, because it individually had no standing to sue the banks for the monies misappropriated from Swan Trust. (Clark Aff., ¶23).  ISG did not secure rights to the assignment until January 23, 2004, and only as a sanction for COB's misconduct in the COB Litigation. (Clark Aff., 23,)  The preliminary order was made a part of the final judgment in April 2004.  Both FMB and ABN Amro filed motions to dismiss on statute of limitations grounds.  While thus far, ISG has survived the statute of limitations argument raised in the motion to dismiss, at least as to FMB,[6] nothing precludes the bank defendants from raising the issues anew later in the

---

[6] ISG has filed an amended complaint against ABN Amro to which ABN Amro has not yet responded. (Clark Aff., ¶24 ).

proceedings. (Clark Aff., ¶24). ISG obtained a judgment the COB Litigation in excess of $10 million but has been unable to recover any of it.

## ARGUMENT

Summary judgment must be denied where genuine issues of material facts are in dispute. *See* Fed.R. Civ. P. 56. "A dispute [of facts] is genuine if it 'may reasonably be resolved in favor of either party.'" Great Northern Insurance Company et al v. Manpower, Inc., 364 F. Supp. 2d 7, 13 (D. Mass. 2005), citing Cadle Co. v. Hayes, 116 F. 3d 957, 960 "Facts are 'material' if they possess 'the capacity to sway the outcome of litigation under the applicable law.'" Great Northern Insurance Company et al v. Manpower, Inc., 364 F. Supp. 2d at 14. Factual disputes "must be resolved in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor." Rossiter v. Potter et al, 2005 U.S. Dist. LEXIS 10422 *4 (May 23, 2005), citing Barbour v. Dynamic Research Corp. 63 F. 3d 32, 36 (1st Cir. 1995).

> I. **Genuine Issues of Material Fact Exist as to Whether Defendants Formed an Attorney-Client Relationship or Similar Relationship Giving Rise to a Duty of Care.**

Under Massachusetts law:

> An attorney-client relationship . . . need not be an express arrangement. An attorney-client relationship may be implied "when (1) the person seeks advice or assistance from an attorney, (2) the advice or assistance sought pertains to matters within the attorney's professional competence, and (3) the attorney expressly or impliedly agrees to give or actually gives the desired advice or assistance (citations omitted).

> In addition, even when there is no attorney-client relationship, either express or implied, an attorney may still owe a duty to a nonclient [citations omitted.] An attorney owes a duty to nonclients who the attorney knows will rely on the services rendered [citations omitted).

22

Cushing and Dolan, PC et al v. National Lenders, Inc., 2004 Mass. Super LEXIS 499 * 6 - 8 (November 1, 2004); *see also* Kirkland Construction Co. v. James, 39 Mass. App. Ct. 559 (1995) (attorneys may liable to nonclients for negligent misrepresentation, negligent supervision of an associate and violations of M.G.L. 93A where attorney carelessly promised payment to third party by his client). Although a duty is less likely to be imposed where the attorney is under an independent and potentially conflicting duty to his client, where the interests of the client and the third party are shared or where the attorney knows the third party is reasonably relying on his advice and representation, a claim for legal malpractice (negligence) will lie. Kirkland Construction v. James, 39 Mass. App. Ct. at 562; Nickerson v. Walsh, 2000 Mass. Super LEXIS 643 * 9-10 (September 29, 2000). In the absence of an express or implied attorney-client relationship, attorneys may also be liable to nonclients for breach of fiduciary duty or aiding and abetting their client's breach of fiduciary duty. Cacciola v. Nellhaus, 49 Mass. App. Ct. 746, 752- 4 (2000). "A fiduciary relationship arises when one reposes faith, confidence and trust in another's judgment and advice. Where a confidence has been betrayed by the party in the position of influence, this betrayal is actionable, and the original of the confidence is immaterial." Fassihi v. Sommers, Schwartz, Silver, Schwartz & Tyler, P.C., 107 Mich. App. 509, 515, 309 N.W. 2d 645 (1981), *cited with approval* in Cacciola v. Nellhaus, 49 Mass. App. Ct. at 750 (2000).

Additionally, nonclients may sue attorneys as third party beneficiaries if the purpose of the engagement of counsel ultimately would benefit them as intended beneficiaries of the engagement. National Bank of Canada v. Hale & Dorr, LLP., 2004 Mass. Super. LEXIS 142 * 36-7 (April 28, 2004) (noting that in Miller v. Mooney, 431

Mass. 57, 61 n.3 (2000), the Supreme Judicial Court assumed, without deciding, that "an attorney-client relationship may be established by proof of a third-party beneficiary contract, the purpose which is to provide legal services for the benefit of a third party.") The absence of a retainer agreement between the plaintiff and the law firms (as defendants argue here) does not, as a matter of law, preclude liability of attorneys to those who rely on their services. *See, e.g.*, Crossland Savings FSB v. Rockwood Insurance Co., 700 F. Supp. 1274, 1281-2 (S.D.N.Y. 1988). ("It does not follow . . . that a lawyer may be held liable in negligence only to those who pay her bills or with whom she has a formal retainer agreement. . . . When the lawyer represents that she is acting on the third party's behalf, the attorney is estopped from denying the attorney-client relationship and may be held liable for breach of fiduciary duty or negligence.")

    The events and statements detailed and set forth in the affidavit and exhibits to the opposition establish genuine issues of material fact as to the roles played by AJP, ESCM and GT and whether they owed a duty of care to ISG or breached contractual undertakings. Defendants argue they owed no duty to ISG because COB's interests were adverse to ISG's; because ISG at some point retained independent counsel in Belgium to pursue a criminal investigation, because of the involvement of Clark, a director of ISG, who happened to be a lawyer based in Hong Kong; and even because ISG's investors retained counsel. But the evidence adduced thus far establishes that ISG retained counsel in Belgium to pursue Pans, whom they believed was acting alone; that AJP and Pomeroy continued to encourage ISG to believe that Pans was acting in a rogue capacity and had been fired and that COB and Pomeroy were "victims"; that the investors retained counsel

24

in Europe to sue ISG, not COB; that neither Belgium counsel nor Clark[7] was admitted to practice in the United States, was familiar with U.S. law or had the capacity to initiate any action here nor were they retained to do so; that, with AJP's knowledge, ISG did not consult counsel in the United States until October, 2001[8] because it was relying on AJP and the law firms to recover its funds and to represent its interests jointly as promised repeatedly by AJP and COB principals; that ISG expressed its reliance and forbearance to AJP; that ISG not only forbore from initiating claims in the United States but also worked to forestall criminal inquiry of Pomeroy in Europe and Asia, again in reliance on defendants and based on AJP's advice that independent claims would jeopardize the chances of recovery; and that ISG sought and obtained from AJP exclusively advice on a variety of legal issues pertaining to the recovery in the United States. The evidence adduced thus far also establishes the inference that the $19 million in principal that COB purportedly retained AJP to recover constituted funds of the three investors, PRCS, St. Frederikslund and ISG, and not funds of COB (COB had an interest only in some portion of the profits, if any. Accordingly the engagement of ESCM and GT was arguably for the direct benefit of the investors pursuant to COB's fiduciary duties to them, which AJP and other counsel frequently acknowledged. The evidence presented by ISG further establishes that ISG as well as St. Frederikslund, and even Pearlberg, regarded defendants

---

[7] Defendants point to Robertson v. Gaston Snow & Ely Bartlett, 404 Mass. 515 (1989) for the proposition that a court is more reluctant to imply an attorney-client relationship where the plaintiff is sophisticated. That case is factually dissimilar as there were no communications between plaintiff and the defendants leading the lawyers to understand that the plaintiff was relying on them. Here, by contrast, there are numerous communications between AJP and ISG wherein AJP was aware of ISG's reliance and forbearance as a result of his role and also numerous direct meetings and legal advice creating an attorney-client relationship or a relationship akin to one. St. Frederikslund similarly believed it had an attorney-client relationship with the defendants.

[8] Defendants argue, based upon a letter from Barber dated July 18, 2001, that ISG consulted counsel in July, 2001. As described earlier ISG denies that it met with counsel in the United States until late October 2001.

25

as their U.S. attorneys.[9] ISG denies that it and AJP discussed conflicts of interest between it and COB in connection with the Swan Trust recovery and, quite to the contrary, maintains that AJP told Clark that their interests were "one and the same." (Clark Aff., ¶8). The evidence establishes that ISG expected utmost good faith and due care from AJP and communicated as much to him[10] and refrained from suing COB and its principals or taking the requisite steps to initiate independent action in the United States against other parties in reliance on AJP's equal representation of ISG's interests and adherence to his advice that such independent actions by ISG would jeopardize the recovery that AJP allegedly was in the process of securing.

From these facts a jury could find that an express and implied attorney-client relationship existed or, in the alternative, that the defendants owed duties of care to a nonclient whom they knew to be reasonably relying on their representations and advice. *See e.g.* McCarthy v. Landry, 42 Mass. App. Ct. 488, 491, *rev. denied*, 425 Mass. 1105 (1997) (attorney for administratrix may owe heirs "a duty akin to that in an attorney-client relationship"). DeVaux v. American Home Assurance Co. et al, 387 Mass. 814, 819 (1983) (denying summary judgment where the question of whether there was an attorney-client relationship depended upon the reasonableness of the plaintiff's reliance -- a

---

[9] In this sense AJP's role in representing the Swan Trust investors may be more analogous to an attorney representing a partnership in which he has a duty to all partners and has a fiduciary duty to disclose all relevant matters. *See discussion* in Cacciola v. Nellhaus, 49 Mass. App. Ct. 746, 752 (2000). In correspondence with FMB, Pomeroy appeared to refer to the other syndicate members as his partners. (Block Aff., Exh.7 ).

[10] The Supreme Judicial Court has stated "We believe an attorney has a duty to prevent any mistaken reliance on his silence." DeVaux v. American Home Assurance Co. et al, 387 Mass. 814, 820 (2000) citing S.J.C. Rule 3:07, DR 6-101 (A) (3). To the extent AJP privately disavowed the expectations described by ISG in its side letter, he was under an obligation to so state.

question "uniquely within the competence of the jury"),[11] citing 10 C.A. Wright & A. R. Miller, Federal Practice and Procedure, § 2729, at 560 (1979). A jury could find that the defendants breached that duty of care as they purported to represent ISG's interests, or led it to believe that they were, all while orchestrating behind the scenes "a general attack plan that makes the three investors stay in line" hoping that ISG's resolve and that of St. Frederikslund would dissipate through attrition. A jury could find that defendants should be estopped from denying an attorney-client relationship. A jury could find that AJP's and the defendants' roles were too multifaceted -- attorney for investors, attorney for COB, attorneys for the newly formed SBG, criminal defense attorney for Pomeroy, "coach" of a junior federal prosecutor -- that they failed in all of their missions. It cannot be said at this stage of the proceedings that defendants owed ISG no duty of care under any tort or contract theory.

## II. Genuine Issues of Material Fact Exist as to Whether Defendants Were the Proximate Cause of Harm to ISG

Defendants argue first, that, as a matter of law, their malfeasance, if any, did not cause harm to ISG because all the funds were gone as of the date of their representation and because after ISG retained new counsel in October, 2001 there was still time to file actions against third parties. However, ISG has raised genuine issues of material fact of damage caused by defendants' conduct.

As ISG argued in opposition to the motion to dismiss earlier filed by defendants, even if ISG still had time to sue COB and Pomeroy in 2001 when it retained Stone,

---

[11] St. Frederikslund's reliance on AJP and Burr until November 2001, when it filed its own lawsuit against COB and Pomeroy, is evidence of ISG's comparable reasonable reliance. The fact that GT and AJP believed themselves too conflicted to represent COB and Pomeroy in that lawsuit is further evidence that the defendants, even in their own minds, acted as counsel for all the investors.

27

liability still could attach to ESCM, GT and AJP if, as alleged here, the delay in ISG's initiation of any claims, induced by defendants, caused ISG to end up with an uncollectible judgment. See 4 Mallen & Smith, Legal Malpractice, The Plaintiff's Attorney – Delay in Prosecution, The Plaintiff's Attorney – Delay in Prosecution – Error Regarding Collectibility and Bankruptcy, §§30.19 -20, 504-7 (5th Ed. 2000); Khadem v. Fischer & Kagan, 626 N.Y.S.2d 500, 215 A D. 2d 441 (N.Y. App. Div.1995) (summary judgment for law firm reversed where there was a question of fact as to whether law firm's delay in prosecuting the case between 1983 and 1985 was a proximate cause of plaintiff's inability to collect on its judgment).

ISG did file claims against COB, Pomeroy and SBG in early 2002, but not a penny of the $10 million judgment it obtained in 2004 is collectible. ISG has produced evidence that COB and COB-related entities received $19 million between September 1998 and October 26, 2001. COB received intra-company transfers, including a $1 million management fee and $350,000 to pay GT and ESCM, and Pomeroy and other COB principals and consultants received funds in 2000 for their personal use. Before ISG retained counsel in 2001, over $230,000 in liens attached to Pomeroy's house. Additionally, funds appear to have been available for attachment in FMB's concentration and sweep accounts at ABN Amro; by May 2000, these funds were transferred out of New York, where they could have been frozen, to Cyprus. St. Frederikslund, having been informed by letter, medallion guaranteed by Fleet Bank, that the balance in its syndicate was $227,620,578.00, contemplated buying out ISG's interest and was likely to have done so as it was eager to continue investment opportunities in partnership with Pomeroy and COB through SBG, invested over $9 million to pursue such opportunities and a buyout of

28

ISG's interest in the Swan Trust was small by comparison. (Block Aff., Exh. 36; Hansen Aff., ¶ 12 and Exh. 5). However this option also was unavailable to ISG by the time it retained Stone, as St. Frederikslund, by November 2001, and as a result of the long delay in recovery, had become adverse to COB. Approximately half of the $1,215,000 was still available at the time of AJP assured ISG he would represent all of the investors in the recovery, but those funds later were dissipated. (Block Aff, Exh. 24.)

All these remedies were lost to ISG while defendants were promising recovery yet not initiating the very actions they deemed required, advising ISG not to file its own actions in the United States and inducing it not to retain independent counsel, assuring ISG that COB recognized its fiduciary duty to the investors and was preparing actions for civil fraud against third parties (when, in fact, it was not), failing to advise ISG of the need for immediate legal action as well as negotiation, failing to tell ISG, as they did COB on 6/28/01 that "the time for litigation is now," promising ISG that SBG would buy out ISG if that were the only option and negotiating with banks who themselves had been suspected of involvement in money laundering. "A law firm may be liable to a client even where the client lost only some but not all of its legal remedies." 4 Mallen & Smith, Legal Malpractice, The Plaintiff's Attorney – Delay in Prosecution, §30.19, 505-6 (5th Ed. 2000).

In addition to its reliance damages, ISG has incurred damages in the form of increased legal fees in the actions filed against FMB and ABN Amro[12] defending against

---

[12] ISG also reserves the right to argue at trial that had defendants done what they recommended to COB (but not ISG) in August 1999, which was to file litigation simultaneously with efforts to negotiate, ISG would not have had to incur its own legal fees bringing actions against the banks. Defendants collectively were paid $350,000, if not more, for legal services. ISG has not had the opportunity to conduct discovery as to what specific services they rendered for that amount..

29

statute of limitations arguments raised in motions to dismiss. These defenses undoubtedly will be advanced anew at later stages of the proceedings and hopefully will not jeopardize recovery entirely.

Defendants here argue,[13] as they did in connection with their motions to dismiss, that ISG had plenty of time after ISG retained new counsel to file claims against third parties, string-citing cases for the proposition that lawyers cannot be the proximate cause of harm if there was a reasonable time to file claims. The irony of that argument, of course, is that they deliberately withheld documents and information from ISG's new lawyer, Stone, when ISG transitioned the matter to her. Stone, consistent with the appropriate diligence before filing a claim, sought from AJP "to obtain for ISG all documents and information relating to ISG's $4 million investment originally placed with Corporation of the BankHouse and allegedly transferred to other parties." (Stone Aff., Exh. A.) Those documents included, without limitation, documents AJP received from Pearlberg and from David Bosse, counsel for FMB. (Id.). Significantly, in his June 28, 2001 letter to Pomeroy,[14] AJP advised Pomeroy that the "substantial documentation and information" he collected from Pearlberg and Bosse -- the very documents he withheld from Stone -- "now allows us to send Demand letters and file lawsuits." AJP earlier told Barber that the documents he received from Pearlberg "were valuable for litigation." (Barber Aff., Exh. 37). Yet defendants here take the position that ISG's new counsel, without the documentation or information that AJP took two years to obtain and which

---

[13] Defendants also argue that ISG could have sued COB and other parties prior to retaining new counsel. But the evidence shows that AJP advised ISG not to do so because it would jeopardize recovery and that ISG followed his advice.

[14] The tone and content of the letter suggests, among other things, that AJP was trying to justify the two-year delay in bringing litigation to avert a malpractice action by COB and/or Pomeroy.

30

would form the basis for demand letters and lawsuits had sufficient time (i) to determine the basis of actions against third parties, (ii) obtain the requisite rights to the Deed of Assignment[15] and (iii) initiate claims against the banks before the date that the banks later would argue the statute of limitations expired. It should be noted that as of June 28, 2001, more than two years after ESCM and GT had been involved directly in the recovery efforts, AJP only opined that COB "would have potential litigation" against certain entities, including ABN Amro. He was not sure of the existence of claims against FMB, reserving judgment until he had reviewed the information recently received, i.e., information he withheld from Stone. (Block Aff., Exh. 37.)

Defendants also argue that Stone had available to her a memorandum attached to St. Frederikslund's lawsuit against COB filed in November, 2001. (AJP Decl., Exh.Q9) But that document, on its face, is hardly a roadmap for a lawsuit as it contains absolutely no legal analysis.[16] Indeed, AJP himself characterized the memorandum merely as "a brief summary of documents [Jens Kristiansen] reviewed in my office" and urged the importance of meeting for a fulsome understanding of the legal issues and prospects of recovery. (Id.). And as the painstakingly drafted complaint eventually filed against FMB and ABN Amro reflects (Garvey Aff,, Exh. 2), far more information than the documents ISG had available in 2001 was required to advance claims against the banks, particularly where ISG alleged fraud, which requires pleading with particularity.

---

[15] Although defendants in the COB Litigation ultimately defaulted in 2004, in the initial stages of the case, they defended vigorously, through Gary Crossen, so it was highly unlikely that Stone could have procured the requisite rights to the Deed of Assignment even if she had filed the case the day after she was retained.
[16] As far as ISG can tell, although defendants had been representing the Swan Trust recovery efforts for over two years, by November 2001, two years and three months after AJP was retained and over two and a half years after Burr was involved, there was precious little legal analysis as to the basis of any claims.

31

For the purposes of this motion, defendants here argue that the statute of limitations expired in February 2002. In the New York action, ISG has filed claims against FMB for fraud and against ABN Amro for negligence and aiding and abetting FMB's fraud. ABN Amro has argued in the New York action that, in respect to a negligence claim advanced by ISG, the applicable statute of limitations is three years and, further, that "ISG's claimed ignorance of the alleged negligence is of no legal significance because 'the statutory period of limitations beings to run from the time when liability for the wrong has arisen even through the injured party may be ignorant of the existence of the wrong or injury.'" ABN Amro further argues that "the purported knowledge of ISG is irrelevant to any possible claim of tolling" because it is "an assignee of a tort claim" and '"did not obtain [ ] an interest in [the] purported claim until well after the period of limitations ran." ABN Amro argues, in respect to the aiding and abetting claim also brought against it by ISG, that "Pearlberg (as well as Pomeroy through whom ISG obtained the Deed of Assignment) had knowledge of the alleged wrongdoing at or about the time it is claimed to have occurred." (Clark Aff., ¶ 24). So far, ISG has survived FMB's motion to dismiss, including on statute of limitations grounds, but that statute likely will continue to be an issue through proceedings. After dismissal with leave to amend, ISG amended the ABN Amro complaint to allege further particulars. (Id.) To the extent ISG is advancing claims on its own behalf against ABN Amro arising out of the transfers made on May 29, 1998 to COB's account at Fleet and to ESCM, ABN Amro's argument, if successful, would cause dismissal of those claims as the statute would have expired on May 29, 2001, when AJP was still purporting to represent all the investors.

The argument that no discovery rule applies, if successful, may also jeopardize a negligence claim brought by ISG as Pearlberg's assignee.

It thus is a jury question as to whether or not Stone or such other counsel as ISG would retain in New York to file claims against ABN Amro and FMB had a "reasonable time" within which to identify and file such claims in time to avoid a defense of a statute of limitations bar where (1) those claims were not immediately obvious even to AJP after over two years of alleged investigation, (2) defendants withheld the information they did have and which AJP boasted to Pomeroy finally enabled the filing of demand letter and a lawsuit, (3) as a predicate to filing claims ISG would have to obtain COB's rights to the Deed of Assignment or else be barred from relief for lack of privity for the illegal Swan Trust transfers and (4) where without a discovery rule to toll the statute, the limitations on direct claims by ISG against ABN Amro for negligence arising out of the May 29, 1998 transfers already expired during defendants' representations of the investors . The question of whether a "reasonable" time remained within the limitations period for ISG to file complaints against other responsible parties "may be one for the jury to decide where the facts are disputed or the matter rests largely on inference[.]" Pagliarini, et al. v. Iannaco, 440 Mass. 1032, 1032-3 (2003) (rescript). ISG should be allowed to argue to the jury that, having retained independent counsel in November, 2001, it could not, under the circumstances and as a result of the two year delay occasioned by defendants' conduct, have filed the New York actions so as to obviate the statute of limitations defense. In this regard it should be noted that on February 20, 2001, Pomeroy's new counsel, Gary Crossen, sought advice from AJP regarding the statute of limitations. He sought such advice two weeks before the e-mail exchange between Clark and AJP whereupon AJP

33

advised Clark, "the statute of limitations will be an issue but creative thinking should be applied." (Block Aff., Exh. 38.)

### III. Genuine Issues of Material Fact Exist as to when the Statute of Limitations Begins to Run on Claims against ESCM[17]

ESCM asserts that ISG's claims against it are barred by the statute of limitations.[18] Under a tolling agreement, the parties agreed that the case should be deemed filed as of June 24, 2004. ESCM asserts that that ISG knew certain facts leading to claims against it over three years before June 24, 2004, and argues that ISG should have initiated those claims earlier, either through AJP after he left the firm, or through independent counsel. ISG contends that any claims against ESCM, GT and AJP did not begin to accrue until it consulted independent counsel and terminated its relationship with AJP. ESCM contends that this event occurred in July 2001; ISG contends it did not consult with independent counsel until October 2001. Either way, the case would be deemed timely filed.

Under the "continuous representation doctrine," the statute of limitations on claims against a law firm does not begin to run until "the termination of the undertaking." Murphy v. Smith, 411 Mass. 133, 137 (1991), Id., quoting McCormick v. Romans, 214 Va. 144, 148 (1973). *Accord* Cambridge Biotech Corp., v. Deliotte Touche, 6 Mass. L. Rep. 367, 1997 Mass. Super LEXIS. 557 * 5 (January 28, 1997) ("[a]s with medical and legal professionals, continuous representation tolls the statute of limitations until an accountant stops rendering professional services to his or her client on a particular matter"). In applying the continuing representation doctrine to lawyers, the Supreme

---

[17] Neither GT nor AJP presently argues that the claims against them are time-barred.
[18] For the purposes of summary judgment, ESCM does not challenge the merits of ISG's claims and, accordingly, ISG has not briefed the issues. Moreover, it has had no discovery on its claims other than automatic disclosure exchanges.

Judicial Court held that the doctrine "recognizes that a person seeking professional assistance has a right to repose confidence in the professional's ability and good faith, and realistically cannot be expected to question and assess the techniques employed or the manner in which the services are rendered." Murphy v. Smith, 411 Mass. at 137, *citing* Succession of Smith v. Kavanaugh, Pierson & Talley, 565 So. 2d 990, 995 (La. Ct. App. 1990). Accord. Rosen Construction Ventures, Inc. v. Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C., 364 F. 3d 399, 406 (1st Cir. 2004). As the court held in that Murphy v. Smith, supra, citing Greene v. Greene, 56 N.Y. S. 2d 86, 95 (1982), "[i]t is not realistic to say that the client's right of action accrued before he terminated the relationship with the attorney." Id. That is because "a person cannot realistically be expected to second-guess the attorney's performance so long as the attorney-client relationship continues." Hodas v. Sherburne, Powers & Needham, 938 F. Supp. 58, 59 (D. Mass. 1996), *affirmed* 114 F. 3d 1169 (1st Cir. 1997).

In Murphy v. Smith, supra, the plaintiffs initiated a legal malpractice claim against their attorney for negligently certifying good title to property they purchased in 1980. In 1983, over three years after the plaintiffs purchased the land, their neighbors sent a letter, stating that they were the true owners of the lot. (Id., at 134-5.) Plaintiffs submitted an affidavit stating that when they raised the letter with their attorney, he told them "it did not present a cause for concern and that he would take care of it." Id. at 137. Plaintiffs also argued that based upon their attorneys' representation that he would take care of the statute problem, they considered the defendant to be their attorney for the purpose of the title dispute. Id. Although plaintiffs sent a demand letter from another attorney to the attorney defendant in 1985, they did not file a malpractice action until 1987, almost four

35

years their receipt of the letter from their neighbors putting them on inquiry notice of a title challenge and two years after they retained independent counsel. On appeal, the Supreme Judicial Court vacated the order of summary judgment against the plaintiffs, holding that it was a question of fact as to when the plaintiffs terminated their relationship with the defendant lawyer and that "the applicable statute of limitations for the plaintiffs' malpractice action should have been tolled from the beginning of this representation until defendant's termination." Id. at 138.

The continuous representation doctrine, tolling the statute until the termination of the relationship, applies even where a client might be aware of its loss, if, as here, the attorney assured them he would take care of the problem and make the client whole through other sources. Marholin v. Kaye, 503 So. 2d 950, 951 (Fla. App. 1987) *per curium* (reversing summary judgment where, even though the clients were on notice of malpractice outside of the limitations period, there was a genuine issue of material fact whether attorney lulled clients into refraining from initiating an action against him by promising to make them whole, either personally or through his insurance carrier). The repeated promises by AJP of recovery to which he alone held the key (whether through Pearlberg, the FBI, the U.S. Attorney's office, negotiations with the banks, or the actions for civil fraud he represented to ISG were being prepared concurrently) and the advice he gave ISG, during the period that he induced and secured ISG's trust and confidence, that ESCM was only paying "creditors of COB and had done nothing and AJP's statement that complicating the case through bad publicity or independent actions would jeopardize such recovery toll the statute of limitations on claims against AJP and his firms until ISG terminated the relationship. *Cf.*, Rosen Construction Ventures, Inc. et al v. Mintz, Levin,

36

Cohn, Ferris, Glovsky and Popeo, P. C., 364 F.3d at 406 (law firm's assurances that the client was going to prevail in its lawsuit triggered the continuous representation doctrine such that the statute of limitations did not begin to run until the client lost the case.) At least at late as September 27, 2001, ISG still considered its relationship to AJP "vital."

Another rationale for application of the continuous representation tolling doctrine "is that the client has a right "[not] to jeopardize his pending case or his relationship with the attorney handling that case." Icahn v. Totman, Nachamie, Spizz & Johns, P.C. 2001 U.S. Dist. LEXIS 15487 *8 (S.D.N.Y. September 28, 2001), quoting Glamm v. Allen, 57 N.Y. 2d 87,93, 453 N.Y.S. 2d 674, 678 (1982). Thus it is illogical as a matter of law and as a matter of the circumstances of this case to argue, as ESCM appears to do in its motion, that AJP could have sued his former firm after March 2001 on ISG's behalf. ISG should be able to proceed to show that AJP's transition to new firm was not a break in the continuum of representation sufficient to put it on notice that it had to file claims against ESCM three years from March 2001. See., e.g., Khadem v. Fischer & Kagan, 215 A. D.at 442 (where attorney was the supervising attorney over the plaintiff's case while a partner at both Fischer & Kagan and Proskauer, Rose, Goetz & Mendelsohn, defendants' argument that there was no continuous representation was "disingenuous.")

37

## CONCLUSION.

For all of the foregoing reasons, the motions for summary judgment should be denied in their entirety.

INTERNATIONAL STRATEGIES
GROUP, LTD

By its attorneys,

*/s/ Jessica Block*
Jessica Block
BBO#046110
Block & Roos, LLP
60 State Street, Suite 3800
Boston, Massachusetts 02109
June 30, 2005　　　　　　　　　　　　(617) 223-1900

## CERTIFICATE OF SERVICE

I, Jessica Block, Esquire, counsel for the plaintiff, do hereby certify that the within pleading was served by causing copies to be delivered, by messenger, to counsel for the other parties of record, this 30th day of June 2005.

*/s/ Jessica Block*
Jessica Block

38