UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

INTERNATIONAL STRATEGIES GROUP, LTD.

    Plaintiff,

v.

GREENBERG TRAURIG, LLP., A. JOHN
PAPPALARDO, AND ECKERT, SEAMANS,
CHERIN AND MELLOTT, LLC.,
    Defendants.

CIVIL ACTION NO. 04-12000 RWZ

## AFFIDAVIT OF CHRISTOPHER G.L. JONES

**CHRISTOPHER G. L. JONES,** being duly sworn,

1.    From 1996 to 1999, I served as president and CEO of COB Asset Management Corporation, an entity formed to provide consulting and financial advisory services to Corporation of the Bankhouse ("COB"), which provided financial services to wealthy individuals, family trusts and institutions requiring investment structures. I acted in a consulting capacity to Pomeroy and COB.

2.    In or about late August or September, 1999, James F. Pomeroy ("Pomeroy"), the CEO of COB, had heart surgery and asked me to become involved with communications to COB clients/investors concerning the recovery of funds from Swan Trust and the Head Trustee, Henry Pearlberg, including communicating directly with investors. I was aware that attorney A. John Pappalardo ("AJP") was leading those recovery efforts and that the firms of Greenberg Traurig LLP ("GT") and Eckert Seamans Cherin and Mellott LLC (ESCM) also were involved. I participated in a number of meetings at the offices of ESCM and COB regarding the recovery,

including meetings with AJP, and communicated frequently with AJP through written correspondence, memoranda, e-mails and telephone calls. Additionally there were private meetings between AJP and Pomeroy at the offices of ESCM and COB after which I was instructed as to what to say to investors as a liaison.

3.      It certainly was my understanding as a result of those meetings that AJP and the law firms were representing all of the investors, including International Strategies Group ("ISG"). I was informed by Pomeroy and AJP that COB and its investors had decided to move forward in concert to assist criminal investigations and seek funds recovery through civil suits and through the use of private investigators (T&TT) expert in these matters. I understood that COB would be joined in its suit(s) for recovery by all the investors and act in concert with them in all actions relating to the recovery. At no time did anyone tell me or suggest to me that there were conflicts regarding joint representation. In all my communications with Philip Clark, it was clear to me that he was relying on AJP in connection with the recovery efforts and in forbearing from initiating any lawsuit against COB or its principals in the United States. I assisted AJP in arranging meetings with Henry Pearlberg (SWAN) to gather information required for the filing of appropriate recovery actions for COB and its investors. I was briefed on meetings organized by AJP in London for similar purposes. Henry Pearlberg communicated to me his confidence in AJP, as a result of the California meetings and his understanding that AJP would represent all the COB investors whose funds had been involved in the fraud perpetrated by FMB of Cyprus. Pearlberg said he looked forward to eventually receiving a portion of the recovery described by AJP along with the other investors involved in COB's transaction through SWAN.

4.      Based on the meetings with AJP and my conversations with Pomeroy, I was led to believe that pleadings had been drafted and that a civil suit was being prepared on behalf of the

investors when the law firms deemed it appropriate. I understood that the civil suit was initially to be coordinated with criminal investigations to support the efforts of the US Attorneys Office in Chicago and the FBI investigation. I believed the California trip by AJP to coordinate with SWAN was integral to the preparation of the suit. Henry Pearlberg informed me that he had turned over to AJP all his files and documents relating to these matters and that AJP had informed Pearlberg that he had everything required for the preparation of a civil suit on behalf of all investors. I recall that in August, 2001, Pomeroy told me he had pleadings on his desk and they were going to be filed immediately and I communicated as much to ISG and Henry Pearlberg.

5.      Prior to my association with COB, I worked as a principal in several investments structures specializing in small and medium sized companies, as a CEO of my own company and as a principal of Tower Hall and its predecessor Ardshiel, a company formed by former principals of Donaldson, Lufkin and Jenrette to provide specialized investment banking services. I now serve as Managing Director of Calder & Cooke which, among its other advisory activities, provides counsel for private equity placements, mergers and acquisitions and asset management. I also have acted as a director of a number of U.S. and international corporations. I served during the 1960's and 1970's in a number of government roles.

6.      I recently learned that in May 1998. ESCM received in its Pittsburgh bank account $821,500 from an account controlled by COB in a foreign bank and then distributed these funds to investors of its client COB. I find that truly astonishing. Having worked in the private placement and financial advisement industry for over 20 years, including with law firms of the size and reputation of ESCM, I have never heard of a law firm essentially acting as a bank or

clearing house for investment funds, thus avoiding regulations imposed upon such agents under the

securities laws or banking regulations.

SWORN TO UNDER PAINS AND PENALTIES OF PERJURY

DATE: June 21, 2005

Christopher G.L. Jones

CERTIFICATE OF SERVICE
I hereby certify that a true copy of the above document was
served upon the attorney of record for each other party
by mail (by hand) on ___6. 30 · 05___ .

4