UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

INTERNATIONAL STRATEGIES GROUP, LTD.

    Plaintiff

v.                                                                               CIVIL ACTION NO.
                                                                                 02-10532-RWZ

CORPORATION OF THE BANKHOUSE, INC.,
SOCIETE BANKHOUSE, and
JAMES F. POMEROY, II

    Defendants

**PLAINTIFF'S MOTION TO COMPEL WITNESS
TO PRODUCE DOCUMENTS
PURSUANT TO SUBPOENA *DUCES TECUM***

I.    INTRODUCTION

Pursuant to Fed. R. Civ. P. 37 and 45, and Rule 37.1 of the Local Rules of the U.S. District Court for the District of Massachusetts, plaintiff International Strategies Group, Ltd. ("ISG") moves to compel a witness served with a subpoena *duces tecum* to produce documents requested by the subpoena. The witness in question is A. John Pappalardo, Esq., former counsel to defendants James F. Pomeroy, II, Corporation of the BankHouse, Inc. and Societe BankHouse ("Pomeroy," "COB," and "Societe," respectively). Mr. Pappalardo also acted on behalf of ISG pursuant to a Power of Attorney.

Mr. Pappalardo has refused to produce certain documents because he claims the attorney-client privilege and/or the work product doctrine exempts them from discovery. ISG does not believe that any of the documents is privileged, for the reasons stated

below. ISG has been unable to obtain these documents from defendants or from other sources, and accordingly is forced to file this motion to compel.

Mr. Pappalardo was served with a subpoena *duces tecum* on December 3, 2002. Pursuant to the subpoena, Mr. Pappalardo, through his counsel, produced documents including many that had not been produced in discovery by the defendants. He also provided a privilege log listing documents which he claimed were exempt from production on the basis of attorney-client privilege and/or the work product doctrine. A copy of the privilege log is attached as Exhibit 1.

The documents which are the subject of this motion fall into five categories:

A. Documents given to Mr. Pappalardo by David Bosse, Esq., an attorney in Phoenix, Arizona who represented First Merchant Bank (the "Bosse documents," #19, 20 and 21 on Exhibit 1);

B. Documents given to Mr. Pappalardo by Henry Pearlberg, Trustee of Swan Trust (the "Pearlberg documents," #25 on Exhibit 1);

C. Documents regarding a possible restitution of funds from Henry Pearlberg, Trustee of Swan Trust (the "Pearlberg settlement documents," 241-247 and 249-415 on Exhibit 1);

D. Communications between Mr. Pappalardo and two individuals, Alex Vladimir Budnitsky and Moshe Dayani, "consultants" hired by COB to recover the funds which defendant Pomeroy had transferred to Henry Pearlberg and others (the "consultant communications," #101, 104, 154, 197, 200, 201, 202, 203, 204, 206, 207, 209, 212, 213, 214, 215, 223, 226, 227 and 228 on Exhibit 1); and

2

E.  Information, including memoranda and draft pleadings, regarding civil claims that could have been brought against May Davis Inc., a merchant bank located in New York City.

II.  FACTS

This action concerns a $4 million investment made by ISG with the defendants. ISG made the investment in May 1998, based on defendants' promises that handsome profits would be earned once the funds were in defendants' hands. For months after the investment was made, ISG asked for proof that the defendants were handling the funds according to their agreement, that is, holding them in a segregated and identified bank account, without depletion, and that they were earning the profit as promised. From June through November 1998, ISG continually wrote to defendants requesting evidence that the funds were intact. Defendants repeatedly assured ISG that this was the case. One of ISG's letters reached COB's financial controller who promised a rely "expeditiously." Immediately thereafter, Pomeroy wrote to ISG reprimanding ISG for corresponding with other members of the staff, and taking personal responsibility for the funds. In November 1998 at a face-to-face meeting between ISG and defendants, Pomeroy went so far as to show ISG a bank account statement and represent that ISG's $4 million investment was in the account. ISG believed Pomeroy's representations and relied on them.[1]

Contrary to Pomeroy's statements, however, ISG's $4 million investment was not in a segregated and identified bank account, and was not earning the profit that had been

---

[1] Documents obtained in discovery show that the funds were not held in ISG's special purpose syndicate account at Fleet Bank which was opened on joint signatory authority with ISG. The funds appear to have been held in another numbered syndicate account, indicating that the funds which defendants represented to be ISG's in fact belonged to another of defendants' clients.

3

promised. ISG's $4 million had been removed from the bank account into which it was initially deposited, and amalgamated with $10 million from Dan Strupland, a Danish corporation now known as St. Frederikslund,[2] and $5 million from P.R.C.S., a British entity. The entire sum of $19 million was transferred to Henry Pearlberg, trustee of Swan Trust (IOM) in November 1998.

Mr. Pearlberg, in turn, had transferred the $19 million to May Davis, Inc. ("May Davis"), a merchant bank in New York City. Following a series of transfers from May Davis, the funds came under the control of First Merchant Bank OSH Ltd. ("FMB"), a bank organized in Turkish North Cyprus and having a correspondent banking relationship with Abn Amro Bank in New York. ISG did not know about these transfers when they occurred and did not consent to them, either explicitly or implicitly. Indeed, ISG relied on Pomeroy's representations at the November 1998 meeting to the effect that the funds were in safe custody, lodged in an account for purposes of investment, and would be returned, with profit, when the investment had matured.[3]

Pomeroy, however, had made the initial transfer to Henry Pearlberg, and knew that Pearlberg had transferred the funds to May Davis. As of August 12, 1999 COB had Stephen Burr, Esq. of Greenberg Traurig send a demand letter to Swan Trust and May Davis stating COB's intention to pursue immediately all avenues of recovery against them. A copy of Mr. Burr's letter dated August 12, 1999 is attached as Exhibit A.

---

[2] St. Frederikslund brought its own action in this court, St. Frederikslund v. SB Global, Inc., 01-CV-11968-RWZ.

[3] Even after the transfer, defendants continued to misrepresent to ISG that its funds were intact. ISG did not know, and could not have known, that its funds had already been depleted, and that it had been duped by defendants. ISG never participated in any investment decision, never agreed that its funds should be transferred, and never acquiesced in defendants' actions. On the basis of defendants' continued misrepresentations, ISG signed additional documents at defendants' request which purported to authorize a new investment arrangement.

4

In approximately August 1999 defendants retained Mr. Pappalardo. Mr. Pappalardo met with a representative of ISG to discuss ISG's concerns about its investment. By letter dated August 20, 1999, Mr. Pappalardo told ISG that the defendants had transferred ISG's $4 million investment to Henry Pearlberg, and that Mr. Pearlberg had transferred a large portion of the principal from May Davis and to other entities including FMB. A copy of Mr. Pappalardo's letter dated August 20, 1999 is attached as Exhibit B. This marked the beginning of a two year period of sporadic communication between Mr. Pappalardo and ISG[4] consisting of meetings, letters, emails and phone calls. Throughout, Mr. Pappalardo acknowledged that COB owed a fiduciary duty to ISG and the other investors, that the $4 million ISG had deposited with COB had been transferred to Henry Pearlberg, and that Pearlberg had made subsequent transfers contrary to his agreement with COB. Mr. Pappalardo portrayed his clients as victims of Pearlberg and the other transferees, and promised that they would honor their fiduciary duties to ISG and the other investors by recovering the $19 million transferred to Pearlberg.

Mr. Pappalardo undertook to investigate the facts surrounding the transfers and recover the funds so they could be returned to ISG and the other investors. On a parallel track, Mr. Pappalardo analyzed whether COB might have legal claims against May Davis and others, and stated that he would commence litigation if the funds were not recovered by consensual means.

By letter dated October 22, 1999 Mr. Pappalardo wrote again to ISG. This time, he indicated that an effort was being made to recover the funds that had been transferred

---

[4] The communication with ISG was primarily to Philip Clark, its attorney and now a director of ISG, and Chris Barber, a director of ISG.

to Swan Trust, using consultants hired by COB. He also said that COB was preparing its own civil fraud case against the transferees who were based in the United States. A copy of Mr. Pappalardo's letter dated October 22, 1999 is attached as Exhibit C.

No recovery was forthcoming, but Mr. Pappalardo continued to assure ISG that efforts were being made. He told ISG that his law firm was researching claims that COB could bring against May Davis in order to recover funds on behalf of ISG and the other investors. Also by letter dated May 9, 2000 Mr. Pappalardo invited ISG to meet with Alex Vladimor Budnitsky ("Budnitsky"), one of the consultants hired by COB. A copy of Mr. Pappalardo's letter dated May 9, 2000 is attached as Exhibit D. The meeting among Mr. Pappalardo, ISG and Budnitsky occurred in London on May 22, 2000, and Mr. Pappalardo followed up by sharing Budnitsky's "action plan" with ISG. According to the "action plan," COB and the investors, including ISG, were to act as one team and Mr. Pappalardo was to represent the team. A copy of Budnitsky's "action plan" and Mr. Pappalardo's fax cover page are attached as Exhibit E.

One month later, by letter dated June 22, 2000, Mr. Pappalardo suggested another meeting among himself, ISG, Budnitsky and Budnitsky's associate, Moshe Dayani ("Dayani"). A copy of Mr. Pappalardo's letter dated June 22, 2000 is attached as Exhibit F.

On July 10, 2000, Mr. Pappalardo faxed to ISG a draft document by which ISG and the other investors would give Mr. Pappalardo power of attorney. The draft recites that COB placed a total of $19 million with Swan Trust, which total was comprised of the funds of ISG, Dan Strupland and P.R.C.S., and that COB thereafter had hired T&TT[5] to

---

[5] T&TT was the name under which Budnitsky and Dayani did business.

6

identify and recover the funds. A copy of the draft power of attorney is attached as Exhibit G. Also on July 10, 2000, Mr. Pappalardo emailed ISG and said that documentation for the recovery was complete and ready to be presented to the banks. A copy of his email dated July 10, 2000 is attached as Exhibit H. The following day, Mr. Pappalardo sent a letter in which he described the power of attorney as authorizing him to collect funds and put them into an escrow account at his law firm, and then disburse them to ISG minus a collection fee. A copy of Mr. Pappalardo's letter dated July 11, 2000 is attached as Exhibit I.

ISG executed and returned the power of attorney as Mr. Pappalardo had requested, along with a letter stating that ISG was granting the power of attorney upon the understanding that Mr. Pappalardo would exercise the utmost good faith and due care with regard to the interests of ISG, and communicate with ISG fully and on a timely basis. A copy of the executed power of attorney and ISG's letter dated July 11, 2000 is attached as Exhibit J. It should be noted that the power of attorney is still extant and has not been revoked.

Throughout this period, ISG and Mr. Pappalardo continued to discuss his law firm's research on possible claims against May Davis. Mr. Pappalardo represented that a memorandum had been prepared, and after he made one final change, it would be shared with ISG. By email dated July 12, 2000, ISG inquired about getting a copy of the memorandum, and a copy of the email is attached as Exhibit K.

On August 24, 2000 Mr. Pappalardo sent ISG an email. He reported that he had executed Budnitsky's "action plan" by sending the power of attorney to Abn Amro Bank in New York, the correspondent bank for FMB, and said that he assumed ISG was

7

communicating directly with Budnitsky or Dayani. A copy of Mr. Pappalardo's email is attached as Exhibit L. Again on September 29, 2000 Mr. Pappalardo emailed ISG stating that Budnitsky or Dayani or both should call ISG directly with an update on the status of the funds. A copy of Mr. Pappalardo's email dated September 29, 2000 is attached as Exhibit M.

By late November or early December 2000, Mr. Pappalardo met with British and American attorneys representing FMB, including David Bosse, Esq. of Phoenix, Arizona, as well as the chairman of FMB, Dr. Yaman. By email he informed ISG of these meetings, and said that he had received "substantial documentation" regarding the improper transfers. A copy of Mr. Pappalardo's email dated December 4, 2000 is attached as Exhibit N. Mr. Pappalardo elaborated further by letter on February 22, 2001. He reaffirmed that he had met with FMB's attorneys and chairman, and stated that he had just received additional files from the attorney. He stated again that COB had hired the consultants to recover the funds, and that the consultants were in direct contact with ISG. He reassured ISG that if funds were recovered, it would be paid forthwith, consistent with COB's fiduciary duty to ISG. Finally, he added that COB was reviewing possible legal claims against individuals and investors. A copy of Mr. Pappalardo's letter dated February 22, 2001 is attached as Exhibit O.

Effective March 12, 2001 Mr. Pappalardo joined the law firm of Greenberg Traurig, where Stephen Burr, the lawyer who had sent the August 12, 1999 demand letter to Swan Trust and May Davis (Exhibit A), was employed. Mr. Pappalardo continued his sporadic communications with ISG, and on May 29, 2001 emailed ISG about a meeting he had had with Henry Pearlberg who promised to make full restitution within 7-10 days.

8

Also, Mr. Pearlberg had provided his "entire file on the Swan Trust dealings with C. Joan Patrick, including original documents such as monetary transfers and contracts with May Davis and Joan Patrick which are valuable for litigation." A copy of Mr. Pappalardo's email dated May 29, 2000 is attached as Exhibit P.

On August 15, 2001, defendants communicated directly with ISG and said that they were proceeding with the "first steps of litigation." A copy of a fax dated August 15, 2001 from Peter Ness, COB's in-house counsel, is attached as Exhibit Q. Thereafter, Mr. Pappalardo sent a few more emails telling ISG about recovery efforts. Mr. Pappalardo's emails dated August 27, 2001, September 28, 2001 and October 2, 2001 are attached as Exhibit R.

By October 2001 ISG had lost faith in COB's and Mr. Pappalardo's willingness and ability to recover its funds. The recovery process had been under way for more than two years. ISG had been given a copy of Budnitsky's "action plan" in May 2000, and had agreed to cooperate with the plan by allowing Mr. Pappalardo to represent its interests in investigating the facts and dealing with the transferees. As a further part of the "action plan," Mr. Pappalardo had asked for and been given a power of attorney from ISG in July 2000. ISG had given the power of attorney upon the express understanding that Mr. Pappalardo would exercise the utmost good faith and due care on behalf of ISG, and communicate with ISG fully and on a timely basis. Despite all of Mr. Pappalardo's promises that recovery was imminent, COB had not returned principal or profits to ISG.[6]

Also, COB had not commenced any litigation. As early as August 1999 COB had expressed its intention to bring civil claims against May Davis and Swan Trust in order to

---

[6] Approximately $1,000,000 was returned to one of ISG's investors in August 1998. This was a payment of profit, and defendants assured ISG that its principal remained safely invested.

9

recover the investors' funds. Mr. Pappalardo said that COB was preparing a civil fraud case, and was researching claims against May Davis. Nonetheless, COB did not commence any action on its own behalf or on behalf of the investors. In conversations with ISG's counsel in early 2002, Mr. Pappalardo explained that COB had not wanted to incur the expense of litigation.

In early 2002, before starting the present lawsuit, ISG's counsel began trying to obtain the documents that Mr. Pappalardo had collected from Henry Pearlberg and David Bosse so that it could assess whether it had claims against Swan Trust and the other transferees. Counsel wrote to Mr. Pappalardo on January 4, 2002 and asked for the documents. No documents were produced, but Mr. Pappalardo replied by email stating that he was preparing a package of documents and he expected defendants' new counsel, Mr. Crossen, to give clearance for their production. No documents were produced. Thereafter, counsel made phone calls and wrote to both Mr. Pappalardo and Mr. Crossen, on January 25 and 31, 2002, to try to obtain the documents. The letters were not answered. Counsel wrote again to Mr. Crossen on March 8 and March 14, 2002. The letters were not answered. (Copies of letters and emails among counsel are attached as Exhibit S.)

ISG commenced the instant action on March 22, 2002. Although ISG had been told about the transfers to Pearlberg, May Davis, FMB and others, it did not have at that time a documentary trail that would enable ISG to assert claims against the transferees. Thus, ISG proceeded only against COB, Pomeroy and Societe.

ISG served its first request for production of documents on defendants on May 17, 2002. ISG asked specifically for the documents given to Mr. Pappalardo by David Bosse

10

and Henry Pearlberg.[7] Initially no documents at all were produced. After several telephone reminders, defendants produced some documents, but did not make a complete production or a privilege log. After plaintiff served a motion to compel, defendants served a written response, and more documents, but no privilege log. To this day, ISG does not know what documents defendants have withheld because no privilege log has ever been produced. In any event, so far as can be ascertained, the documents sought by this motion have not been produced by defendants.

ISG has undertaken discovery from several third parties, including Mr. Pappalardo. It has encountered roadblocks along the way, including Mr. Pappalardo's failure to comply with the subpoena *duces tecum*, as further described below.

III.   DOCUMENTS WITHELD

A.   The Bosse documents (#19, 20 and 21 on Exhibit 1)

ISG seeks the documents which David Bosse, the Arizona attorney who represents FMB, gave to Mr. Pappalardo. Mr. Pappalardo described them in his email to ISG dated December 4, 2000 as "substantial documentation relating to the accounts believed to have originated from the improper Swan Trust transfers." (see Exhibit N). Mr. Pappalardo has refused to produce them on a claim of work product.

Mr. Pappalardo bears the burden of demonstrating, factually and legally, that the privilege exists and covers the contested documents. A.W. Chesterton Co. v. Allstate

---

[7] Request #34 was for "[a]ll documents that relate to FMB, or relate to, reflect, evidence or constitute those given to John Pappalardo by David Bosse, attorney for FMB. Request #35 was for all documents which "John Pappalardo described as 'substantial documentation relating to the accounts believed to have originated from the improper Swan Trust Transfers' in his email to Chris Barber dated December 4, 2001." Request #37 covered all documents which "John Pappalardo described as Henry Pearlberg's 'entire file on the Swan Trust dealings with Joan Patrick including original documents such as monetary transfers and contracts with May Davis and Joan Patrick which are valuable for litigation' in his email to Chris Barber dated May 29, 2001."

11

Insurance Co., 2001 Mass. Super. Lexis 16 (2001). Mr. Pappalardo can not meet that burden with respect to the Bosse documents.

Returning to the touchstone of Hickman v. Taylor, 329 U.S. 495, 67 S. Ct. 385 (1947) it is clear that the attorney work product doctrine covers materials prepared by the attorney in anticipation of litigation. Protected materials include interviews, statements, memoranda, correspondence, and briefs -- those materials that contain the mental impressions of an attorney. The doctrine gives a lawyer a "zone of privacy" within which to prepare his client's case and plan strategy, without undue interference from the adverse party. In re Grand Jury Subpoena, 925 F. Supp. 849, 853 (D. Mass. 995), citing In re San Juan Dupont Plaza Hotel Fire Litigation, 859 F. 2d 1007, 1014 (1st Cir. 1988).

Work product is not an absolute shield from discovery. Courts distinguish between "opinion" work product and "ordinary" work product -- the former category encompassing materials that contain the mental impressions, conclusions, opinions or legal theories of an attorney, the latter category embracing the residue. In re Grand Jury Subpoena, 925 F. Supp. at 853, relying on In re San Juan Dupont Plaza Hotel Fire Litigation, 859 F.2d at 1014. Some courts give only qualified protection to "ordinary" work product, and will mandate its disclosure upon a showing of substantial need and undue hardship. The question that must be asked is whether denial of production would unduly prejudice the preparation of the moving party's case.

Here, the Bosse documents are not work product in any way. They certainly are not "opinion" work product. ISG is not asking Mr. Pappalardo for his notes, or memoranda, or correspondence, or any other materials he prepared that might contain his mental impressions or legal theories with respect to the Bosse documents. Nor is ISG

12

seeking ordinary work product -- anything else that Mr. Pappalardo might have prepared in anticipation of litigation. Instead, ISG is asking for documents which Mr. Bosse, the attorney for FMB, a party with interests adverse to Mr. Pappalardo's clients, handed over during a meeting in late November or early December 2000. Mr. Pappalardo did not prepare any of the documents; he simply carried them away from the meeting.

By the time he met with Mr. Bosse, Mr. Pappalardo was operating under the power of attorney on behalf of ISG, so the documents he received from Mr. Bosse were collected under its auspices. Also, according to the "action plan," Mr. Pappalardo was representing himself to third parties as the lawyer for the "team" that consisted of COB and the investors, including ISG. Mr. Pappalardo did not try to keep his meeting confidential from ISG. He told ISG about the meeting, including that he had obtained "substantial documentation" from Mr. Bosse, without any limitation that the documents be kept confidential. It is the very same "substantial documentation" that ISG is now moving to compel.

Also, Mr. Pappalardo did not prepare or collect any of the documents in anticipation of litigation against ISG. Although Mr. Pappalardo assured ISG that he had made considerable progress in preparing a lawsuit against the third parties, his goal for any such litigation was to recover funds for the investors. To the extent that Mr. Pappalardo collected the Bosse documents in anticipation of litigation, he did so under the auspices of ISG's power of attorney. The documents certainly were not collected in preparation of a defense to this litigation as the parties were still acting as one team and hoping for a consensual recovery. It was assumed that ISG and COB would be on the same side of any litigation against the third party transferees, not adverse to one another.

13

Accordingly, there is no need to carve out a "zone of privacy" for the Bosse documents. They do not contain Mr. Pappalardo's mental impressions or legal theories, and were not even prepared by Mr. Pappalardo. Moreover, Mr. Pappalardo obtained them to help ISG recover its funds, not to be hidden from ISG.

To support his claim of work product privilege, Mr. Pappalardo relies on the case of Sporck v. Peil, 759 F.2d 312 (3rd Cir. 1985). There, a deponent was asked to identify and produce the documents he reviewed with his counsel before his deposition. His counsel refused to have the documents identified, arguing that the select grouping of documents which he had reviewed with the deponent was protected from discovery as attorney work product. The trial court ordered them produced, and on a petition for a writ of mandamus, the Court of Appeals for the Third Circuit found that they were protected and need not be produced. The court found that counsel's selection and compilation of documents in preparation for a deposition is protected as work product. Sporck v. Peil, 759 F.2d 312, 316. In using his judgment to select documents relevant to the deposition, counsel was engaging in proper and necessary preparation of his client's case. Id.

The facts here are completely different. There is no factual showing that Mr. Pappalardo selected any documents; so far as it appears, he simply took what Mr. Bosse gave him. Even if Mr. Pappalardo had exercised some judgment in selecting among documents made available by Mr. Bosse, it was not for any purpose related to pretrial discovery. Unlike the lawyer in Sporck, Mr. Pappalardo did not select documents to prepare his client for a deposition. The purpose of getting documents from Mr. Bosse was to locate and recover ISG's and the other investors' funds. Now, ISG is trying to

recover its own funds and Mr. Pappalardo is standing in the way by refusing to produce documents.

Without conceding in any way that the work product objection is well-founded, ISG has attempted without success to get the same documents from other sources. If a party can show that it has a substantial need of materials in the preparation of a case, it may obtain discovery of work product. Applegarth v. General Cinema, 2002 Mass. Super. Lexis 255 (July 3, 2002).

First, ISG requested the Bosse documents in its First Request for Production of Documents served on defendants on May 17, 2002. They were not produced.

Next, ISG asked Mr. Bosse for the documents, first informally and then by subpoena *duces tecum*. Counsel for Mr. Bosse produced documents, but refused to allow Mr. Bosse to testify under oath whether the documents she produced were the same as those he had given Mr. Pappalardo. In lieu of oral testimony, ISG offered to accept a written statement from Mr. Bosse. It would be a simple matter for Mr. Bosse to produce an affidavit to that effect, but his counsel has refused to provide even that. (Correspondence from counsel is attached as Exhibit T).[8] Consequently, ISG has been unable to ascertain whether the "substantial documentation" that Mr. Bosse gave to Mr. Pappalardo has been produced.

---

[8] Mr. Bosse's counsel has represented that the documents produced are the same as those given to Mr. Pappalardo, but she has no personal knowledge of the facts. Because her statements lack the proper foundation, ISG can not rely on her representation.

B.      The Pearlberg documents (#25 on Exhibit 1)

In May 2001, over a period of three days in California, Mr. Pappalardo met with Henry Pearlberg and obtained documents. It is that file of documents that ISG moves to compel. The work product doctrine does not protect them from discovery because, as explained above with respect to the Bosse documents, above, they do not contain Mr. Pappalardo's mental impressions, were not prepared in anticipation of litigation, and even if litigation was contemplated, it was to be undertaken for ISG's benefit. Again, Mr. Pappalardo was acting pursuant to the power of attorney on behalf of ISG's efforts to recover its funds, so the documents were essentially collected for the benefit of ISG, but now are being hidden from ISG.

The facts pertaining to the Pearlberg documents make Sporck v. Peil, 759 F.2d 312 totally inapposite. Mr. Pearlberg decided which documents would be of interest to Mr. Pappalardo, and simply turned them over at their meeting. Mr. Pappalardo did not, according to Mr. Pearlberg's sworn testimony, exercise any judgment as to which documents were important. Pearlberg himself decided what was important, and gave them to Mr. Pappalardo. (See Pearlberg deposition transcript, pp.13-5, 68-9, attached as Exhibit U). Because Mr. Pearlberg, and not Mr. Pappalardo, made the selection, the Pearlberg documents can not possibly reveal any mental impressions of Mr. Pappalardo, and the case of Sporck v. Peil has no application at all.

Moreover, Mr. Pappalardo made no effort to keep his meeting with Mr. Pearlberg confidential. On May 29, 2001 he emailed ISG about having met with Mr. Pearlberg and said that he had obtained the entire file on Swan Trust's dealings with Joan Patrick,

including original documents. Because some of the documents given to Mr. Pappalardo were originals, and Mr. Pearlberg no longer has copies, there is no source other than Mr. Pappalardo for these documents.

C. The Pearlberg settlement documents
(#241 - 247 and 249-415 on Exhibit 1)

According to what Mr. Pappalardo told ISG, Pearlberg offered to make restitution so that COB could return the funds to ISG and the other investors. Restitution was not made, but apparently numerous documents were created and exchanged in anticipation of a payment. Much of it is correspondence among parties other than COB or Mr. Pappalardo. The correspondents include Henry Pearlberg, Joan Patrick (another transferee), Jeffrey Rapp, Sr. (a broker who worked with Joan Patrick), Jerry Hultgren, Esq. (a lawyer in California who represented Joan Patrick), Dr. Yaman, C. Ermiya and Mete Fadil (representatives of FMB), and Carl Corley and Gregg Mack (employees of participating financial institutions).

Communications among third parties about a voluntary restitution, when no litigation was anticipated, can not be legitimately claimed as attorney work product.

D. Consultant communications (#101, 104, 154, 197, 200, 201, 202, 203, 204, 206, 207, 209, 212, 213, 214, 215, 223, 226, 227 and 228 on Exhibit 1)

The documents in this category are four memoranda from Budnitsky and Dayani to Mr. Pappalardo (#101, 104, 154, 197) and one from Budnitsky to Mr. Pomeroy (#202).

17

Mr. Pappalardo refused to produce them on a claim of attorney-client privilege and work product.

COB retained Budnitsky and Dayani as consultants to help with its efforts to recover the investors' funds. They are not lawyers, and Mr. Pappalardo did not retain them. They were retained directly by COB. No privilege exists with respect to communications with them.

Even if a privilege had attached, it has been waived by Mr. Pappalardo's own actions. Mr. Pappalardo shared the information he received from them with ISG, such as the "action plan," and encouraged direct communications between ISG and the consultants. All of this was done with defendant's knowledge and consent. Mr. Pappalardo took steps to insure that communications were open, but now is trying to reverse his position and close the communications by putting the memoranda from the consultants beyond ISG's reach. This should not be permitted.

E.   May Davis documents

Mr. Pappalardo told ISG that his law firm was researching legal claims against May Davis so that COB could recover the investors' funds. He said this as early as May 1999, and many times thereafter. In July 2000 Mr. Pappalardo accepted a power of attorney from ISG, and almost simultaneously told ISG that a memorandum regarding claims against May Davis had been prepared and, after one final change, would be given to ISG. In August 2001 COB said that it was proceeding with the first steps of litigation. With all these representations being made to ISG, including that these efforts were being undertaken on behalf of ISG and the other investors, the memoranda and whatever

18

constituted the "first steps of litigation" rightfully belong to ISG as much as they do to COB.

When ISG began this action, it did not sue Swan Trust, or May Davis, or FMB, or the other transferees, because it did not have adequate facts to bring a claim. The research memoranda regarding May Davis, and any draft pleadings, should be turned over to ISG so that ISG can benefit from that work, as was originally intended

IV.  CONCLUSION

Starting in August, 1999, Mr. Pappalardo began collecting information and documents about where the investors' funds had gone. By July 2000, he has ISG's power of attorney. He thereafter obtained documents from David Bosse and Henry Pearlberg, including original documents. He analyzed legal claims against third parties and reportedly took the "first steps" of litigation. All of this was done for the benefit of ISG and the other investors who had lost their money after entrusting it to defendants.

Now, Mr. Pappalardo refuses to produce the documents he collected, and ISG is unable to obtain them from other sources. ISG, which has lost $4 million principal plus much more in profits, interest and costs, can not get the documents which it now needs to recover its funds. The defendants proclaim they have no money at all, and cannot pay anything to ISG, either voluntarily or after judgment. ISG's only hope of financial recovery is to proceed against third parties, but Mr. Pappalardo is blocking those efforts. In effect, Mr. Pappalardo removed the documents from the realm of access, and is now hiding them behind claims of work product and privilege.