UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

INTERNATIONAL STRATEGIES GROUP, LTD.,

    Plaintiff,

v.

GREENBERG TRAURIG, LLP., A. JOHN PAPPALARDO, AND ECKERT, SEAMANS, CHERIN AND MELLOTT, LLC.,

    Defendants.

CIVIL ACTION NO. 04-12000 RWZ

**AFFIDAVIT OF PHILIP G. CLARK IN OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

PHILIP G. CLARK, being duly sworn, deposes and states as follows:

1. I am a principal of International Strategies Group, Ltd. ("ISG") and submit this affidavit to support ISG's opposition to the motions for summary judgment of defendant law firm Eckert, Seamans, Cherin and Mellott, LLC ("ESCM") and of defendants A. John Pappalardo ("AJP") and Greenberg Traurig LLP ("GT"). I make this affidavit based upon personal knowledge and information and upon my review and analysis of documents produced in <u>International Strategies Group, Ltd. v. Corporation of the Bankhouse, et al</u>, Civil Action No. 02-10532-RWZ ("the COB Litigation").

2. I have reviewed the affidavit of Christopher Barber and confirm his recitation of the facts leading to the transfer by COB of $19 million to Swan Trust IOM, ("Swan Trust") including $4 million represented by COB to be ISG's funds. I should add that ISG accepted the executed the New Proposal Letter and promissory note on the promise that ISG's funds would not leave a joint account opened for COB and ISG for any further investment without ISG's approval. We did not know that funds earmarked as ISG's funds had already been transferred to Swan Trust. Through documents produced in the COB Litigation and otherwise, I learned that Henry Pearlberg ("Pearlberg"), trustee of Swan Trust, took the $19 million transferred to Swan Trust by COB on November 4, 1998, used $2.3 million for his own purposes and then on February 2, 1999, transferred the remaining $16.7 million to First Merchant OSH Ltd. Bank (FMB) for a proposed investment by C. Joan Patrick, an independent broker affiliated with the May Davis Group ("May Davis") in New York. ISG was not aware of either transfer at the time it occurred.

3. Through documents obtained in the COB Litigation, I also learned that FMB, a foreign bank operating out of the Turkish Republic of Northern Cyprus, had established correspondent banking privileges with ABN Amro in New York prior to Pearlberg's transfer of $16.7 million. Further I have learned, after subpoenaing bank records in the COB Litigation, that FMB never maintained individual sub-accounts accounts as it represented, but instead illegally pooled depositors' money in a single "concentration" account. About a month after FMB established correspondent banking privileges with ABN Amro (and before the Pearlberg transfer) ABN Amro received a warning notice that FMB was part of a number of foreign financial institutions suspected of money laundering and other financial improprieties.

4.      On August 11, 1999, on behalf of ISG, I flew from Hong Kong to Boston to confront James Pomeroy ("Pomeroy") regarding the $4 million ISG placed with COB, which appeared to be in jeopardy. I was very concerned about the status of ISG's funds. Pomeroy, protesting innocence, immediately took me to meet with A. John Pappalardo ("AJP") at the offices of ESCM. Stephen Burr ("Burr") and perhaps another attorney were also present.

5.      During the meeting, AJP touted his experience as a U.S. Attorney, as a state Attorney General and in private practice as well as his extensive expertise in white collar crime, public corruption and securities fraud matters. AJP advised me that COB and Pomeroy were victims, that he (AJP) had been retained to recover the funds on behalf of the syndicate participants; that he had the expertise, the clout and the special connections to the FBI, U.S. Attorney's office, and other government authorities to recover the funds for all of us; that all necessary steps, including litigation, would be taken; and that any independent action against ISG in the United States against Pomeroy or COB or other parties would jeopardize recovery. The next day Pomeroy provided me with a copy of a letter sent by Burr to Swan Trust and May Davis, in which Burr threatened these entities, "Our instructions are to pursue immediately all avenues of recovery." (Exh. A.) My meeting with AJP and the strong letter from Burr gave us comfort that ISG's interests were being represented through both ESCM, with which AJP was then affiliated, and GT, with which Burr had just become affiliated.

6.      On August 20, 1999, AJP sent me a follow up letter thanking me for meeting with him, giving me an update on communications with the FBI and other

enforcement agencies and telling me the conclusions of those agencies that COB was a victim. (Exh.B.)

7. I wrote back to AJP on September 30, 1999, informing him that his involvement "provided essential comfort" for ISG and that I had been advised that amounts exceeding $100 Million had been frozen. (Exh. C.) I also conveyed to COB through Christopher Jones ("Jones"), whom I then believed to be a Vice President of COB, that it was ISG's belief that Albert Pans had misappropriated its funds acting alone. (Exh. D.) Based upon a news article in the Belgium press, I learned that Pans invested $3 million in an Antwerp football club; based upon the apparent timing of Pans' investment, I suspected that money to be ISG's. Accordingly we caused a criminal complaint to be filed against him in Belgium. Pomeroy and AJP encouraged my belief that Pans was acting alone. Indeed, during my first meeting with AJP and thereafter when I discussed the sequence of events leading to ISG's entrustment of $4 million to COB, AJP told me that Pans, the COB officer who induced Barber to participate in the Federal Reserve Guarantee Program, was acting in a rogue capacity and his affiliation with COB had been terminated.

8. From the August, 1999, meeting with AJP forward, Barber and I believed that AJP was representing ISG's interests simultaneously with COB's. In a letter to Barber, which Barber shared with me, AJP expressed the "need on our side to have mutually supportive positions." (Barber Aff, Exh N). I understood, in reviewing that letter, the term "our" to refer to COB, ISG, PRCS and St. Frederikslund. In literally every conversation I had with AJP and every meeting -- and there were many between August, 1999, and October 2001 -- AJP spoke of the need for mutual cooperation and support and

joint representation and warned against any independent action by ISG as that would jeopardize the recovery actions he was undertaking. At no time did he state that any conflicts of interests would preclude him from representing ISG and the other syndicate participants jointly with COB in the Swan Trust recovery. I recall him assuring me emphatically on a number of occasions that COB's interests and ISG's were "one and the same." I do recall at some point AJP pondering out loud to me whether he could represent Pomeroy individually without a conflict but he never thereafter shared his conclusion on that issue.

      9. As a result of AJP's advice, counsel, and involvement, ISG not only forbore from initiating its own actions against COB and Pomeroy and others but worked with AJP to forestall criminal indictments of Pomeroy and COB. For instance, I was contacted by FBI Agent Robert Klimas, who, as I noted in a file memo, "was scathing in his comments about both John Pappalardo and Jim Pomeroy," telling me that "there was no rectification process." (Exh. E). Alarmed at this information, I immediately placed a phone call to AJP, Jones and Pomeroy. AJP advised that Klimas was acting "completely outside the ambit of his authority," assured me that the process was underway, and appeared to confirm the existence of documents evidencing two amounts of $4 million and $4 million available to COB. (Exh. E)

      10. I later spoke with Jones, who told me, based upon his conversations with AJP, that "any process or publicity" regarding the funds would delay the release of the funds by the banks, and "nothing must now disturb the indictment" of Pearlberg. (Exh. F).

      11. On March, 23, 2000, when the indictments seemed to be delayed, I communicated further with COB indicating ISG's desire to commence civil proceedings.

(Exh. G.)   As reflected in my file notes, I was told "John Pappalardo wished to speak with me directly to ascertain what exactly was required to help ISG keep its holding pattern." (Exh. H.) I was also told that AJP was "coaching" the federal prosecutor in Chicago, Amy St. Eve. I did speak with AJP and was told that any actions on ISG's part to file claims in the United States would cause all recovery actions to come to a halt.

12. In April, 2000, as a result of investigations by authorities in Belgium, ISG, having previously believed, as it communicated to AJP, that Pans, whose affiliation with COB had been terminated, had acted alone, learned that Pomeroy may also have been actively involved in the dissipation of ISG's funds, including the transfer of $821,500 to ESCM. Nonetheless I told AJP "we appreciate and do not wish to involve Jim in this especially since he needs to go to Europe to negotiate the settlement of profit with ABN Amro Bank." (Exh. I)   I reminded AJP that, "we exercised forbearance late last year because of your introduction." (Id.) I sent AJP a letter detailing the results of the investigation, including the revelation that Pomeroy was making representations to ISG regarding profits when, in fact, amounts in ISG's accounts were depleted and some of ISG's money was transferred to ESCM. (Exhs. J, K).

13. Around that time ISG was under increased pressure from its own investors to take action and I so informed AJP. From April through July 2000, and continuing thereafter, AJP and I had a series of conversations over these issues in which AJP advised me repeatedly that ESCM had done nothing wrong and was only paying "creditors," that Pomeroy and COB were victims, that Pans was acting in a rogue capacity and Pomeroy knew nothing of his activities; and that any action against Pomeroy and COB or other parties in the United States, including any lawsuit or bad press or publicity, would

6

interfere with recovery. AJP also advised me that in addition to his continued actions to obtain funds directly with the banks and in connection with investigation by the FBI and U.S. Attorney's office through means he was not at liberty to disclose because of alleged confidentiality constraints imposed by those entities, Pearlberg was prepared to make restitution directly. He acknowledged ISG's "great patience in face of unusual circumstances." (Exh. L).

14.   On June 1, 2000, AJP sent me the so-called "action plan" detailing collection efforts on behalf of PRCS, St. Frederikslund and ISG as a "team" represented by AJP, with the assistance of a Russian-based recovery service and met directly with me in London to discuss the plan. We approved the action plan and expressed our readiness to become a "team player" subject to certain conditions. (Exh. M).

15.   In London there were discussions over a power of attorney to be granted to AJP or comparable written agreement so that he may represent the team. I did not initiate the idea – AJP did in discussion regarding the written agreement requirement proposed by the Russian recovery team in the "action plan." I also did not receive from AJP, as AJP asserts in his "Declaration," any memorandum from Peter Ness regarding potential claims. I have reviewed the files I originally had collected before consulting new counsel in 2001 and no such memorandum is contained therein.

16.   In any event, on July 11, 2000, I did sign a power of attorney received from AJP. The power of attorney was prepared by ESCM. I had drafted a power of attorney as well, which AJP and/or Pomeroy rejected. Also on July 11, 2000, Barber sent, by e-mail and regular mail, a letter clarifying that the power of attorney was given "upon the understanding that it will be actioned by the attorney with the utmost good faith and due

care having regard to the interests of ISG. In particular the Directors of ISG require that all communications concerning any matter affecting of affected by the Power of Attorney, directly or indirectly which may concern or relate to the interests of ISG will be communicated by the attorney fully, and on a timely basis." If AJP disagreed with these obligations, he never so informed me.

17. In or before January, 2001, investors in ISG hired their own counsel and threatened to sue ISG or subject me and Barber to an investigation by Hong Kong regulatory authorities. I immediately made AJP and COB aware of this development (Exh. N.) AJP responded with a phone call giving ISG a "reason for more optimism" with recovery and offered to speak with the investors and their attorneys. (Exh. O). With a follow up letter dated February 22, 2001, he advised ISG that "it is reasonable to conclude that positive developments could result in the return of monies," and that COB had a fiduciary duty to ISG to pay ISG "forthwith." (Exh. P).

18. On March 13, 2001, AJP advised Barber by e-mail that he joined GT. Barber sent me a handwritten note with a hard copy of the e-mail stating that "the firm he has joined was the other law firm apart from Eckert Seamans who were appointed I believe on the criminal side of things." It did not occur to me that ESCM ceased any involvement with the Swan Trust recovery as we were led to believe by Pomeroy that he had retained both firms. Certainly neither AJP nor anyone else at ESCM informed us of any cessation of representation.

19. Thereafter, that AJP made me aware of the existence of SBGlobal ("SBG"). He told me that (i) SBG was the successor to COB, (ii) COB would retain a 15

percent interest in SBG to cover any liability to ISG, (iii) SBG had assets of over $200 million and (iv) as a last resort, SBG would buy out ISG's position to placate ISG.

20. In mid-July, 2001, not having heard from AJP since May 29, 2001 and no restitution having been received, Barber and I did consider finding new counsel and began to assemble documents to send to the United States for legal advice. ISG, did not, in fact, retain new counsel in the United States at that time, although I understand that the letter of July 18, 2001 might be construed to suggest that we did. I note that no attorney purporting to act for ISG ever contacted AJP until after November, 2001, when ISG retained Kathleen Stone ("Stone"). In fact, in August, 2001, we put our efforts to find new counsel on hold when Jones told us Pomeroy had pleadings on his desk and was ready to file litigation. On August 15, 2001, Peter Ness of COB also stated that COB was proceeding with litigation and further that he, in conjunction with AJP, would send me a letter addressing our concerns over the hiatus in communications. AJP also told me on numerous occasions that pleadings had been prepared.

21. I further refer to the affidavit of Christopher Barber and the documents submitted by defendants as to further communications between them and ISG during the period ISG believed they were representing all syndicate participants in connection with the Swan Trust recovery, when ISG believed it was part of a team effort, and when Barber and I refrained from actions in Asia and Europe in the belief that defendants were also representing our interests, even though they now claim they were not.

22. In late October, 2001, with no restitution received from FMB, Pearlberg, or through the U.S. attorneys office, despite AJP's continued representations that recovery would be had from one or more of these sources and that litigation was proceeding

9

simultaneously, I traveled to the United States to interview new counsel. I note that as of September 27, 2001, when I asked about the progress of the civil proceedings I believed to have been filed by then based upon previous Ness's correspondence, I still considered ISG's relationship with AJP "vital. I met with Stone on October 23, 2001, and formally retained her on November 7, 2001. I knew that Stone was having tremendous difficulty getting the documents she needed from AJP despite his initial offer of cooperation, so I tried independently to obtain documents from him, including the pleadings AJP previously told me had been drafted. Given AJP's superior knowledge of the facts, I further sought advice from AJP regarding the statute of limitations on claims against other parties. AJP responded in March 2002 that no pleadings ever existed and further advised me, "the statute of limitations will be an issue but creative thinking should be applied." (Exh. Q).

23. ISG, in addition to initiating and obtaining a judgment in the COB Litigation, has sued ABN Amro and FMB in New York ("the New York action") after finally receiving AJP's files and after receiving, by subpoena, other documents from ABN Amro. As a predicate to filing the New York action, ISG also had to obtain, as part of its judgment in the COB Litigation, an assignment of COB's rights in the Deed of Assignment, because it individually had no standing to sue the banks for the monies misappropriated from Swan Trust. ISG did not secure rights to the assignment until January 23, 2004, and only as a sanction for COB's misconduct in the COB Litigation. The preliminary order was made a part of the final judgment in April 2004.

24. In the New York action, ISG has filed claims against FMB for fraud and against ABN Amro for negligence and aiding and abetting FMB's fraud. Both FMB and ABN Amro filed motions to dismiss, including on statute of limitations grounds. ABN

Amro has argued in the New York action that, in respect to a negligence claim advanced by ISG, the applicable statute of limitations is three years and, further, that "ISG's claimed ignorance of the alleged negligence is of no legal significance because 'the statutory period of limitations beings to run from the time when liability for the wrong has arisen even through the injured party may be ignorant of the existence of the wrong or injury.'" ABN Amro further argues that "the purported knowledge of ISG is irrelevant to any possible claim of tolling" because it is "an assignee of a tort claim" and "'did not obtain [ ] an interest in [the] purported claim until well after the period of limitations ran." ABN Amro argues, in respect to the aiding and abetting claim also brought against it by ISG, that "Pearlberg (as well as Pomeroy through whom ISG obtained the Deed of Assignment) had knowledge of the alleged wrongdoing at or about the time it is claimed to have occurred." While thus far, ISG has survived the statute of limitations argument raised in the motion to dismiss, at least as to FMB, that does not preclude FMB (or ABN Amro) from raising the issue anew at later stages of the proceedings. ISG obtained a judgment in the COB Litigation in excess of $10 million but has been unable to recover any of it. After dismissal with leave to amend, it has filed an amended complaint against ABN Amro complaint to allege further particulars.

SIGNED UNDER PAINS AND PENALTIES OF PERJURY

Date: June 30, 2005

Philip G. Clark

CERTIFICATE OF SERVICE
I hereby certify that a true copy of the above document was served upon the attorney of record for each other party by mail (by hand) on 6·30·05

11