UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

INTERNATIONAL STRATEGIES GROUP, LTD.

    Plaintiff,

v.

GREENBERG TRAURIG, LLP., A. JOHN PAPPALARDO, AND ECKERT, SEAMANS, CHERIN AND MELLOTT, LLC.,

    Defendants.

CIVIL ACTION NO. 04-12000 RWZ

**AFFIDAVIT OF CHRISTOPHER M. BARBER IN OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

CHRISTOPHER M. BARBER, being duly sworn, deposes and states as follows:

1.    I make this affidavit on behalf of International Strategies Group, Ltd. ("ISG") in support of ISG's opposition to the pending motions for summary judgment of Eckert, Seamans, Cherin and Mellott, LLC ("ESCM") and of Greenberg Traurig LLP ("GT") and A. John Pappalardo ("AJP"). I make this affidavit of my own personal knowledge, including information I discovered after the date of the facts detailed herein.

2.    In April 1998, I met in Asia with an Albert Pans ("Pans"), who represented himself as Vice President of European Affairs of COB. Pans induced me on ISG's behalf to participate in a so-called "Federal Reserve Guaranteed Program," which he described as

a highly confidential program vehicle sponsored by the U.S. government to control the circulation of U.S. dollars. As Pans explained the program, participants agree to take their money out of circulation for specified periods of time in exchange for substantial profits. Pans represented that the bank to which the funds would be transferred would undertake a guarantee of non-depletion meaning that the funds would not be at risk

3. Pans also represented that two large and highly reputable international companies, Frederikslund Holdings A/S ("St. Frederikslund") and PRCS Ltd. ("PRCS"), already had placed funds in the amount of $10 million apiece and that these funds had already been deposited in syndicate "sub-accounts" at ABN Amro in their names. Based on the representations of Pans and a Christopher Heron ("Heron"), a COB Vice President, and particularly the representations that the funds would not be at risk, on April 22, 2998, I executed a Funds Management Agreement with COB. Heron and Pans signed the agreement on behalf of COB. (Exh. A).

4. On May 5, 1998, ISG and COB executed a Syndicate Agreement, which purported to implement the Funds Management Agreement. The Syndicate Agreement was signed by James F. Pomeroy ("Pomeroy") on behalf of COB and by myself on behalf of ISG. (Exh. B). ISG thereafter deposited $4 million to an ISG syndicate sub-account at ABN Amro in Belgium known as COB Syndicate Number 165. (Exh. B)

5. On or about May 26, 1998, Pans told me that the guarantee of non-depletion could not attach to three separate sub-accounts and requested ISG to transfer its funds to COB's master account at ABN Amro. Pans represented that St. Frederikslund and PRCS, already had done so. On May 29, 1998, Pans reassured me that the transfer would "in no way affect the terms and conditions of the earlier with you executed

2

agreements [sic]." (Exh. C).  ISG authorized the transfer to the master account.  On June 8, 1998, Pans assured ISG that the non-depletion guarantee was in place. (Exh. D).

6. According to bank records we later procured, on May 29, 1998, the very day COB assured ISG the transfer to the master account at ABN Amro would not affect the previous agreements, COB transferred $821,500 of ISG's money to ESCM's account at Mellon Bank in Pittsburgh, PA.  Another $328,500 was transferred to COB's account at Fleet Bank in Boston. (Exh. E).  According to the bank statements later obtained, the transfers (which effectively depleted ISG's funds from $4,000,000 to $2,849,544.20, contrary to the non-depletion undertaking), were authorized by "JFP" (James F. Pomeroy) and "SH" (Stephen Heffernan, a senior executive at COB).

7. After May 29, 1998, we continued to believe, based upon representations by Pomeroy that our deposit in the Federal Guarantee Reserve Program was safe and growing.  For instance, on August 12, 1998, Pomeroy represented to me, in writing, that ISG had earned $2 million in profits and that the total assets in the syndicate had increased to $6 million. (Exh. F).  Pomeroy thereafter transferred $1 million of ISG's own money back to ISG, representing it to be profit.  Believing the $1 million to be profit, ISG paid out profit commissions to independent brokers.

8. I later learned that on September 17, 1998, COB transferred the balance of ISG's funds at the ABN Amro master account in Brussels to COB's account at Fleet Bank in Boston, without ISG's knowledge or authorization.  In October, 1998 (after the master account at ABN Amro in Brussels had already been depleted), Pomeroy persuaded us (after the fact and to cover his tracks) to authorize the transfer of its funds from the ABN Amro master account in Brussels to Fleet Bank in Boston, representing to ISG that COB

was having difficulty receiving bank statements from ABN Amro and further representing, again, in writing, that ISG had a total of $6 million in guarantees and notes. (Exh. G.)

9. We later learned that on or about November 4, 1998, COB transferred a total of $19 million of syndicate funds to an account at the Bank of New York (BONY). The BONY account was held in the name of May Davis/S.G. Cowen Securities Corp for the benefit of Swan Trust IOM ("Swan Trust") of which a Henry Pearlberg ("Pearlberg") was Head Trustee. But in late November, 1998, Pomeroy continued to represent that ISG's principal was intact and, in fact, had earned $2 million in profit. He proposed a Cash Flow Promissory Note in favor of ISG in the amount of $9 million as collateral for a proposed new investment using the $4 million. He gave ISG a New Proposal Letter, which he back-dated to October 31, 1998, purportedly in anticipation of a new investment scheduled to occur before January 31, 1999. (Exh. H). We accepted the new proposal and the note in reliance on the representation that ISG's principal and interest totaled $6 million and remained in tact and not knowing that Pomeroy had already transferred funds.

10. ISG also later learned from Pomeroy that Pearlberg used approximately $2.3 million for his own purposes before transferring the remaining $16.7 million to First Merchant OSH Ltd. Bank (FMB) on February 2, 1999 for a proposed investment by C. Joan Patrick, an independent broker affiliated with the May Davis Group ("May Davis") in New York. ISG did not learned of that transfer until after the fact.

11. Records we have obtained from ABN Amro and FMB reflect a number of transfers from the Pearlberg funds out of the FMB account with ABN Amro in New York to various parties and in and out of a "sweep account" established by ABN Amro on

FMB's behalf. Funds were literally "swept" through the FMB accounts until May 12, 2000, when the account was closed after the balance of over $1 million was transferred to FMB in Cyprus. Attached to this affidavit are preliminary summaries we prepared, with reference to the underlying document numbers, of transfers in and out of the concentration and the sweep accounts. (Exhs. I and J.)

12.     On March 30, 1999 (Exh. K), Pomeroy told ISG that he had confirmed $19 million in principal, including ISG's funds, and $46 million in profits to be distributed among the participants. He further "confirmed" the availability of $65 million in April, 1999. (Exh. L). To this day, we have no idea where those numbers originated.

13.     After the fact, ISG did learn that COB had transferred $19 million to the so-called Swan Trust (although we were not told about the transfer until after it had occurred) and that availability of the funds was in jeopardy. On August 11, 1999, Pomeroy sent me an e-mail detailing the options for recovery of the funds. (Exh. M). After listing several "workout" options, Pomeroy informed ISG, "It is our intent to continue to negotiate. However, I have chosen to move to prepare litigation against the parties utilizing the law firm of Greenberg & Traurig. I have utilized the law firm of Seamin Cherin & Melott [sic] for the criminal assistance against the parties."

14.     Thereafter, AJP communicated directly with me and with Philip Clark, including meetings and numerous phone calls, e-mails and letters. On October 22, 1999, AJP described "significant efforts" in the recovery process, and assured us, "[t]o also protect your interest and as part of pursuing our position for collection COB has been preparing its own civil fraud case against the US based parties." (Exh. N). AJP also expressed the "need on our side to have mutually supportive positions." Clark and I

discussed this letter and we certainly understood "our" to refer to COB, ISG, PRCS and St. Frederikslund.

15.     On July 11, 2000, the day Mr. Clark executed a power of attorney in favor of AJP, I sent, by e-mail and regular mail, a letter stating that the power of attorney was given "upon the understanding that it will be actioned by the attorney with the utmost good faith and due care having regard to the interests of ISG. In particular the Directors of ISG require that all communications concerning any matter affecting or affected by the Power of Attorney, directly or indirectly which may concern or relate to the interests of ISG will be communicated by the attorney fully, and on a timely basis." (Exh. O). AJP at no point informed us that he disagreed with ISG's expectations of his obligations.

16.     By January 2001 two of ISG's investors had hired counsel and threatened to sue me and Clark and ISG. We made AJP aware of this recent development by letter from Clark. On February 2, 2001, AJP promised to respond to Clark's recent letter on the subject. (Exh. P).

17.     On March 13, 2001, AJP advised me that he joined the firm of GT. (Exh. Q ). I sent Clark a handwritten note that "the firm he has joined was the other law firm apart from Eckert Seamans who were appointed I believe on the criminal side of things." The transition of AJP to GT did not in any way alert us that ESCM's role in the recovery has ceased as Pomeroy earlier had told us he had retained both firms.

18.     After the transition we continued to communicate directly with AJP. On March 14, 2001, AJP advised ISG that GT was exploring a lawsuit against Patrick and thereafter had a conference call with us and ISG's investors, assuring us of recovery (Exh.

R.) In that conference call, which occurred on or about March 16, 2001, AJP placated ISG's investors by his assurances of his representation of ISG as well as COB.

18. On May 29, 2001, AJP advised that he met with Pearlberg for three days and Pearlberg would make full restitution within 7-10 days. (Exh. S). He also stated on May 29, 2001, that Pearlberg, "provided his entire file on the Swan Trust dealings with Joan Patrick including original documents such as monetary transfers and contracts with May Davis and Joan Patrick which are valuable for litigation." (Id.)

19. On August 16, 2001, I sought legal advice from AJP regarding, among other items, the expected progress of the civil action, the statute of limitations and a summary of communications with Pearlberg, reminding him that ISG remained in a "hold mode" because of his representation. (Exh. T). AJP corresponded with me directly by e-mail and telephone, representing that recovery was proceeding, including representing, on October 2, 2001, that the restitution deal "was all set." (Exhs. U, V, W).

19. When Clark met with AJP in London in June, 2000, he promised to send us an opinion regarding claims against May Davis. I reminded him of his promise later by e-mail (Exh. X) and thereafter asked for the opinion several times. We never received it.

20. When we executed the power of attorney and sent the side letter, we believed we had executed the first steps of the action plan. On August 24, 2000, AJP informed me that he had "executed the action plan from this end." (Exh. Y).

SIGNED UNDER PAINS AND PENALTIES OF PERJURY

Date: June 28, 2005

_____
Christopher M. Barber

CERTIFICATE OF SERVICE
I hereby certify that a true copy of the above document was served upon the attorney of record for each other party by mail (by hand) on 6-30-05.

_____