UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

INTERNATIONAL STRATEGIES GROUP,
LTD.

      Plaintiff,

      v.

GREENBERG TRAURIG, LLP., A. JOHN
PAPPALARDO, AND ECKERT, SEAMANS,
CHERIN AND MELLOTT, LLC.,

      Defendants.

CIVIL ACTION NO. 04-12000 RWZ

**MEMORANDUM OF INTERNATIONAL STRATEGIES GROUP, LTD. IN
SUPPORT OF ITS MOTION FOR RECONSIDERATION UNDER RULE 59 (e)
OR FOR RELIEF FROM JUDGMENT UNDER RULE 60 (b)**

**Introduction**

International Strategies Group, Ltd. ("ISG") submits this memorandum of law in

support of its Motion to Alter or Amend the Judgment under Fed.R.Civ.P. 59 (e) or, in the

alternative, for Relief from Judgment under Fed.R.Civ.60 (b).   The January 30, 2006

order of this Court granting summary judgment ("the Decision") in favor of defendants

Eckert, Seamans, Cherin and Mellott, LLC ("ESCM"), Greenberg Traurig LLP ("GT")

and A. John Pappalardo ("AJP") must be reversed because (1)  it is based upon manifest

errors of fact due to the Court's misinterpretation of evidence presented by ISG; (2) a new

case, decided between oral argument and just before entry of summary judgment, provides

precedent for applying the continuous representation doctrine where, as here, a partner

changes law firms before his representation terminates; and (3) alternative theories of recovery, not addressed in defendants' motion for summary judgment, provides an alternative basis for continued proceedings in this case.

### ARGUMENT

A motion for reconsideration under Fed.R.Civ.P. 59(e) should be granted when the Court's misapprehension of evidence led to an erroneous ruling; when the Court makes *sua sponte* rulings on summary judgment without giving the targeted party "appropriate notice and a chance to present its evidence on the essential elements of the claim or defense," particularly where discovery is incomplete;  when the Court does not consider all of the theories of liability pleaded in the complaint; or when there is a change in the controlling law between oral argument and summary judgment. Berkovitz v. Home Box Office, Inc., 89 F.3d 24, 29 (1st Cir. 1996); Grabowski et al v. Bank of Boston, et al, 997 F. Supp. 130, 132-3 (D. Mass. 1998); Barrett et al v. Continental Illinois National Bank and Trust Company of Chicago, 695 F. Supp. 66, 68 (D. Mass. 1988).  See also Marie v. Allied Home Mortgage Corp., 402 F.3d 1, 11 n.2 (1st Cir. 2005), citing with approval 11 C. Wright et al, Federal Practice & Procedure § 2810.1 (2d ed. 1995) (noting four grounds for granting such a motion:  manifest errors of law or fact, newly discovered or previously unavailable evidence, manifest injustice, and an intervening change in controlling law). Fed.R.Civ. P. 60(b) is much broader and allows relief from judgment for mistakes as well as "any other reasons justifying relief from the operation of judgment."   These precepts require reversal of the grant of summary judgment against ISG.

In this case, defendants, having lost a motion to dismiss, immediately after the first scheduling conference and before any deposition or other documentary discovery

2

commenced, moved for summary judgment based upon documents produced in automatic

disclosure. The thrust of their arguments was that no attorney-client relationship existed

between them and ISG nor could they could be the proximate cause if ISG had time to

file actions against third parties within the statute of limitations period. ESCM also

argued that the claim against it for conversion of ISG's funds was time-barred and the

continuous-representation tolling doctrine was unavailable to ISG after AJP left the firm.

In the Decision, the Court concluded, properly, that there were disputed facts about

the formation of an attorney-client relationship between ISG and defendants and,

therefore, summary judgment on the grounds of a lack of such a relationship was not

appropriate. The Court focused on the period commencing on August 11, 1999, when

AJP met with Philip Clark of ISG, forward. The Court then considered the argument,

advanced by ISG, that even if there were time for ISG to press claims against third parties

during applicable statute of limitations periods, ISG could still recover against these

defendants if delayed prosecution was the proximate cause of harm to ISG.

Unfortunately, the Court granted summary judgment in favor of defendants based

upon its own conclusions that (1) funds were not available for attachment as of August 11,

1999, (2) St. Frederikslund (SFH), the larger investor, did not decline to purchase ISG's

position because of the delayed prosecution and (3) ISG's new counsel, Kathleen Stone,

believed there were claims against Abn Amro Bank N. V. ("Abn Amro") and First

Merchant's Bank ("FMB") as early as January 4, 2002. The Court also concluded that

Ms. Stone filed actions against Abn Amro and FMB. These conclusions regarding

material facts were not correct and led to an improper grant of summary judgment.

Further a very recent case with analogous facts, decided after oral argument on the

3

motions for summary judgment and just before the Decision, provides a reason for

reconsideration and reversal of the Court's grant of summary judgment, on statute of

limitations grounds, on the conversion claim against ESCM.

### Funds Were Available for Attachment in August, 1999

ISG presented to this Court, in support of its argument that defendants failed to

take the very actions they told Corporation of the Bankhouse were absolutely required,

i.e., **immediate freezing of assets**,[1] summary charts showing monies traceable to the

ISG's original investment and the combined investors' investment with Henry Pearlberg,

that were held in a concentration account (Account Number 574073851441)[2] and a sweep

account ((801073851471) at Abn Amro in New York.[3]  The Court, reviewing the charts

and the description in ISG's opposition papers, stated, "plaintiff's description implies that

funds were available for attachment over a period of time" but then drew its own,

unfortunately erroneous, conclusion that "the bank records clarify that the accounts were

literally swept daily, often multiple times per day, immediately upon deposit of any

substantial amount of money." (Decision, page 5).

As described in the new affidavit of Christopher M. Barber submitted with this

motion for the sole purpose of correcting the mistaken interpretation of fact ("Barber Aff.

II"), it simply was not correct to have concluded that "no substantial funds ever remained

in the account for more than a day" or that the funds were swept "multiple times a day."

(Barber Affidavit II, ¶3.)  The Court's conclusion otherwise stems, perhaps, from

---

[1] June 28, 2005 Affidavit of Jessica Block Pursuant to Fed .R.Civ.P. 56 (f), Exhibit 10.
[2] AJP, ESCM and GT were aware of the concentration account number in August 1999 because it is set forth on the April 29, 1999 Deed of Assignment from Henry Pearlberg to James Pomeroy, their client, found in AJP's files.  See June 28, 2005 Affidavit of Jessica Block Pursuant to Fed .R.Civ.P. 56 (f), Exhibit 2.
[3] June 28, 2005 Affidavit of Christopher Barber, Exhibits I and J.

4

confusion over the nature of overnight sweep accounts. With a sweep account, a depositor can automatically invest (i.e., sweep) all excess funds from its main account into an overnight sweep account in the depositor's name in order to earn higher interest.[4] (Barber Aff. II, ¶4; see also Affidavit of Blaine Bortnick ("Bortnick Aff."), ¶ 5). After normal banking hours, all funds in excess of an agreed upon target balance, are swept into this overnight investment vehicle. The following day, before the bank opens, the same funds are transferred back into the depositor's main account where they are accessible during business hours. The funds are swept, in accordance with banking practice, just once a day and after normal banking hours, only to be restored to the main account before the bank opens the next day. Id. See also Exhibit A to this Memorandum (a description by Bank of America, available over the Internet, of "automated overnight sweeps" promoting their "full liquidity"). "Because sweep accounts are overnight investments, [the depositor] maintain[s] access to all of [its] funds during business hours." (Exhibit A).

Thus, during banking hours, the funds in the concentration account, i.e., the main FMB account at Abn Amro, were available for attachment. (Barber Aff. II, ¶4.) As the summary charts reflect, had AJP and his law firms immediately sought to freeze assets in August 1999, as they deemed necessary, the investors could have captured between $2,340,440.60 and $3,564,415.60. (Barber II, ¶ 5.)[5]

As of August 11, 1999, the relevant date, defendants in this case had sufficient cause to file a claim against Henry Pearlberg ("Pearlberg") and had even obtained a Deed of Assignment from him, which set forth on its face the name and number of the account

---

[4] The sweep accounts give the banks access to the funds overnight for global banking/investment purposes. In return the depositor receives the benefit of a higher interest rate. (Barber Aff. II, ¶4).
[5] See also the chart attached to the June 28, 2005 Affidavit of Christopher Barber as Exhibit I.

at Abn Amro where the investors' funds were located. Claims against other parties,

including May Davis, the brokerage house that effectuated the transaction between

Pearberg and Joan Patrick of LIPALSC, also were contemplated. [6]

New York has a procedure similar to Massachusetts' trustee process attachment

statute whereby, using *in rem* jurisdiction, pre-judgment relief may be obtained to freeze

in-state assets. Under New York's CPLR article 62, had ESCM, GT or AJP immediately

filed a lawsuit against Henry Pearlberg or Joan Patrick (or retained local New York

counsel to do so), they could have sought an attachment in New York on an ex-parte basis

restraining the dissipation of the funds in concentration accounts (574073851441), as

these funds were traceable to ISG's investment with COB and COB's subsequent transfer

of that investment, along with funds of other investors, to Swan Trust and thereafter to the

FMB concentration account at Abn Amro. (Bortnick Aff., ¶6.) Indeed there may have

been more assets known to defendants and available for attachment. Presented to this

Court in opposition to summary judgment were notes from AJP's files, indicating his

knowledge that "all banks have assets on US soil."[7] Also presented to the Court in

opposition to summary judgment was a letter from AJP to ISG of October 23, 1999

notifying ISG that "recovery specialists" retained by COB "have identified all of the

accounts involved in the transactions, including those, which contain the "principal" and

---

[6] June 28, 2005 Affidavit of Jessica Block Pursuant to Fed .R.Civ.P. 56 (f), Exhibit 2. See also id, Exhibit
8, memorandum from James Pomeroy to Steven Burr (of ESCM) dated July 29, 1999, found in AJP's files,
regarding aggressive litigation against Swan Trust and May Davis (the brokerage house).
[7] June 28, 2005 Affidavit of Jessica Block Pursuant to Fed .R.Civ.P. 56 (f), Exhibit 16, p.1580.

proceeds therefrom" and further assuring ISG that "certain accounts are frozen,"[8]  when apparently they were not.

By concluding, erroneously, from the summary charts that no monies were available for attachment, the Court made a manifest error of fact.  Further, by declining to construe the charts of the Abn Amro-FMB transaction as urged by ISG and by ignoring other evidence presented by ISG in opposition to summary judgment of available funds on U.S. soil, the Court did not draw all reasonable inferences from the facts presented in favor of ISG as the non-moving party, as it must in evaluating a motion for summary judgment. Nadherny v. Roseland Property Company, 390 F. 3d 44, 48  (1st Cir. 2004); Barbour v. Dynamic Research Corp. 63 F. 3d 32, 36 (1st Cir. 1995).   Because the Court made a manifest error of fact as to evidence of harm occasioned by the delayed prosecution in the form of lost opportunities to recapture funds, the grant of summary judgment must be reversed upon ISG's motion for reconsideration or relief from judgment.  Reversal is especially compelled in light of the pre-maturity of the motion for summary judgment, where ISG had not had the opportunity to take any deposition discovery of defendants or of third parties to explore further what other monies, known to defendants in 1999, were available to be attached as suggested by their notes and their representations to ISG.

### There Was a Cause and Effect Between the Delayed Prosecution and the Missed Opportunity for ISG to sell its Investment Interest to SFH.

Focusing exclusively on the affidavit of Frank Hansen, the CEO of SFH, the Court concluded on its own that the delayed prosecution did not affect SFH's willingness to buy out ISG's position.  Again, the Court declined to draw all reasonable inferences in favor of

---

[8]  June 28, 2005 Affidavit of Christopher Barber, Exhibit N

ISG, as required. Moreover, the Court ignored the additional evidence presented to it in opposition to the motion for summary judgment in the form of notes from Peter Ness ("Ness") of COB to AJP. In those notes, Ness informs AJP, "one of our large investors might buy out the small investors if the process appears to be going forward." [9] Because of the procedural posture of the case, ISG did not have the opportunity to adduce deposition testimony in respect to this note,[10] but a reasonable inference could have been and should have been drawn from it that the larger investor, SFH, declined to purchase ISG's position because of the delays occasioned by the defendants' negligence in recovering investor funds.

### The Refusal of AJP to Produce Files and the Delay Occasioned by Defendants in ISG's Own Prosecution of Claims Against Abn Amro and FMB Proximately Caused Injury to ISG

Finally, the Court rejected the argument that the twenty-six month delay to ISG's prosecution of its own case against COB, Pomeroy and SBG and, eventually against Abn Amro and FMB proximately caused economic harm to ISG. In doing so the Court drew mistaken conclusions from the affidavit of Kathleen Stone, the lawyer ISG retained in October 2001. The Court also did not appear to consider other evidence, presented by ISG, demonstrating the multiple hurdles ISG had to cross before it even could file its complaint in New York, which led to the increased fees defending statute of limitations challenges.

---

[9] June 28, 2005 Affidavit of Jessica Block Pursuant to Fed .R.Civ.P. 56 (f), Exhibit 36, p.1642. In fact, ISG cited this exhibit in opposition to summary judgment (see Opposition of International Strategies Group, Ltd to Defendants' Motions for Summary Judgment, pages 28-9) of an opportunity lost to ISG because of the delayed prosecution.
[10] June 28, 2005 Affidavit of Jessica Block Pursuant to Fed .R.Civ.P. 56 (f),¶5.

First, the Court concluded, based upon its reading of a letter dated January 4, 2002, that "Ms. Stone believed, at least as early as January 4, 2002, that plaintiff had adequate grounds to initiate suit against the financial institutions before obtaining requested files from GT and Pappalardo." (Decision, page 6). In fact that conclusion is not correct. When Ms. Stone wrote, "although ISG has not yet filed, it certainly has grounds to do so and I expect I will be instructed to do so shortly," she was referring to a lawsuit against COB and its CEO Pomeroy, the corporate entity and individual against whom she did initiate action in Boston on March 22, 2002. As of January 4, 2002, she did not have adequate documentation with which to evaluate potential claims against Abn Amro or FMB or any other financial institutions for that matter, which was why she was seeking documentation from AJP, who, she understood from ISG, had amassed significant information over the prior two year period. See Affidavit of Kathleen Stone submitted with this motion ("Stone Aff." II), ¶ 2.

The Court also assumed that Ms. Stone filed the action in New York against Abn Amro and FMB. (Decision, page 4). That also is not correct. There was no jurisdiction over Abn Amro or FMB in Massachusetts. Because Ms. Stone's law firm did not have a New York presence, she had to refer the matter to a New York firm to commence any kind of action against such entities. It was not until her firm received (i) in 2003, the "Pappalardo documents" upon the motion to compel that she initiated, and the Court granted, together with (ii) the documents subpoenaed from Abn Amro, that ISG had available to it information sufficient to interest a New York law firm in prosecuting the case against Abn Amro and FMB. With respect to the documents subpoenaed from Abn Amro, because of the bank's intransigence, Ms. Stone received only a few documents in

9

August, 2002, further documents in March 2003, and a final batch of documents in June

2003. (Stone II Aff., 2.)  Obviously, had Ms. Stone been retained in August 1999 to

prosecute a case against COB and Pomeroy, these documents would have been

subpoenaed at least two years earlier.  The documents in question showed the chain of

custody of the funds deposited by Henry Pearlberg, trustee of the Swan Trust, the funds

transferred in and out of sweep and concentration accounts, Mr. Pappalardo's conclusions

regarding his communications and the documents received from David Bosse, an attorney

representing Ralph Jarson, an employee of FMB and Joan Patrick's primary contact at that

institution, and subpoenas to Abn Amro to testify in connection with a criminal

investigation of FMB in August 1999.   (Stone II Aff., ¶ 3; Bortnick Aff., ¶3.)

Additionally, and most importantly, when Ms. Stone was retained and filed the

COB Litigation on behalf of ISG, ISG did not have rights in the Deed of Assignment from

Henry Pearlberg to James Pomeroy. As a predicate to filing the New York action, ISG

also had to obtain, as part of its judgment in the COB Litigation, an assignment of COB's

and Pomeroy's rights in the Deed of Assignment, because it individually had no standing

to sue the banks for the monies misappropriated from Swan Trust.  On behalf of ISG, Ms.

Stone was able to secure rights to the assignment as of January 23, 2004, but only as a

sanction for COB's failure to respond to discovery in the COB Litigation.

Ultimately, ISG retained Blaine Bortnick of the New York law firm Liddle &

Robinson. Mr. Bortnick initiated International Strategies Group Ltd et al v. Abn Amro

Bank N.V. and First Merchant Bank OSH Ltd., Index No. 601604/04 ("the FMB/Abn

Amro Action"), in the Supreme Court of the State of New York, County of New York. As

Mr. Bortnick's affidavit confirms (and as Philip Clark of ISG earlier informed the Court in

10

his affidavit[11]), rights to the Deed of Assignment was a necessary condition precedent for ISG to assert direct claims against FMB and Abn Amro because ISG's primary claims in the FMB/Abn Amro actions have been brought as Pearlberg's assignee.  Indeed, the New York court has already found that this assignment was a condition precedent to ISG's right to maintain the action in New York. (Bortnick Aff., ¶3).  The process of obtaining that Assignment was delayed for the twenty-six month period that defendants purported to be representing ISG and the other investors.  And, of course during this twenty-six month period, when it was relying on defendants to act as its attorneys, ISG lost out on the opportunity on its own behalf to attach bank funds traceable to the Swan Trust investment (which included ISG's funds), as these were out of reach by October, 2001.

### The Court Should Reconsider Its Finding that Claims Against ESCM for Conversion of ISG's Funds in 1998 Are Time Barred

ISG argued, in its opposition and at oral argument, that the statute of limitations on its claims against ESCM, AJP's former law firm, for its role in the unauthorized transfer of $821,500 of ISG's funds in 1998, should be tolled for the entire period that AJP was representing the investors, including ISG.  Although AJP left ESCM for GT in March 2001, he continued to represent ISG until October 2001 when ISG consulted and later retained Kathleen Stone to sue COB and Pomeroy.

In the Decision, the Court declined to apply the continuing representation doctrine because, it found, "the record is devoid of any evidence supporting an inference that

---

[11] June 30, 2005 Affidavit of Philip G. Clark, ¶23 ( "As a predicate to filing the New York action, ISG also had to obtain, as part of its judgment in the COB Litigation, an assignment of COB's rights in the Deed of Assignment, because it individually had no standing to sue the banks for the monies misappropriated from Swan Trust.")

11

plaintiff operated under the impression that ESCM continued to serve its interests after Pappalardo moved to GT." (Decision, page 8). ISG responds as follows.

First of all, ISG did present to the Court, in opposition to summary judgment, evidence of its belief that ESCM continued to serve its interest after March 2001 when AJP switched firms. Christopher Barber previously testified that, "the transition of AJP to GT did not in any way alert us that ESCM's role in the recovery had ceased as Pomeroy earlier had told us he had retained both firms." [12] In fact, Mr. Barber informed his colleague Philip Clark of the transition by telling him "the firm he [AJP] has joined was the other firm apart from Eckert Seamans who were appointed I believe on the criminal side of things."[13] Also attached to Mr. Barber's earlier affidavit was an e-mail dated August 11, 1999, from Pomeroy to Barber, stating, "I have chosen to move to prepare litigation against the parties utilizing the law firm of Greenberg and Traurig. I have utilized Seamin Cherin & Mellott [sic] for the criminal assistance against the parties."[14] Thus there was evidence before the Court from which a jury could find that ISG, thinking both firms were involved in the recovery efforts but on different tracks (one pursuing the criminal implications of the funds transfers and the other pursuing civil litigation), would not have been alerted that March 2001 was the start date for commencing an action against ESCM for the conversion of its funds.

As both counsel acknowledged during oral argument, there is no case law in Massachusetts addressing the continuing representation doctrine when, as here, the lawyer switches firms midway through his representation. Instead, in its Reply brief, addressing

---

[12] June 28, 2005 Affidavit of Christopher M. Barber, ¶17.
[13] Id. at Exhibit Q.
[14] Id. at Exhibit M.

12

ISG's argument that the doctrine was available to toll the statute under October 2001, ESCM relied on Crouse v. Brobeck, Phleger & Harrison, 67 Cal. App. 4 1509 (1998), for the proposition that the continuing representation doctrine did not apply to a law firm where the partner handling the matter left to join another firm and thereafter represented the plaintiff on the same matter. ESCM argued that the case against it had to be filed, at the latest, three years from March 2001, when AJP left the firm.

However, since oral argument on July 12, 2005, a new case has challenged the continued viability of Crouse. In a very recent case, Beal Bank, SSB v. Arter & Hadden LLP., 2006 Cal. App. LEXIS 12 * 20 (January 10, 2006), the Court of Appeal of California questioned the logic of Crouse. Rejecting that case, the court held that "the limitations period for a legal malpractice action under [the state limitations statute] is tolled *as to the attorney and the attorney's former law firm and its attorneys* while the attorney continues to represent the client in the same specific subject matter in which the alleged malpractice occurred." (emphasis added). Finding the logic of Crouse unpersuasive, the Beal Bank court recognized that, even if the client knew of the harm outside of the limitations period, "the purpose of the continuing-representation tolling provision is to benefit the client's interest by preserving undisturbed the client's relationship with its attorney so that the attorney can try to undo the damage he has done to the client." Id., 2006 Cal. App. LEXIS 12 * 19. This reasoning is sound and applies to just the situation in which ISG found itself in March 2001. It certainly sought at that time to preserve, undisturbed, its relationship with AJP. The continuing representation doctrine should toll the commencement of the statute of limitations on all the law firm defendants until October 2001, the end of the relationship between ISG and AJP.

13

Because of this new legal development and because ISG did in fact present evidence that it continued to believe ESCM had a role in the recovery effort even after AJP transferred to GT, summary judgment dismissing the conversion claim on statute of limitations grounds should be reversed.

### Other Theories of Liability, Not Addressed by the Motion for Summary Judgment, Compel Reinstatement of the Case, Including the Claims Against ESCM

Defendants' motions for summary judgment, and necessarily ISG's opposition, were focused on the attorney-client relationship and causation. The motions did not address (and, because of the early stage of the case, could not address) the substance of any claim.

In its complaint, ISG advanced, in Count Six, a claim against all of the defendants, including ESCM, under M.G.L. 93A, §11.[15] ISG incorporated by reference all of the previous allegations of the complaint, including the allegations that ESCM converted $821,5000 of ISG's funds yet purported to represent ISG and secured a power of attorney from it, and participated in a plan of action that included withholding critical information from ISG. Claims for conversion by a law firm while acting as an escrow agent can form the basis of a 93A claim. <u>Grand Pacific Finance Corporation v. Brauer</u>, 57 Mass. App. Ct. 407 (2003) (affirming conversion claim and reversing dismissal of the 93A claim against defendant lawyers and law firm). Thus, even assuming, arguendo, that March 2001 was the trigger date for the commencement of claims against ESCM (which ISG disputes, <u>supra</u>, at pages 13-4), M.G.L. 93A has a four year limitations period. Any claim filed

---

[15] This Court has held because 93A liability has to be decided on a case-by-ase basis given the fact-specific nature of the claim, dismissal before discovery of the egregiousness of the facts is improper. <u>Jayson Associates, Inc. v. United Parcel Service Co</u>, 2004 U.S. Dist. LEXIS 13191 *I (July 15, 2004).

14

against ESCM by June 2004, the effective date of the complaint in this action, therefore is timely and should not have been dismissed.

## CONCLUSION

For all of the foregoing reasons, this Court should reconsider its decision of summary judgment of January 30, 2006 and reinstatement ISG's complaint in its entirety.

INTERNATIONAL STRATEGIES
GROUP, LTD

By its attorneys,

Jessica Block
BBO#046110
Block & Roos, LLP
60 State Street, Suite 3800
Boston, Massachusetts  02109
(617) 223-1900

February 9, 2006

## CERTIFICATE OF SERVICE

I, Jessica Block, Esquire, counsel for the plaintiff, do hereby certify that the within pleading was served by causing copies to be mailed, first class, postage prepaid, to counsel for the other parties of record, this 9th day of February, 2006 and through the electronic filing process.

Jessica Block

15



**Home · Contact**

**BankofAmerica**  **Higher Standards**

Registered Client Access

Select One

## Investment Solutions

**Investment Solutions Home**

**Automated Overnight Sweeps**

**Fixed Income Securities**

**Money Market Funds**

**Tax Advantaged Investments**

**Safekeeping**

**Managed Account Solutions**

## EXHIBIT A
## Automated Overnight Sweeps

By linking your Bank of America corporate checking account to an overnight sweep service, you can automatically invest all your excess funds. With this investment solution, you have the flexibility to maximize investment potential while maintaining complete control over daily liquidity needs.

Bank of America is the largest sweep provider in the country with approximately $33.8 billion in assets and over 32,000 accounts. Automated overnight sweep services provide a fully automated two way sweep between your corporate checking account and an investment account.

### Who Can Benefit

Sweep accounts are designed to provide a convenient way to achieve higher earnings from excess checking account balances. Whether the services supplement an existing investment strategy or completely replace it, you can be confident that operating cash will be readily available when you need it.

### Advantages

- Automatic investment: Checking account activity is posted before your investment is made. Only the money in excess of the target balance is put into an overnight investment account.
- Full liquidity: Because sweep accounts are overnight investments, you will maintain access to all your funds during business hours.
- Enhanced earnings potential: Idle cash balances that are invested earn competitive market returns, providing the opportunity to earn interest income on operating cash balances.
- Investment options: Excess cash balances are swept into an investment option of your choice including Nations Funds money market funds, repurchase agreements or Eurodollar deposits.
- Comprehensive statement: Each month you will receive a detailed statement that reflects all investment activity including dollar amounts and investment earnings.

### Capabilities

- Through online information reporting services, you can receive accurate and timely information on overnight investments any time you need it.
- When you set up a sweep account, you will work with a Bank of America representative to establish a target balance for your account.
- We can accommodate virtually any target balance you choose. Dollar amounts over this balance are invested in the overnight service.
- By simply maintaining a target balance, you have the option of conveniently and automatically reducing your

**Glossary of Inves Terms**

View PDF

organization's monthly treasury management service
charges.

Investment products offered through Bank of America, and its affiliates, are NOT FDIC INSURED and are NOT deposits or other
of, or guaranteed by, Bank of America Corporation. An investment in repurchase agreement, Eurodollar deposits and money ma
involves investment risk including possible loss of the principal amount invested.

©2006 Bank of America Corporation. All rights reserved. Terms and Conditions.