UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

INTERNATIONAL STRATEGIES GROUP, LTD.,

    Plaintiff,

v.

GREENBERG TRAURIG, LLP, et al.

    Defendants.

Civil Action No. 04-12000 RWZ

## DEFENDANT ECKERT SEAMANS' RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR RECONSIDERATION OR FOR RELIEF FROM JUDGMENT

Defendant Eckert Seamans Cherin & Mellott LLC ("ESCM") submits this response in opposition to the Motion for Reconsideration Under Rule 59(e) Or For Relief From Judgment Under Rule 60(b) filed by plaintiff International Strategies Group, Ltd. ("ISG"). The court correctly entered summary judgment in favor of ESCM. There are no grounds to require reconsideration or reversal of the judgment entered in defendants' favor. ISG has not presented an appropriate basis for reconsideration of the summary judgment. In any event, the speculation and purported new arguments advanced by ISG do not undermine the summary judgment. ISG's attempt to disturb the summary judgment should be rejected.[1]

**I. ISG's speculations about freezing the concentration/sweep accounts at Abn Amro Bank are not a basis for reconsideration of the summary judgment, especially since ISG was not damaged by any alleged failure to "attach" accounts at Abn Amro Bank.**

ISG's first argument is that the Court purportedly made an erroneous factual conclusion about the nature of the concentration and sweep accounts at Abn Amro Bank. It is difficult for ESCM to respond to the specific factual assertions made by ISG, which are based on the "summaries" of the accounts attached to the June 28, 2005 affidavit of ISG principal Christopher

---

[1] ESCM agrees with and relies upon the analysis presented by GT and AJP on the standard for reconsideration presented in their opposition brief. In addition, all Defendants are making a motion to strike supported by separate memorandum of law. ESCM also agrees with and relies upon the analysis by GT and AJP in their opposition memo regarding causation, attachment and the so called "missed opportunity" by ISG.

{K0320029.1}                                     1

Barber, because ISG did not produce the underlying account records with its Initial Disclosure. But even if we assume the ISG-prepared summaries are accurate reflections of the account balances, transfers and dates, there in no evidence in the record that the funds in the listed Abn Amro Bank concentration/sweep accounts were in fact ISG's investment, or whether they were funds of the other investors, or funds of third party(s), or a mixture of any of these. Indeed, the summary attached as Exhibit I to Barber's affidavit shows that the concentration account at Abn Amro was opened in January, 1998, many months <u>before</u> ISG even invested funds with COB. Exhibit I also shows that that millions of dollars were deposited, and withdrawn and paid to various entities, in the months <u>before</u> ISG's investment fund was transferred to this account. The very fact that this was a concentration account, *i.e.* an account holding funds of various entities, belies ISG's assertion that any balance that existed in the account after August, 1999 was clearly the property of ISG. At the least, ISG has presented no evidence to show this to be a fact.

If we assume that the Abn Amro account contained some portion of ISG's investment funds after August, 1999, ISG has not established that it was actually damaged by any alleged inaction of Pappalardo to "attach" the account. ISG complains that defendants should have taken action at that time to "freeze" the assets that were in the Abn Amro concentration and sweep accounts.[2] ISG assumes that COB authorized or directed that such a legal action be filed, but COB never directed its attorneys to take that action, who, of course, could not institute litigation without client authorization. ISG further assumes that a prejudgment attachment action to "freeze" the Abn Amro account would have been successful which is unlikely and unproven. *See Michaels Elec. Supply Corp. v. Trott Elec. Inc.*, 231 A.D.2d 235, 634 N.Y.S.2d 839 (2d Dept. 1996) (because attachment is in derogation of common law, "the courts have strictly

---

[2] ISG once again misstates the record by claiming that "defendants failed to take the very actions they told Corporation of the Bankhouse were absolutely required, i.e. immediate freezing of assets." *See* ISG Motion at 4. The letter to COB that ISG cites for this proposition was actually from Steven Burr of Greenberg Traurig, not from "defendants". Moreover, that letter from a corporate lawyer, not a litigator, is far short of proof that attachment was an appropriate course of action or even feasible, much less that funds could have been attached.

{K0320029.1}                                          2

construed the attachment statute in favor against whom it may be employed"). But even if the Court speculates that COB authorized the filing of a suit and an attachment action in August, 1999 (which it did not) and further speculates that the attachment action would have been successful, ISG has not shown it suffered actual damage by the failure to file an earlier attachment action.

ISG has sued Abn Amro Bank and FMB Bank. It is seeking compensatory damages of $16.7 million (interestingly, its investment with COB was only $4 million), prejudgment interest, and punitive damages of not less than $60 million, plus costs and attorneys' fees. *See* Exhibit 2 to Affidavit of Matthew P. Garvey. ISG has a pending suit against a financially viable defendant.[3] The freezing of assets which ISG speculates about would not transfer the funds to ISG, but would simply be security for any judgment that ISG might obtain at a later date. ISG does not contend that any judgment it may be awarded against Abn Amro, or FMB, would be uncollectible. Following ISG's argument to the only logical conclusion, ISG would incur damage from the alleged failure to "freeze" the accounts in August, 1999 (giving ISG the benefit of inferences from all of the speculation discussed above) only when, and if, ISG is successful in its action against Abn Amro and FMB but is unable to collect the judgment. There is simply no basis in this record to support ISG's speculation that it was damaged by the lack of freezing of assets even accepting *arguendo* ISG's speculation and unproven assumptions that some assets could have been frozen to secure the payment of an eventual judgment against the Bank. The "freezing" issue is not grounds for reconsideration here.

**II. The Court correctly concluded that ISG failed to establish the existence of a "missed opportunity" to sell its investment to St. Fredrickslund Holdings ("SFH").**

---

[3] Abn Amro's website (www.abnamro.com) states that it is the 11th largest bank in Europe and 20th largest in the world, with assets of over 880 billion euros. It is hard to fathom why a court would freeze two or three million dollars in funds to secure payment of a judgment against a defendant with billions of dollars of assets—and ISG has not made a showing beyond speculation that such a meaningless freeze was obtainable.

{K0320029.1}                              3

ISG next argues that the Court erred in its conclusion that ISG offered "no persuasive argument for a cause and effect relationship between delayed prosecution and the missed opportunity to sell its investment interest to SFH, a COB co-investor." *See* January 30, 2006 Memorandum of Decision p. 5. ISG is disapproving of the fact that the Court "focused on the affidavit of Frank Hansen, CEO of SFH", in reaching that conclusion. *See* ISG Motion p. 7. But we remind the Court that ISG is the party who procured and submitted the Hansen affidavit, not defendants. As the Court correctly held, the Hansen affidavit "neither asserts nor implies, in spite of plaintiff's characterization, that SFH declined to purchase as a result of defendants' delayed prosecution." Memorandum of Decision p. 6. Since the Hansen affidavit failed to support ISG's argument that it missed an opportunity to sell its investment interest to SFH, the insufficiency of evidence submitted to the Court lies at the feet of ISG.

In addition, it is telling that neither Christopher Barber nor Philip Clark, the two principals and directors of ISG, made any mention of a purported "missed opportunity" in their lengthy affidavits submitted in opposition to defendants' summary judgment motions. Barber did not claim that he ever attempted to negotiate a sale of ISG's investment interest to SFH. Nor did Clark. There is no evidence that a proposed sale was ever contemplated by ISG, that there were even preliminary discussions between ISG and SFH about such a sale, or that SFH "declined" a proposed sale. The supposed "lost opportunity" is sheer speculation.[4] There is no basis to modify the Court's conclusion.

### III. The Court correctly concluded that defendants' failure to file a suit on ISG's behalf was not the proximate cause of any loss to ISG, because ISG had sufficient information and its own legal counsel to commence a suit.

ISG's next argument is simply another attempt to explain away its delay in initiating its own suit against Abn Amro Bank and FMB bank, even though ISG admitted that it retained

---

[4] We also note that Hansen of SFH states that the possibility of such a buyout would have been contingent on ISG having separate legal counsel from COB. ("had ISG been separately represented . . ."). This is 180 degrees opposite to ISG's theory of the case – that it allegedly relied on Pappalardo as its counsel.

{K0320029.1}                                                    4

independent legal counsel, Kathleen Stone, Esq., many months before any statute of limitations would expire against the banks or the other persons and entities involved in the depletion of funds. This argument was fully addressed in the prior briefs and at oral argument and there is no good reason to revisit it. Even if there was a reason to consider ISG's re-argument of the same point, it is still clear, as a matter of law, that Pappalardo's alleged failure to initiate an action on behalf of ISG was not a proximate cause of any damage to ISG. ISG had plenty of time, through its own counsel, to initiate a timely suit and, in fact, has pending, viable suits against Abn Amro Bank and FMB Bank.

The claim that ISG lacked sufficient information about the fund transfers and related events to institute its own suit against third parties is directly contradicted by admissions and statements made by ISG in its own documents. There are many examples in the affidavits and declarations submitted with the summary judgment motions. We note only a few here:

(1) A September 28, 1999 letter from Clark indicates that ISG believed that $3,000,000 of its money had been "improperly removed" from the Abn Amro account and that the "directors of ISG . . . have communicated formally with ABN AMRO Bank requesting details of transfers and correspondence with respect to the amount." *See* Clark Affidavit Exhibit D.

(2) An October 1, 1999 memorandum records that Clark of ISG reported that ISG's own attorneys in the Netherlands had "gained, together with Belgian authorities, access to the ABN-AMRO/COB master account" and that their review of that information indicated activities "which could be viewed as a breach of fiduciary responsibilities by all involved, including ABN-AMRO." Clark also revealed his plans to meet with senior officials of Abn Amro Bank and "stated that the bank has violated it's covenants of non depletion, signature verification and account administration . . .". Clark also planned to meet with Belgian criminal authorities and had provided them with a "60-page brief to assist further investigation" of Abn Amro. *See* Pappalardo Declaration Exhibit E.

{K0320029.1}                                              5

(3) On March 30, 2000, Clark told Pappalardo that ISG was "considering direct dealings with [Abn] Amro Bank immediately." *See* Pappalardo Declaration Exhibit C.

(4) An April 7, 2000 letter from Clark discusses his imminent meeting with a Belgian investigating judge (along with two attorneys representing ISG) and describes detailed financial information already obtained by ISG concerning the loss of its investment. *See* Pappalardo Declaration Exhibit F. On April 17, 2000, Barber of ISG sent a copy of a report (obtained in the above-described meeting with Belgian authorities) to Pappalardo which detailed the transactions from the Abn Amro account. Barber's handwritten note on this report asked Pappalardo to contact Clark "who would be able to give a great deal more" information. *See* Clark affidavit Exhibit K.

(5) ISG was also aware of and had access to the December 2001 lawsuit filed by another investor against COB. *See* Pappalardo Declaration ¶ 14 and Exhibit Q. The complaint filed in that suit contained multiple exhibits with information about the transactions and fund dissipation at issue in this case, including a memorandum from Pappalardo which laid out in substantial detail the events, persons, banks, and account numbers involved in the depletion of ISG's investment funds. *See* Pappalardo Declaration Exhibit Q, Attachment 9.

Moreover, ISG previously argued that ISG supposedly could not have brought suit against the banks (or others) until it received the Deed of Assignment. The assertion is simply incorrect. Federal and state procedural rules allow a plaintiff to join another party who refuses to participate in the suit and whose rights or obligations may be implicated. So if ISG had timely decided to file suit against the banks or others, it could have joined COB as an involuntary plaintiff if COB refused to initiate the suit. *See, e.g.* Fed.R.Civ.P. 19(a) (permitting joinder of party as an involuntary plaintiff where needed for just adjudication); *see also* New York C.P.L.R. 1001(a) ("When a person who should join as a plaintiff refuses to do so he may be made a defendant.") Equally importantly, ISG could have joined some or all of these third parties in its

{K0320029.1}                                                                 6

suit against COB which was commenced in this Court in March, 2002. The failure of ISG's successor counsel to timely file suit against the banks or to use available procedural devices to overcome any "complication" in suing such parties is not conduct that can be attributed to defendants.[5]

**IV. The Court did not err is ruling that the conversion claim against ESCM is barred by the statute of limitations.**

The transfer of funds by COB to an ESCM account which forms the basis for ISG's conversion claim against ESCM took place in May, 1998. ISG has specifically admitted that at least by April, 2000, ISG acquired actual knowledge of the May, 1998 transfer.

ISG's principal, Clark, states in his sworn affidavit that "[i]n April, 2000, as a result of investigations by authorities in Belgium, ISG . . . learned that [James] Pomeroy [of COB] may have also been actively involved in the dissipation of ISG's funds, including the transfer of $821,500 to ESCM." *See* Clark Affidavit ¶ 12 (emphasis added). Clark further states that he sent a letter to Pappalardo "detailing the results of the investigation, including the revelation that Pomeroy was making representations to ISG regarding profits when, in fact, amounts in ISG accounts were depleted and some of ISG's money was transferred to ESCM". *Id.* (emphasis added).

Clark also attached Exhibit K to his affidavit, which is a document bearing a fax date of April 17, 2000 and the hand written note: "To John Pappalardo, Details as mentioned in earlier fax, From Chris Barber ISG." Exhibit K contains a report by a Belgium investigating judge that was obtained by ISG as part of its independent investigation in 1999 and 2000 into the facts leading to the loss of its investment funds. Among other things, Exhibit K lists specific transfers that "drained away" the funds from the Abn Amro Bank account where the ISG funds were

---

[5] This conclusion is even stronger as to ESCM. ISG's own theory of the case is that Pappalardo could and should have filed suit after he left ESCM.

{K0320029.1}                                          7

maintained. Included in this list of alleged misappropriations of ISG funds is a specific description of the precise transfer that is the basis for ISG's conversion claim:

> "29th May, 1998: USD 821,500 to MELLON BANK, Pittsburgh, USA, account: 1628234 ABA 043000261, holder ECKERT DEMANS CHERIN & MELLOT" [sic]"

The <u>undisputed</u> evidence submitted to the Court is that ISG became aware of the events that form the basis of its conversion claim by at least April 17, 2000. All that is required for a cause of action for conversion to accrue is the wrongful exercise of ownership or control over the plaintiff's property. *MacCleave v. Merchant*, 15 Mass. L. Rep. 315, 2002 Mass. Super. LEXIS 392 (Mass. Super. Ct. 2002). A cause of action for conversion accrues on the happening of an event likely to put the plaintiff on notice. *Id.*, citing *Hendrickson v. Sears*, 365 Mass. 83, 89-90, 310 N.E.2d 131 (1974). A conversion action must be brought within three years after the cause of action accrues. M.G.L. ch. 260, 2A. ISG thus had until April 17, 2003 to file its conversion claim against ESCM. However, the date of filing of ISG's action against ESCM was June 24, 2004.[6] ISG's claim was filed more than a year late. Accordingly, the Court's ruling that the conversion claim against ESCM is time-barred is manifestly correct and should not be modified.

In an attempt to avoid these obvious and undisputed facts, ISG once again incorrectly argues that the statute of limitations was tolled by the so-called continuing representation doctrine. This contention was fully briefed and argued in the summary judgment proceeding, and was ultimately rejected by the Court. ISG now argues that a recent decision from a division of California's intermediate appellate court calls this Court's ruling into question.

The decision of the Second Division of the California Court of Appeals in *Beal Bank SSB v. Arter & Hadden, LLP,* 2006 Cal. App. LEXIS 12 (January 10, 2006) simply shows that there is currently a split of opinion among divisions of that court as to whether California's one year legal malpractice statute of limitations is tolled as to a potential claim against an attorney's

---

[6] Although ISG's Complaint here was actually filed on September 15, 2004, ISG and ESCM have agreed that the Complaint should be deemed filed as of June 24, 2004 for statute of limitations purposes.

{K0320029.1}                                     8

former law firm if the attorney continues to represent the client on the same matter while at his new firm. *Compare Crouse v. Brobeck, Phleger & Harrison,* 67 Cal. App. 4th 1509 (1998) (statute of limitations not tolled as to former law firm). While this split of opinion among the divisions is yet to be resolved by the California Supreme Court, the *Beal* decision is in no way binding on this Court.[7]

What is controlling with regard to our case here is <u>Massachusetts</u> law concerning the so-called continuing representation doctrine. The controlling law was explained in ESCM's prior briefs, but is totally ignored by ISG in its Motion for Reconsideration. In Massachusetts, "the continuing representation doctrine . . . <u>has no application</u>, however, where the client actually knows that he suffered appreciable harm as a result of his attorney's conduct. If the client has such knowledge then there is no 'innocent reliance which the continued representation doctrine seeks to protect." (emphasis added) *Lyons v. Nutt,* 436 Mass. 244, 250, 763 N.E.2d 1065, 1070 (2002), quoted with approval in *Feddersen v. Garvey,* 427 F.3d 108 (1st Cir. 2005). *See also Cantu v. St. Paul Cos.*, 401 Mass. 53, 57, 514 N.E.2d 666 (1987) (finding legal malpractice action accrued when doctor first learned his attorneys failed to notify his excess insurance carrier of a potential claim, not at a later date when he replaced his attorneys and hired different ones).

Here, the events giving rise to the conversion claim and allegedly harming ISG (*i.e.* ESCM's May, 1998 receipt of funds from its client, COB, that allegedly belonged to ISG) were admittedly within ISG's actual knowledge more than four years before its filed suit against

---

[7] The better view is that the continuing representation doctrine cannot toll the statute of limitations with respect to the former firm because that firm has no control over a departing lawyer and indeed it would be inappropriate for the former firm to attempt to inject itself into the relationship between the departing lawyer and the client. This conclusion is even stronger here where the alleged attorney client relationship between Pappalardo and ISG supposedly arose by implication without any file being opened, engagement letter or billing or fees paid so that ESCM's books and records did not show any relationship to ISG. However, as noted in the body of this brief, there is no reason to reach this aspect of the continuing representation doctrine since under Massachusetts law it is manifestly clear that this doctrine has no application to this case because ISG, the purported client, actually knew that it suffered harm more than four years before it filed suit against ESCM.

{K0320029.1}                                                    9

ESCM. The continuing representation doctrine has no application under these admitted facts and controlling Massachusetts law.

### V. The M.G.L. 93A, § 11 claim is also barred by the expiration of the statute of limitations.

ISG's last argument is that the conversion claim against ESCM should be have been allowed to proceed under M.G.L. ch. 93A §11. While it is doubtful that a time-barred conversion claim can be converted into a 93A claim, there is no need to reach that issue here because any supposed 93A claim is also time-barred by the 93A statute of limitations. As discussed above, ISG has admitted it knew of the alleged events giving rise to the conversion claim by at least by April, 2000. The statute of limitations for a 93A action is four years. ISG did not file suit until June 24, 2004, more than four years after its purported claim arose.

### VI. Conclusion

For all of the above reasons, ISG's Motion for Reconsideration or Relief From Judgment should be denied.

Respectfully submitted,

ECKERT SEAMANS CHERIN & MELLOTT, LLC

By its attorneys,

*/s/ Devorah Levine*

William B. Mallin, General Counsel (admitted pro hac vice)
Timothy S. Coon, Esq. (admitted pro hac vice)
Eckert Seamans Cherin & Mellott, LLC
600 Grant Street, 44th Floor
Pittsburgh, PA 15219
412-566-6000
and
Devorah A. Levine, Esq. (BBO #650813)
Eckert Seamans Cherin & Mellott, LLC
One International Place, 18th Floor
Boston, MA 02110-2602
617-342-6800

CERTIFICATE OF SERVICE
I hereby certify that a true copy of the above document was served upon the attorney(s) of record for each party by ~~mail~~ E-filing ~~(hand)~~ on 2/22/06
/s/ Devorah Levine